ORAL ARGUMENT NOT YET SCHEDULED

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

## No. 15-3015

_____

### UNITED STATES OF AMERICA,

*Appellee*,

v.

### RODNEY CLASS,

*Appellant.*

_____

Appeal from the United States District Court
for the District of Columbia

_____

## OPENING BRIEF OF COURT-APPOINTED AMICUS CURIAE
## IN SUPPORT OF APPELLANT

DAVID W. DEBRUIN
JESSICA RING AMUNSON
R. TRENT MCCOTTER
JENNER & BLOCK LLP
1099 New York Ave., NW
Suite 900
Washington, DC 20001
(202) 639-6000
ddebruin@jenner.com
jamunson@jenner.com
tmccotter@jenner.com

November 20, 2015

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### (A)    PARTIES AND AMICI

Defendant-Appellant Rodney Class was initially represented before the United States District Court for the District of Columbia by counsel Lara Quint and A.J. Kramer of the Office of the Federal Public Defender for the District of the District of Columbia.  Mr. Class later appeared *pro se*, with Mr. Kramer serving as stand-by counsel.  Plaintiff-Appellee is the United States of America.  David W. DeBruin of Jenner & Block LLP was appointed by this Court to serve as an *amicus curiae* to present arguments in support of Mr. Class.

### (B)    RULING UNDER REVIEW

The rulings under review are (1) Judge Kessler's April 16, 2014, Memorandum Opinion and Order denying Mr. Class's motions to dismiss the indictment, which appears in the Joint Appendix ("J.A.") at J.A.70–J.A.100; and (2) Chief Judge Roberts's October 27, 2014, oral pronouncement denying Mr. Class's motions to dismiss the indictment, which appears at J.A.142–J.A.151.[1]

---

[1] All references to the J.A. are to the Joint Appendix accompanying this brief. *Amicus* coordinated the J.A. with counsel for the United States of America.  *See* D.C. Cir. Rule 24(c).

**(C)    RELATED CASES**

This case has not previously been before this Court.  *Amicus* is not aware of

any pending, related cases.


November 20, 2015                                Respectfully submitted,

                                                /s/ David W. DeBruin

                                                DAVID W. DEBRUIN
                                                JESSICA RING AMUNSON
                                                R. TRENT MCCOTTER
                                                JENNER & BLOCK LLP
                                                1099 New York Ave., NW
                                                Suite 900
                                                Washington, DC 20001
                                                (202) 639-6000
                                                ddebruin@jenner.com
                                                jamunson@jenner.com
                                                tmccotter@jenner.com

ii

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES............................................................1

STATUTES AND REGULATIONS .......................................................2

STATEMENT OF THE CASE................................................................2

    A.  Factual Background ........................................................4

    B.  Procedural History ..........................................................7

SUMMARY OF ARGUMENT ............................................................13

STANDARD OF REVIEW .................................................................15

ARGUMENT .....................................................................................15

I.    MR. CLASS CAN CHALLENGE HIS UNDERLYING CONVICTION. ......15

II.   AS APPLIED TO MR. CLASS, THE GUN BAN VIOLATES THE SECOND AMENDMENT. ..............................................................16

    A.  There Is A Right To Bear Arms Outside Of The Home. ............................18

       1.  The Text Of The Second Amendment Provides A Right To Bear Arms Outside Of The Home. .................................................19

       2.  The Core Purpose Of The Second Amendment Is To Provide For Self-Defense, Which Is Just As Relevant Outside Of The Home........21

       3.  Historical Evidence Also Supports The Right To Bear Arms Outside Of the Home........................................................................23

    B.  The Gun Ban Should Be Subjected To Strict Scrutiny Because It Prohibits Law-Abiding Citizens From Exercising Self-Defense By Possessing Any Weapon In A Public Area. ................................25

    C.  As Applied To Mr. Class, The Gun Ban Fails Heightened Scrutiny. .........30

       1.  The Gun Ban Does Not Serve An Especially Strong Interest...............30

       2.  As Applied To Mr. Class, The Gun Ban Is Overbroad.........................32

a.   What: The Gun Ban Prohibits All Firearms. ...........................33

b.   Who: The Gun Ban Disarms All Law-Abiding Citizens—
     Even Citizens With A Concealed Carry Permit. .....................34

c.   Where: The Gun Ban Disarms All Citizens In A Parking
     Lot That Is Not A "Sensitive Place." ........................................37

     i.   *Heller I* And *McDonald* Speak Only To Gun Bans "*In*
          Sensitive Places." ...............................................................37

     ii.  The Maryland Avenue Parking Lot Is Not In A
          Sensitive Place. ..................................................................39

     iii. It Does Not Matter That The Government Owns The
          Maryland Avenue Parking Lot. ...........................................46

d.   When: The Gun Ban Applies All Day, Every Day—Even
     When Congress Is Not In Session..............................................48

III. THE GUN BAN IS VOID FOR VAGUENESS. ..............................................51

CONCLUSION .......................................................................................................56

iv

## TABLE OF AUTHORITIES

CASES

*Bonidy v. U.S. Postal Service*, 790 F.3d 1121 (10th Cir. 2015) ...18, 19, 20, 21, 22, 23, 25, 34, 35, 36, 39, 40, 42, 43, 45, 46, 47

*Bonidy v. U.S. Postal Service*, No. 10-CV-02408-RPM, 2013 WL 3448130 (D. Colo. July 9, 2013) ........................................................................49

*Bridgeman v. United States*, 229 F.3d 589 (7th Cir. 2000) ..............................15, 16

*District of Columbia, v. Heller*, 554 U.S. 570 (2008) ............. 3, 18, 21, 22, 23, 24, 27, 29, 33, 34, 35, 37

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) ...................................20, 21, 22, 36, 40

*GeorgiaCarry.Org, Inc. v. Georgia*, 764 F. Supp. 2d 1306 (M.D. Ga. 2011) ..........................................................................................................41

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)..16, 17, 19, 21, 25, 26, 27, 28, 29, 30, 33, 37, 40, 49, 50

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015).......16, 18, 27, 28, 30

*Initiative & Referendum Institute v. U.S. Postal Service*, 417 F.3d 1299 (D.C. Cir. 2005) .........................................................................47

*Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C. 1972) ....................................................................39, 40, 44

*Johnson v. United States*,135 S. Ct. 2551 (2015) ...........................................51, 56

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012)..........................19

*Klein v. San Diego County*, 463 F.3d 1029 (9th Cir. 2006) ...................................55

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) .......................................................31

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ................9, 21, 25, 26, 37, 45

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ......................................19, 21, 22

*Morris v. U.S. Army Corps of Engineers*, 60 F. Supp. 3d 1120 (D. Idaho 2014) ...................................................................................48

*Morris v. U.S. Army Corps of Engineers*, 990 F. Supp. 2d 1082 (D. Idaho 2014) ......................................................................28, 36, 48

*National Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185 (5th Cir. 2012) ................................ 28-29

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015) .................................................................................51

*Nordyke v. King*, 563 F.3d 439 (9th Cir. 2009) ......................................................41

*Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014) ...........11, 19, 50

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) ............................20

*People v. Aguilar*, 2 N.E.3d 321 (Ill. 2013) ....................................................19, 22

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014) ........................19, 23

*Puckett v. United States*, 556 U.S. 129 (2009) ......................................................15

*Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013) .........................................27, 28

*In re Sealed Case*, 702 F.3d 59 (D.C. Cir. 2012) .............................................15, 16

*State v. Reid*, 1 Ala. 612 (1840) ..............................................................................34

*Tyler v. Hillsdale County Sheriff's Department*, 775 F.3d 308 (6th Cir. 2014) .................................................................................26

*United States v. Adkins*, 743 F.3d 176 (7th Cir. 2014) ...........................................51

*United States v. Chester*, 628 F.3d 673 (4th Cir. 2010) ..........................................28

*United States v. Dorosan*, 350 F. App'x 874 (5th Cir. 2009) ..................................41

*United States v. Grace*, 461 U.S. 171 (1983) ........................................................53

*United States v. Guillen*, 561 F.3d 527 (D.C. Cir. 2009) .......................................15

*United States v. Huitron-Guizar*, 678 F.3d 1164 (10th Cir. 2012) ..........................33

*United States v. Mahdi*, 598 F.3d 883 (D.C. Cir. 2010) ..........................................50

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011)............................20, 22

*United States v. Nieves-Castano*, 480 F.3d 597 (1st Cir. 2007) .............................55

*United States v. Ringling*, 988 F.2d 504 (4th Cir. 1993) .........................................15

*United States v. Williams*, 616 F.3d 685 (7th Cir. 2010).........................................37

*United States v. Yakou*, 428 F.3d 241 (D.C. Cir. 2005)...........................................15

*Washington Mobilization Committee v. Cullinane*, 566 F.2d 107 (D.C. Cir. 1977) ...........................................................................................................51, 54

## CONSTITUTIONAL PROVISIONS AND STATUTES

U.S. Const. amend. V...................................................................................................51

18 U.S.C. § 922(q)(2)(A) ..........................................................................................54

18 U.S.C. § 930.............................................................................................................32

18 U.S.C. § 930(h) .......................................................................................................55

18 U.S.C. § 3231 .............................................................................................................1

28 U.S.C. § 1291 .............................................................................................................1

40 U.S.C. § 5104(e) .........................................................................................1, 2, 8, 11

Act of July 1, 1882, 22 Stat. 126, § 5 .................................................................24, 33

Act of Oct. 20, 1967, Pub. L. No. 90-108, 81 Stat. 276 (Oct. 20, 1967)................24

D.C. Code § 22-4504(A)..........................................................................................7, 8

Kan. Stat. Ann. § 75-7c10(f)......................................................................................31

Ky. Rev. Stat. Ann. § 237.110(16)(d)........................................................................31

Minn. Stat. § 609.66(1g)(b)(2).....................................................................................31

N.C. Gen. Stat. § 14-415.12(b)(1) – (11)...................................................................35

N.C. Gen. Stat. § 14-415.13 .......................................................................35

N.C. Gen. Stat. § 120-32.1(c1) ................................................................31

Or. Rev. Stat. Ann. § 166.370(3)(g) ..........................................................31

Tex. Gov't Code Ann. § 411.0625 .............................................................31

Utah Admin. Code R131-3-4(4) .................................................................31

Wash. Rev. Code Ann. § 9.41.300 .............................................................31

OTHER AUTHORITIES

36 C.F.R. § 327.13 ....................................................................................28

1 William Blackstone, Commentaries ........................................................23

4 William Blackstone, Commentaries ........................................................24

Brief of the District of Columbia, *Wrenn v. District of Columbia*, No.
    15-7057 (D.C. Cir. Aug. 27, 2015)......................................................39

Fed. R. App. P. 4(a)(2)................................................................................1

Amy Hetzner, *Where Angels Tread: Gun-Free School Zone Laws and
    an Individual Right to Bear Arms*, 95 Marq. L. Rev. 359 (2011) .......38

David Kopel, *Bonidy v. United States: The Second Amendment at the
    Post Office*, Wash. Post, Oct. 2, 2014.................................................43

Eugene Volokh, *The First and Second Amendments*, 109 Colum. L.
    Rev. Sidebar 97 (2009) ........................................................................24

*Eugene Volokh, *Implementing the Right to Keep and Bear Arms for
    Self-Defense: An Analytical Framework and a Research Agenda*,
    56 UCLA L. Rev. 1443 (2009).........................................38, 43, 44, 49

U.S. House of Representatives Calendar,
    http://www.gpo.gov/fdsys/pkg/CCAL-113hcal-S2/pdf/CCAL-
    113hcal-S2-pt22.pdf .............................................................................5

U.S. Senate Calendar,
    http://www.senate.gov/legislative/resources/pdf/2013_calendar.pdf..................5

Vt. Legislature, Advisory Cmte. on Capitol Security, *Allowance of Handguns Within U.S. State Capitol* Buildings (Mar. 11, 2014), *available at* http://tinyurl.com/odpqgej .......................................................31, 32

## JURISDICTIONAL STATEMENT

The United States District Court for the District of Columbia had jurisdiction over this criminal case pursuant to 18 U.S.C. § 3231.  Mr. Class filed a timely notice of appeal from the district court's sentencing pronouncement on February 9, 2015, and its judgment issued March 4, 2015.[2]   This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether Mr. Class's conviction under 40 U.S.C. § 5104(e) violates the Second Amendment, as applied to a law-abiding adult citizen's right to keep legally-owned firearms in his vehicle parked in an unsecured, publicly-accessible parking lot.

2.     Whether Mr. Class's conviction under 40 U.S.C. § 5104(e) can be sustained where the statute is unconstitutionally vague because it fails to give fair warning to reasonably intelligent persons as to the locations where firearms are banned and because it does not require the government to prove a defendant's scienter of same.

---

[2] Mr. Class's notice of appeal was filed on February 13, 2015, but it is "treated as filed on the date of and after the entry" of the district court's official judgment, which was March 4, 2015.  *See* Fed. R. App. P. 4(a)(2).

1

## STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the addendum to this brief.

## STATEMENT OF THE CASE

This case concerns whether the Second Amendment extends outside of the home to protect a law-abiding adult citizen's ability to keep legally-owned firearms in his vehicle while parked in a publicly-accessible, unsecured parking lot. Mr. Class was convicted on one count of violating 40 U.S.C. § 5104(e) (the "Gun Ban"), which states that it is a crime to "carry on or have readily accessible to any individual on the [Capitol] Grounds or in any of the Capitol Buildings a firearm, a dangerous weapon, explosives, or an incendiary device." 40 U.S.C. § 5104(e)(1)(A)(i). While he was visiting the Capitol, Mr. Class parked about 1,000 feet away on the 200-block of Maryland Avenue SW in a parking lot that is designated as being within the "Capitol Grounds," an expansive area of approximately 290 acres that includes not only the Capitol itself but also portions of thirty public streets and twelve parking lots in the general vicinity of the Capitol. Secured in his vehicle out of plain view were three legally-owned firearms. Mr. Class never carried the weapons on his person, but when he returned to his vehicle after visiting the Capitol building, he found officers waiting for him at his vehicle, and he was arrested and convicted for violating the Gun Ban.

In the district court, the government argued that it can ban all citizens from possessing any weapon on government property. Mr. Class argued that the Second Amendment protects his ability to keep weapons for self-defense inside his vehicle. His weapons were all legally owned, and he has a permit from North Carolina (his home state) to carry a concealed weapon. He has no history of mental illness or violence, nor did he have any prior felonies or other serious crimes. The Maryland Avenue parking lot is about 1,000 feet from the entrance of the Capitol building, and the parking lot has no restricted access or heavy security presence: hundreds of buses, cars, bikes, and pedestrians travel through that exact area every day. Congress was not in session the entire week when Mr. Class came to Washington. Mr. Class thus argued that the area where he parked is not "in [a] sensitive place[]" where guns may presumptively be banned. *District of Columbia, v. Heller* ("*Heller I*"), 554 U.S. 570, 626 (2008). Mr. Class further contended that effectively disarming him in this area defeated his right to self-defense as guaranteed by the Second Amendment. The district court disagreed and rejected Mr. Class's Second Amendment arguments, concluding that the entire Capitol Grounds are a sensitive place.

Mr. Class also raised issues regarding his *mens rea*. Construing his *pro se* arguments liberally, Mr. Class argued that the Gun Ban risks ensnaring innocent conduct because a person of reasonable intelligence would not know what acts the

3

Gun Ban prohibits, and the statute is thus unconstitutionally vague.  Mr. Class argued that he was not aware that the parking lot was on "Capitol Grounds," raising the issue that the statute fails to give fair warning to people of reasonable intelligence about where the boundaries of the Capitol Grounds actually are.  The statute defines the "Grounds" primarily by reference to a 1946 map that must be obtained from the D.C. Surveyor's office.  That map actually shows that the Maryland Avenue parking lot is *not* part of the Capitol Grounds.  However, over the course of time, the Grounds have been expanded by statutes-at-large to include the Maryland Avenue parking lot and curbs.  The government concedes that there were no signs indicating that the parking lot was considered to be "Capitol Grounds," or that weapons were prohibited there.  The government also concedes that there is no *mens rea* requiring that a person know or even suspect that he is on the Capitol Grounds.  Thus, anyone with a weapon in his vehicle who is driving down any of the dozens of streets within the "Capitol Grounds" has committed a felony.  The district court implicitly rejected Mr. Class's arguments on this issue.

### A.    Factual Background

On May 30, 2013, Mr. Class was driving from Virginia to visit a friend in Pennsylvania.  Mr. Class stopped in Washington, D.C., to visit the U.S. Capitol.

4

May 30, 2013, was a Thursday, and neither the House nor Senate were in session that entire week.[3]

At about 11:30 AM, Mr. Class parked his Jeep on the 200 block of Maryland Avenue SW, which is located just north of the Botanic Gardens and approximately 1,000 feet from the entrance to the Capitol building. J.A.162, ¶ 1. Mr. Class has parked in this same lot several times in the past. J.A.128. The parking lot is publicly accessible during both weekends and weekdays, but on weekdays a permit is usually required to park there. J.A.128. It is undisputed that there is "no sign that states this is Capitol Grounds" nor is there any sign indicating that weapons are prohibited. J.A.125 n.1.

Mr. Class locked his vehicle and walked (unarmed) to visit the House and Senate buildings. J.A.125. Approximately an hour later, Capitol Police Officer Laneeka Manning noticed that Mr. Class's vehicle had North Carolina plates. *Id.*; ECF No. 87-3 at 2.[4] She determined that the car did not have a parking permit on the front windshield. J.A.125. She also noticed what looked like a large blade attached inside the roller bar of the vehicle and what appeared to be an empty gun

---

[3]        *See*        2013        U.S.        Senate        Calendar, http://www.senate.gov/legislative/resources/pdf/2013_calendar.pdf; 2013 U.S. House of Representatives Calendar, http://www.gpo.gov/fdsys/pkg/CCAL-113hcal-S2/pdf/CCAL-113hcal-S2-pt22.pdf.

[4] All references to "ECF" refer to the district court docket in *United States v. Class*, No. 1:13-cr-253-RWR (D.D.C).

holster in the driver's door in the map pocket. *Id.*; J.A.162, ¶ 1. Using the license plate, Manning determined that the vehicle was registered to Mr. Class. J.A.125. She radioed for additional officers to assist her. *Id.*

Mr. Class returned to his vehicle around 1:21 PM. J.A.162, ¶ 2. An officer asked Mr. Class if he owned the vehicle, which he acknowledged. J.A.125. An officer also asked Mr. Class if he had any weapons on his person, which he did not. *Id.* An officer then asked if Mr. Class had any weapons in the vehicle, and he freely admitted that he had three firearms inside the vehicle. *Id.* The officer said that "it is illegal to have weapons on Capitol grounds." J.A.126. Mr. Class was arrested and taken to Capitol Police headquarters, where he said that he "travels around the country with his guns and other weapons," *id.*, and that he has a permit issued by North Carolina to carry a concealed weapon. J.A.130.

While Mr. Class was being detained, an officer obtained a search warrant, and Mr. Class's vehicle was impounded and searched later that same day. J.A.162, ¶ 2. Inside the vehicle, there was a large blade attached to the roller bar, as the officer had seen. *Id.* The item that appeared to be a gun holster was actually the sheath of a knife. *Id.* Three firearms were located in the vehicle: (1) a loaded 9mm Ruger pistol, secured out of plain sight inside a bag on the passenger seat, with 92 other rounds in an accompanying box and magazines, J.A.162, ¶ 3; (2) a loaded .44 Taurus pistol, secured out of sight in a bag in the passenger area, with

96 other rounds in the bag and magazine, J.A.162, ¶ 4; and (3) a loaded .44 Henry rifle, secured in a bag between the passenger area and the very rear of the vehicle, with 65 other rounds in the bag and magazine, J.A.162, ¶ 5. There were also several knives in the car. J.A.126.

### B.    Procedural History

On May 31, 2013, Mr. Class was charged in D.C. Superior Court for a violation of D.C. Code § 22-4504(a), carrying a pistol in public without a license. *Id.* He was kept in prison for three days, then released. *Id.* This D.C. Superior Court charge was later dismissed in September 2013. *See District of Columbia v. Class*, No. 2013-CF2-009225 (D.C. Super. Ct.).

On August 15, 2013, Mr. Class took the unusual step of voluntarily testifying to a grand jury for the U.S. District Court for the District of Columbia. J.A.127. He indicated that he had previously parked in the same parking lot without issue, J.A.127–J.A.128, and stated repeatedly that he was not aware that he was parked on the Capitol Grounds, J.A.128–J.A.129. He said "there was no sign" indicating the area was restricted in any way, and he "was just driving in [and] got into a parking lot; that's all I was looking at." J.A.129. He stated that he *later* noticed a permit-parking-only sign when he was arrested, but he "didn't notice it at the time" he parked and left his vehicle to visit the Capitol buildings. *Id.*

7

On September 3, 2013, the grand jury indicted Mr. Class on two charges: one violation of D.C. Code § 22-4504(a); and one violation of 40 U.S.C. § 5104(e)(1)—the Gun Ban.  J.A.28.  Mr. Class surrendered himself on September 5, 2013, and was released on his own recognizance under order from Judge Wilkins.  ECF No. 4.  When Judge Wilkins was elevated to this Court, the case was reassigned to Judge Kessler.  ECF No. 9.  Mr. Class was initially represented by Lara Quint, Assistant Federal Public Defender, who was later replaced by the Federal Public Defender, A.J. Kramer.  On January 27, 2014, Mr. Class moved to represent himself, ECF Nos. 10–11, and Judge Kessler later granted this motion, finding that Mr. Class had knowingly and intelligently waived his right to counsel, ECF No. 52.  Mr. Kramer was appointed as stand-by counsel.  *Id.*

Mr. Class filed numerous *pro se* motions and briefs, many of which raised Second Amendment and lack-of-notice arguments.  For example, in his brief filed on February 18, 2014, Mr. Class sought to have his charges dismissed because "[t]he 2nd Amendment to our Constitution states that 'the Right of the People to keep and bear Arms, shall not be infringed,'" and accordingly "there can be no legislation which would abrogate (abolish) them."   J.A.32–J.A.33 (emphasis omitted).  In a brief filed on February 21, 2014, he argued that the statutes under which he was being charged were "unlawful Acts or contravening laws governing the protected rights under the Constitution and the bill of Rights to uphold and

defend the 2nd Amendment." J.A.36; *see also* J.A.43. He also argued that "at no

time did the District of Columbia post signs that warned the people of it[s] Firearm

laws." J.A.39. On March 26, 2014, he filed a motion in which he cited the Second

Amendment and *Heller I*, and he argued that there was a constitutional right for

"an individual to possess a firearm unconnected with service in a militia, and to use

that arm for traditionally lawful purposes, such as self-defense within the home."

J.A.46. He also argued that requiring firearms "be kept nonfunctional even when

necessary for self-defense … violated that right," *id.*, and that his possession of a

"license to 'carry concealed'" weapons offered him protection under the Second

Amendment, J.A.50. In a separate motion filed that same day, he cited *Heller I*

again, as well as *McDonald v. City of Chicago*, 561 U.S. 742 (2010), which

extended *Heller I* to the states, *see id.* at 791 (plurality opinion of Alito, J.).

On April 7, 2014, Judge Kessler held a hearing, where she noted that Mr.

Class had raised numerous arguments for why his indictment should be dismissed,

stating, "I find it hard to imagine that there can be a new argument that you haven't

already made." J.A.55. Mr. Class then presented argument on his motions, and he

argued that he "was well within [his] protected rights of [the] Second

Amendment." J.A.69. Judge Kessler agreed that "[y]ou definitely make your

Second Amendment argument." J.A.58. Mr. Class then raised a lack-of-notice

argument, contending that he had no way of knowing that weapons were forbidden

where he parked: "I thought I was right for coming in. I didn't see no signs coming here that says: Check your arms because your local police department – there's nothing here that says you can't bring anything in." J.A.65.

On April 16, 2014, Judge Kessler issued an order that addressed Mr. Class's filings. J.A.70–J.A.100. While she rejected most of Mr. Class's arguments (including, implicitly, his claim that he had no notice that he was on Capitol Grounds), she stated that "to the extent Defendant challenges his prosecution under the Second Amendment of the Constitution, the Government has not submitted a substantive response to this argument. The Court therefore lacks an adequate record on which to evaluate it." J.A.83. Judge Kessler ordered the government "to file further briefing on this issue." *Id.*; *see also* J.A.92.

On May 1, 2014, the government filed a brief in response to Judge Kessler's order. J.A.101–J.A.121. The government extensively addressed the question of whether the Second Amendment, as interpreted by *Heller I* and *McDonald*, would prohibit Mr. Class's prosecution. J.A.106–J.A.113. The government argued that *Heller I* addressed only the right to keep arms "in the home," and that "'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings'" were still presumptively constitutional. J.A.107–J.A.108 (quoting *Heller I*, 554 U.S. at 626–27). The government claimed that all "government property" is inherently a "sensitive place[]," and thus the government

10

can presumptively ban all weapons from the entirety of the Capitol Grounds. J.A.112.

On May 23, 2014, the case was reassigned to Chief Judge Roberts. ECF No. 94. On August 20, 2014, the government moved to dismiss the charge made under D.C. Code § 22-4504, after that statute was declared unconstitutional by the district court in *Palmer v. District of Columbia*, 59 F. Supp. 3d 173 (D.D.C. 2014). J.A.122. Chief Judge Roberts dismissed that count on September 9, 2014, and a superseding indictment was filed on October 23, 2014. J.A.141.

On October 7, 2014, the government filed a motion for jury instructions on the sole remaining count against Mr. Class: 40 U.S.C. § 5104(e)—the Gun Ban. J.A.124–J.A.135. The government argued that it did not need to prove whether "defendant knew that the area he was in was part of the Capitol Grounds" because "Congress legislated that having firearms on Capitol Grounds … required no such *mens rea* element." J.A.124. The government acknowledged that there was "no sign that states this is Capitol Grounds," but argued there were signs that "indicate permit parking only." J.A.125 n.1. The government also noted that while there were no security stations or barriers in the parking lot, there were "signs of security, including a guard station, and street barriers" at other locations "[w]ithin eyesight." *Id.* The government acknowledged Mr. Class claimed he was unaware he was on Capitol Grounds, but the government concluded that was irrelevant

because "Congress … chose not to include … knowledge and/or intent requirements" in the Gun Ban.  J.A.130.  The government also rejected application of the canon of construction that there is a "general presumption favoring a *mens rea* element in criminal statutes."  J.A.134.  On October 20, 2014, the government filed another jury-instruction motion, which included three pages explaining why the definition of "Capitol Grounds" included the area where Mr. Class parked.  J.A.136–J.A.138.

Chief Judge Roberts set trial for October 27, 2014, but Mr. Class was unable to attend (he wrote a letter to the court stating that he would not appear for trial, but the letter was apparently not discovered until just before the trial was set to begin).  J.A.145.  That same day, Chief Judge Roberts orally denied Mr. Class's Second Amendment arguments, noting that *Heller I* held that firearm bans in "sensitive places such as schools and government buildings" are "presumptively lawful."  J.A.150.  Chief Judge Roberts concluded that the Maryland Avenue parking lot was a "sensitive place" where firearms could presumptively be banned, and "Mr. Class would have to rebut this presumption by showing that there was more than a *de minimis* effect on his exercise of his Second Amendment right."  J.A.151.  The court concluded that Mr. Class had "not provided any evidence to rebut the presumption," and accordingly the court denied the Second Amendment challenge.  *Id.*

12

On November 2, 2014, Mr. Class pleaded guilty to one violation of § 5104(e).  J.A.152–J.A.163.  In his guilty plea, he waived his right to directly "appeal the sentence in this case," but he did not waive his right to directly appeal his underlying conviction.  J.A.157, ¶ 9(C).

On November 21, 2014, Chief Judge Roberts accepted Mr. Class's guilty plea, ECF No. 194 at 31, and on February 9, 2015, Mr. Class was sentenced to time served of twenty-four days, ECF No. 195 at 20.  Mr. Class filed a notice of appeal on February 13, 2015.  J.A.164.  On October 2, 2015, this Court appointed the undersigned as *Amicus* to present arguments in favor of Mr. Class.

## SUMMARY OF ARGUMENT

The Gun Ban is overbroad in practically every sense: what it forbids (all weapons, even lawfully-owned pistols and rifles), who it disarms (all people, regardless of their law-abiding status or their criminal intent), where it applies (wide-open public areas and public streets), and when it applies (24 hours a day, 365 days a year, even when Congress is not in session).  While the Supreme Court has held that the government can presumptively ban weapons "in sensitive places" such as *inside* government buildings, the Court has never held that such bans can extend *outside* the buildings to wide-open, public areas that are 1,000 feet away, nor has the Supreme Court held that the government can ban firearms on its property altogether.  In such places—like the parking lot where Mr. Class

13

parked—there is little or no security, there is no important government business occurring, there is no restricted access, and there are no confined quarters. This is the type of location where the Second Amendment protects a citizen's right to possess firearms for self-defense. If the government's position that it can ban firearms anywhere near a government building were correct, then it could ban firearms essentially anywhere in the District of Columbia on the premise that a government building is nearby, or that the government owns the streets themselves. That cannot be correct. The Gun Ban as applied to Mr. Class violates the Second Amendment.

The Gun Ban also runs afoul of the Due Process Clause. As the law stands, any law-abiding citizen parking near the Botanic Gardens or driving down Constitution Avenue (or any of the other twenty-nine streets included within the Capitol Grounds) with a legally-owned weapon carried inside his vehicle has committed a felony—regardless of who he is, what type of gun it is, what he intended to use the gun for, or whether he even knew he was on the Capitol Grounds. This kind of broad, overbearing restriction is incompatible with the basic notions of fair play protected by the Due Process Clause.

For these reasons, this Court should vacate Mr. Class's conviction.

14

## STANDARD OF REVIEW

This court reviews *de novo* constitutional challenges to a criminal statute. *See United States v. Yakou*, 428 F.3d 241, 246 (D.C. Cir. 2005).

## ARGUMENT

## I.     MR. CLASS CAN CHALLENGE HIS UNDERLYING CONVICTION.

As a threshold matter, Mr. Class is not barred from raising arguments on direct appeal for why this Court should vacate his conviction. Even though he entered a guilty plea and waived certain rights, he did not wave his right to directly appeal his underlying conviction.

"[P]lea bargains are essentially contracts," and accordingly are interpreted using general principles of contract construction. *Puckett v. United States*, 556 U.S. 129, 137 (2009). However, "the analysis of the plea agreement must be conducted at a more stringent level than in a commercial contract because the rights involved are generally fundamental and constitutionally based." *United States v. Ringling*, 988 F.2d 504, 506 (4th Cir. 1993). If there is any "ambiguity in a  plea agreement," it must be "construed against the drafting party; in this case, the government." *In re Sealed Case*, 702 F.3d 59, 63 n.2 (D.C. Cir. 2012).

Further, it is well-recognized that a defendant can waive his right to appeal just his sentence, *see United States v. Guillen*, 561 F.3d 527, 529–30 (D.C. Cir. 2009), and this does not mean that the defendant has also waived his right to challenge his conviction, *see Bridgeman v. United States*, 229 F.3d 589, 591 (7th

Cir. 2000); *see also In re Sealed Case*, 702 F.3d at 63–64 (waiver of right to appeal "sentence" did not waive right to appeal amount of restitution).

Here, Mr. Class is free to challenge his conviction on direct appeal because his plea agreement "only agreed not to contest his *sentence*; the plea agreement is silent as to a waiver of any challenge to his underlying *conviction*." *Bridgeman*, 229 F.3d at 591 (emphasis in original). In Paragraph 9(C) of his plea bargain, Mr. Class pleaded guilty and waived any direct appeal of the *sentence* ultimately imposed, but nowhere did Mr. Class waive his right to directly appeal his *conviction*. J.A.157, ¶ 9(C). Indeed, the very next sub-paragraph makes clear the distinction between challenging a sentence and challenging a conviction: Paragraph 9(D) states that Mr. Class cannot collaterally attack his "sentence *or conviction*." J.A.157–J.A.158, ¶ 9(D).

Accordingly, Mr. Class has not waived his right to directly appeal his underlying conviction.

## II. AS APPLIED TO MR. CLASS, THE GUN BAN VIOLATES THE SECOND AMENDMENT.

As discussed below, the Second Amendment forbids prosecution of a law-abiding adult citizen for storing lawfully owned weapons in a vehicle that is not within any "sensitive place." This Court has adopted a two-step approach for evaluating Second Amendment challenges. *Heller v. District of Columbia* (*"Heller III"*), 801 F.3d 264, 272 (D.C. Cir. 2015); *Heller v. District of Columbia*

16

(*"Heller II"*), 670 F.3d 1244, 1252–53 (D.C. Cir. 2011). The Court first asks "whether a particular provision impinges upon a right protected by the Second Amendment." *Heller II*, 670 F.3d at 1252. If so, the Court "go[es] on to determine whether the provision passes muster under the appropriate level of scrutiny," *id.* at 1252.[5]

As discussed below, the Gun Ban certainly "impinges" upon the Second Amendment right to bear arms outside the home—a right supported by the text, purpose, and history of the Second Amendment and recognized by courts across the country. *See* Part II.A, *infra*. Accordingly, this Court should proceed to the second step, which requires a review of the Gun Ban under "the appropriate level of scrutiny."

Here, the appropriate level is strict scrutiny because the Gun Ban prohibits all law-abiding citizens from possessing firearms in a public area. But even under intermediate scrutiny, the outcome is the same because the Gun Ban is overbroad in terms of what weapons it prohibits (every firearm, as well as knives), who it disarms (every law-abiding citizen, regardless of intent), where it applies (wide-open public parking lots), and when it applies (24 hours a day, 365 days a year, even when Congress is not in session). While the Supreme Court has said that

---

[5] *Heller II* noted that even "longstanding" regulations that are "presumptively lawful" would still proceed to the second step if the regulation has "more than a *de minimis* effect" on a Second Amendment right. 670 F.3d at 1253.

laws banning weapons "*in* … government buildings" are presumptively lawful, *Heller I*, 554 U.S. at 626 (emphasis added), no such presumption applies to parking lots that happen to be in the same general area as government buildings, like where Mr. Class's car was parked.  "[I]t is not enough to say that every government building, lot, or park will be treated the same.  In such a case, we should hesitate before holding a prophylactic general regulation substantially related to its objective."  *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1135 (10th Cir. 2015) (Tymkovich, J., dissenting).

In the end, the Gun Ban fails heightened review as applied to Mr. Class for the simple reason that it is difficult to fathom what compelling governmental interest exists for prohibiting a law-abiding citizen from storing a lawful weapon inside his vehicle in a publicly-accessible parking lot.

## A.     There Is A Right To Bear Arms Outside Of The Home.

The threshold question is whether the Gun Ban impinges any amount on a right protected by the Second Amendment.  *Heller II*, 670 F.3d at 1252–53.  It does.  Relying on the text and purpose of the Second Amendment, as well as relevant historical evidence, courts around the country have concluded that there is a Second Amendment right to bear arms outside of the home.  By prohibiting all firearms and weapons in a wide-open public area, the Gun Ban impinges this core right.

18

### 1.    The Text Of The Second Amendment Provides A Right To Bear Arms Outside Of The Home.

The text of the Second Amendment confirms that the right to bear arms extends outside of the home.  In *Heller I*, the Supreme Court held that to "bear arms" means to "wear, bear, or carry … upon the person or in the clothing or in a pocket, for the purpose … of being armed and ready for offensive or defensive action in a case of conflict with another person."   554 U.S. at 584 (internal quotation marks omitted) (ellipsis in original).  It would certainly have been odd to speak of "bearing" arms in preparation "for offensive … action" *inside of one's own home*.  As the Seventh Circuit stated, "[t]o speak of 'bearing' arms within one's home would at all times have been an awkward usage.  A right to bear arms thus implies a right to carry a loaded gun outside the home."  *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012).  The Tenth Circuit has agreed that "the Second Amendment right is 'to keep and bear' arms, and 'bear' certainly implies the possibility and even the likelihood that the arms will be carried outside the home." *Bonidy*, 790 F.3d at 1125; *accord Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1152–53 (9th Cir. 2014), *vacated pending en banc*, 781 F.3d 1106 (9th Cir. 2015); *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012) ("The plain text of the Second Amendment does not limit the right to bear arms to the home."); *Palmer*, 59 F. Supp. 3d at 181–82 (same); *People v. Aguilar*, 2 N.E.3d 321, 327 (Ill. 2013) (*Heller* and *McDonald* both "contain language strongly suggesting if not

outright confirming that the second amendment right to keep and bear arms extends beyond the home").

Besides the awkward usage of "bearing" arms within one's own home, it is also the case that to "speak of 'bearing' arms solely within one's home … would conflate 'bearing' with 'keeping.'" *Drake v. Filko*, 724 F.3d 426, 444 (3d Cir. 2013) (Hardiman, J., dissenting). Thus, giving effect to all terms in the Second Amendment confirms that "bear" must mean something different than "keep." *See Parker v. District of Columbia*, 478 F.3d 370, 385 (D.C. Cir. 2007) ("The District appears to claim that 'keep and bear' is a unitary term and that the individual word 'keep' should be given no independent significance. This suggestion is somewhat risible in light of the District's admonishment … that when interpreting constitutional text 'every word must have its due force ….'").

Further, "[i]f the Second Amendment right were confined to self-defense in the home, the [Supreme] Court would not have needed to express a reservation for 'sensitive places' outside of the home." *United States v. Masciandaro*, 638 F.3d 458, 468 (4th Cir. 2011) (Niemeyer, J., concurring). If there were no right to have a gun outside of the home at all, then the school and government building bans would be constitutional on that simple basis alone. *Id.*; *Bonidy*, 790 F.3d at 1130–31 (Tymkovich, J., dissenting); *Drake*, 724 F.3d at 445 (Hardiman, J., dissenting).

20

For all these reasons, "[o]nly an unrealistic reading of [the Second Amendment] could restrict the right to the home, and it is hard to believe a founding generation who routinely carried weapons for protection outside the home and traveling would agree." *Bonidy*, 790 F.3d at 1131 (Tymkovich, J., dissenting). Accordingly, the text of the Second Amendment resolves this issue conclusively in Mr. Class's favor: there is a Second Amendment right to bear arms outside of the home.

> **2.    The Core Purpose Of The Second Amendment Is To Provide For Self-Defense, Which Is Just As Relevant Outside Of The Home.**

The purpose of the Second Amendment also fully supports the conclusion that the right to bear arms extends outside the home. As this Court has noted, the Supreme Court stated in *Heller I* that "self-defense is the 'core lawful purpose' protected by the Second Amendment." *Heller II*, 670 F.3d at 1260; *accord McDonald*, 561 U.S. at 768. Thus, the "Second Amendment protects an inherent right to self-defense." *Drake*, 724 F.3d at 444 (Hardiman, J., dissenting). While the need for self-defense may be "most acute" within the home, *Heller I*, 554 U.S. at 628, "that doesn't mean it is not acute outside the home," *Moore*, 702 F.3d at 935. Rather, self-defense "is as important outside the home as inside." *Id.* at 942; *Drake*, 724 F.3d at 446 (Hardiman, J., dissenting) (the "need for self-defense naturally exists both outside and inside the home"). After all, someone is a "good

21

deal more likely to be attacked on a sidewalk in a rough neighborhood than in his apartment on the 35th floor" of his apartment building. *Moore*, 702 F.3d at 937.

Given this, the only logical conclusion is that the Second Amendment applies outside of the home for purposes of self-defense. *Moore*, 702 F.3d at 936; *Drake*, 724 F.3d at 446 (Hardiman, J., dissenting); *Bonidy*, 790 F.3d at 1130 (Tymkovich, J., dissenting). In fact, *Heller I* itself said as much when it held that the Second Amendment provides the "right to 'protect[] [oneself] against both *public* and private violence." 554 U.S. at 594. It is difficult to imagine "public violence" inside one's own home. Further, *Heller I* recognized that the Second Amendment was also designed to protect hunting and militia rights—neither of which can occur inside one's home. *See Heller I*, 554 U.S. at 599; *Masciandaro*, 638 F.3d at 468 (Niemeyer, J., concurring); *Drake*, 724 F.3d at 444 (Hardiman, J., dissenting); *Bonidy*, 790 F.3d at 1130 (Tymkovich, J., dissenting).

Any attempt to "confine the right to be armed to the home [would] divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*." *Moore*, 702 F.3d at 937; *Aguilar*, 2 N.E.3d at 327 ("[I]f *Heller* means what it says … then it would make little sense to restrict this right to the home."). Accordingly, the purpose of the Second Amendment also shows that there is a right to keep and bear arms outside of the home.

### 3.    Historical Evidence Also Supports The Right To Bear Arms Outside Of the Home.

Historical evidence supports the same conclusion.  *See, e.g., Peruta*, 742 F.3d at 1154, 1156–66 (extensively outlining historical evidence for right to bear arms outside home).  For example, Blackstone noted that subjects all possessed the right "of having arms for their defence" to ensure the "natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression."   1 William Blackstone, Commentaries *139.   Further, the "founding generation … routinely carried weapons for protection outside the home and *traveling*."   *Bonidy*, 790 F.3d at 1131 (Tymkovich, J., dissenting).  If anything, the right to keep arms while traveling (as Mr. Class was doing here), was even more strongly protected than carrying arms elsewhere.  *Heller I* noted that there had been an historical debate about whether it was constitutional to prohibit persons, "*when not on a journey, or as travellers*," from carrying concealed weapons.  *Heller I*, 554 U.S. at 618.  This suggests that there was little historical dispute that persons traveling could maintain weapons for their own defense.

Some historical laws banned firearms in public, but generally only in circumstances where the arms were "dangerous or unusual" or where the person had a malevolent intent.  Thus, the 1328 Statute of Northampton, as described by Blackstone, outlawed "[t]he offense of riding or going armed with dangerous or

23

unusual weapons, [which] is a crime against the public peace, by terrifying the good people of the land."  4 William Blackstone, Commentaries *148–49.  In other words, "[o]nly public carrying 'accompanied with such circumstances as are apt to terrify the people' was thus seen as prohibited; 'wearing common weapons' in 'the common fashion' was legal."  Eugene Volokh, *The First and Second Amendments*, 109 Colum. L. Rev. Sidebar 97, 102 (2009).

It is true that as far back as 1882, Congress prohibited the "*discharge* [of] any firearm" on Capitol Grounds, punishable by (at most) a $100 fine and sixty days in jail.  *See* Act of July 1, 1882, 22 Stat. 126, § 5 (emphasis added).  But, as the Supreme Court said in *Heller I*, laws "punish[ing] the discharge (or loading) of guns with a small fine and forfeiture of the weapon (or in a few cases a very brief stay in the local jail)" are not instructive when it comes to analyzing the scope of the Second Amendment because it is "implausible that [such minor laws] would have been enforced against a citizen acting in self-defense."  554 U.S. at 633.  The Gun Ban itself is of quite modern vintage, with the prohibition of merely carrying firearms and the imposition of severe penalties (up to five years in prison) first added in 1967.  *See* Act of Oct. 20, 1967, Pub. L. No. 90-108, 81 Stat. 275, 276.  Such a modern law with serious penalties does not provide any useful insight into the original scope of the right to self-defense under the Second Amendment.

24

The historical evidence is in accord with the text and purpose of the Second Amendment: "it [is] incontestable that the Second Amendment applies outside of [the] home." *Bonidy*, 790 F.3d at 1130 (Tymkovich, J., dissenting).

**B.    The Gun Ban Should Be Subjected To Strict Scrutiny Because It Prohibits Law-Abiding Citizens From Exercising Self-Defense By Possessing Any Weapon In A Public Area.**

The Gun Ban "impinges upon" the Second Amendment right to bear arms outside of the home by prohibiting law-abiding citizens from carrying or having readily accessible any weapons whatsoever in public parking lots and on public streets that happen to be in the same general area as the Capitol. *Heller II*, 670 F.3d at 1253.[6]   The Gun Ban burdens conduct falling within the scope of the Second Amendment, and this triggers heightened scrutiny. *Id.*  For the reasons below, the Court should apply strict scrutiny because the Gun Ban flatly prohibits law-abiding citizens from exercising the right to self-defense in a public area.  As the Supreme Court has made clear, the Second Amendment may not be "treat[ed]" as "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *McDonald*, 561 U.S. at 780.   In other words, heightened scrutiny should apply to the Second Amendment with the same searching inquiry as it does to other fundamental rights.

---

[6] Even if the Court considers the Gun Ban to be a longstanding regulation (which it is not, *see* Part II.A.3, *supra*), then the Court still must proceed to heightened scrutiny review because the Gun Ban has "more than a *de minimis* effect upon" a Second Amendment right. *Heller II*, 670 F.3d at 1253.

*Heller II* stated that "the level of scrutiny applicable under the Second Amendment surely 'depends on the nature of the conduct being regulated and the degrees to which the challenged law burdens the right.'" 670 F.3d at 1257.[7] The level of scrutiny depends on whether the challenged law burdens "the core right of self-defense protected by the Second Amendment." *Id.* In *Heller II*, this Court closely tied that "core right" with the right to possess a handgun, because *Heller I* and *McDonald* both stated that "handguns are 'overwhelmingly chosen by American society for the lawful purpose' of self-defense,'" and therefore "citizens must be permitted 'to use handguns for the core lawful purpose of self-defense.'" *McDonald*, 561 U.S. at 767–68 (quoting *Heller I*, 554 U.S. at 628, 630) (alterations omitted). Thus, in *Heller II*, while addressing a law banning *assault rifles*, this Court applied intermediate scrutiny precisely *because* the law "d[id] not prohibit the possession of 'the quintessential self-defense weapon,' *to wit, the handgun*." *Heller II*, 670 F.3d at 1261–62 (emphasis added). The obvious implication is that a ban on handguns for self-defense should be subjected to a more-searching scrutiny (*i.e.*, strict scrutiny). Indeed, in response to Judge Kavanaugh's dissent, the

---

[7] As Judge Kavanaugh stated in his dissent in *Heller II*: "[I]f it were appropriate to apply one of the levels of scrutiny after *Heller,* surely it would be strict scrutiny rather than the intermediate scrutiny test." *Heller II*, 670 F.3d at 1284 (Kavanaugh, J., dissenting); *see also Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 775 F.3d 308, 318, 326–29 (6th Cir. 2014) (same), *vacated pending en banc* (6th Cir. Apr. 21, 2015).

majority in *Heller II* emphasized that "we apply intermediate scrutiny [to the assault rifle ban] *precisely because the District's laws do not affect the core right protected by the Second Amendment*"—that is, the right to self defense *via handgun*. *Id.* at 1266. *Heller III* was the follow-on case to *Heller II* and accordingly applied intermediate scrutiny for the same reasons. *See Heller III*, 801 F.3d at 272.

This Court also applied intermediate scrutiny in *Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013), where a man previously convicted of assault and battery argued that he had a Second Amendment right to firearms, despite 18 U.S.C. § 922(g)(1), which prohibits certain misdemeanants from possessing firearms. Intermediate scrutiny was warranted in that case because the person challenging the law was a confirmed criminal, and *Heller I* itself had stated that laws prohibiting irresponsible criminals from owning weapons were presumptively lawful. *See* 554 U.S. at 626.

The Gun Ban is different than the laws in *Heller II*, *Heller III*, or *Schrader*. First, unlike in *Heller II* and *Heller III*, the Gun Ban *does* directly impact the right of self-defense by pistol—in fact, it prohibits *all weapons* for self-defense anywhere on the Capitol Grounds—and therefore the ban directly affects a core right protected by the Second Amendment. *See Heller II*, 670 F.3d at 1261–62, 1266 (applying only intermediate scrutiny "precisely because the District's laws do

27

not affect the core right protected by the Second Amendment," which was "the possession of 'the quintessential self-defense weapon,' to wit, the handgun"); *Heller III*, 801 F.3d at 272.  Further, the Gun Ban does not just regulate firearms or make it "more difficult" to acquire them—it flatly forbids their possession.  *Heller II*, 670 F.3d at 1255–58.[8]

Second, unlike the law in *Schrader*, the Gun Ban prohibits all people—*including law-abiding adult citizens*—from carrying guns or other weapons.  Even citizens such as Mr. Class, who was granted a concealed carry permit by the State of North Carolina after undergoing considerable scrutiny, are prohibited from storing firearms in their car while they visit the Capitol Grounds.  Numerous courts, including this one, have held that intermediate scrutiny is appropriate for bans on possession or sales of weapons by *law-breakers* or *minors*, *see, e.g.*, *Schrader*, 704 F.3d at 989 (misdemeanants); *United States v. Chester*, 628 F.3d 673, 683 (4th Cir. 2010) (violent domestic offenders); *Nat'l Rifle Ass'n of Am., Inc.*

---

[8] In this way, the Gun Ban is even broader than other regulations that courts have found trigger strict scrutiny, such as the Army Corps of Engineers' general prohibition of firearms in many public parks.  *See* 36 C.F.R. § 327.13.  Although this regulation contains numerous exceptions, it was still described by one court as effectively "a flat ban on carrying a firearm for self-defense purposes" that "may impose a burden on [a] core right of the Second Amendment *severe enough to call for strict scrutiny*."  *Morris v. U.S. Army Corps of Engineers*, 990 F. Supp. 2d 1082, 1087 (D. Idaho 2014).  The court in *Morris* ultimately concluded that it was irrelevant whether strict or intermediate scrutiny applied because "the regulation fails to pass muster even if intermediate scrutiny is applied."  *Id.*

28

*v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 204–06 (5th Cir. 2012) (minors).  But it would be inappropriate to grant that same level of deference to a law that applies to "law-abiding, responsible citizens."  *Heller I*, 554 U.S. at 635.

Because the Gun Ban directly prohibits a law-abiding citizen from possessing *any* weapon for self-defense in a public area, the Ban impinges on a core Second Amendment right.  Thus, *Heller II* dictates that this Court should apply strict scrutiny to the Gun Ban.  Strict scrutiny requires that the government show the law "furthers a compelling interest and is narrowly tailored to achieve that interest."  *Heller II*, 670 F.3d at 1256.  As discussed in more detail below, as applied to Mr. Class, the Gun Ban is substantially overbroad and therefore fails strict scrutiny.

Even if this Court concludes that intermediate scrutiny is the proper test here, the outcome will be the same.  Intermediate scrutiny places the burden on the government to show that the law is "substantially related to an important governmental objective.'"  *Id.* at 1258 (internal quotation marks omitted). That is, the government "must establish a tight 'fit' between the [law's] requirements and an important or substantial governmental interest, a fit 'that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective.'"  *Id.* (ellipsis in original).  To meet the fitness requirement,

the law must not be "substantially broader than necessary." *Id.* As discussed

below, because of the Gun Ban's overbreadth, it fails even intermediate scrutiny.

### C.    As Applied To Mr. Class, The Gun Ban Fails Heightened Scrutiny.

The Gun Ban violates the Second Amendment, as applied to Mr. Class's act

of securing firearms in his car in a public parking lot on Maryland Avenue. Under

heightened scrutiny, the government bears the burden of establishing a substantial

or compelling interest *and* showing a proper tightness-of-fit or narrow tailoring.

*Heller II*, 670 F.3d at 1258. The government cannot make that showing.

### 1.    The Gun Ban Does Not Serve An Especially Strong Interest.

*Amicus* recognizes that there undoubtedly is a strong government interest in

promoting safety and preventing crime. However, the government could offer that

justification in support of every gun law. If citing that general concern alone were

sufficient, then there would be no point in even evaluating the government's

interest under a heightened-scrutiny test. Rather, the Court must look deeper to

ensure that the government is not using broad public safety interests as an excuse

to "effectively disarm individuals" and affect their "ability to defend themselves."

*Heller II*, 670 F.3d at 1262. Thus, the government cannot present "assertions"—

instead, it must provide "meaningful evidence" of its interest in passing a gun

regulation that impinges on the Second Amendment, *id.* at 1259; *accord Heller III*,

801 F.3d at 272–73, and it goes without saying that the government cannot claim a

strong interest in broad laws simply because such laws are "easier" to write and enforce than narrowly tailored laws, *McCullen v. Coakley*, 134 S. Ct. 2518, 2540 (2014).

In the district court, the government asserted that there is a strong interest in preventing weapons from being present on *any* government property, specifically in a place that is somewhat near the Capitol. J.A.112. Although this argument may seem facially appealing, it cannot stand up to a more searching scrutiny. For example, at least sixteen states currently allow civilians to bear firearms *inside their state capitol buildings*.[9] *See* Vt. Legislature, Advisory Cmte. on Capitol Security, *Allowance of Handguns Within U.S. State Capitol Buildings* (Oct. 15, 2013), *available at* http://tinyurl.com/odpqgej. It is difficult to imagine how the federal government can claim such an important interest in forbidding something that many state governments readily allow. If banning all firearms anywhere *near* legislative buildings were such a strong government interest, one might expect other governments to follow suit. But that is not the case, not even for guns

---

[9] The states are Florida, Hawaii, Idaho, Kansas, Kentucky, Michigan, Minnesota, Mississippi, Nebraska, New Hampshire, Oregon, Texas, Utah, Virginia, Washington, and Wisconsin. *See also*, *e.g.*, Kan. Stat. Ann. § 75-7c10(f); Ky. Rev. Stat. Ann. § 237.110(16)(d); Minn. Stat. § 609.66(1g)(b)(2); Or. Rev. Stat. Ann. § 166.370(3)(g); Tex. Gov't Code Ann. § 411.0625; Utah Admin. Code R131-3-4(4); Wash. Rev. Code Ann. § 9.41.300. North Carolina, which issued Mr. Class's concealed carry permit, generally forbids firearms on the State Capitol Grounds in Raleigh *but explicitly excepts* any firearms stored "in a closed compartment or container within a person's locked vehicle." N.C. Gen. Stat. § 120-32.1(c1).

actually *inside* the legislative buildings.   As the Vermont Legislature noted, "[t]here is no apparent standard regarding the allowance of guns . . . at state capitol buildings." *Id.*

Further, if the government truly has a compelling interest in prohibiting weapons from a certain location, it stands to reason that the government would want to post notices on-site to inform the general public that weapons are prohibited.   That is why the government posts signs at the *entrance* of every federal building, warning that firearms are prohibited.  *See* 18 U.S.C. § 930.  But the government does not post any signs about the Gun Ban at the Capitol Grounds entrances or in the Maryland Avenue parking lot.  J.A.125 n.1.  This shows that the government is not particularly interested or diligent in ensuring that no one has weapons in those locations.

Because heightened scrutiny applies here, the Court must view with some skepticism the government's asserted interests, especially given that the government's own actions, as well as those of many sovereign states, suggest that there is not a compelling interest in prohibiting all weapons in parking lots that happen to be near legislative buildings.

## 2.     As Applied To Mr. Class, The Gun Ban Is Overbroad.

Not only does the Gun Ban fail to serve a compelling (or even substantial) government interest, but it is also substantially overbroad and thus flunks the

32

narrowness-of-fit analysis required by heightened scrutiny. To address the overbreadth of the Gun Ban, the Court should focus on the "what," "who," "where," and "when" that it affects. *See, e.g., United States v. Huitron-Guizar*, 678 F.3d 1164, 1166 (10th Cir. 2012) (noting that the right to bear arms requires one to look at "what one might call the 'who,' 'what,' 'where,' 'when,' and 'why'"). As applied to Mr. Class, the Gun Ban is overbroad in terms of what firearms it prohibits (all firearms), to whom it applies (everyone indiscriminately, regardless of their law-abiding status or their reason for possessing a weapon), its geographic scope (public streets and open areas that are heavily trafficked and unsecured), and its temporal scope (24 hours a day, 365 days a year, even when Congress it not in session).

### a.    What: The Gun Ban Prohibits All Firearms.

The Gun Ban forbids possession of any type of weapon on the Capitol Grounds. It does not ban just assault rifles, *see Heller II*, 670 F.3d at 1264, or large-capacity magazines, *id.*, or "dangerous and unusual weapons," *Heller I*, 554 U.S. at 627, or even just the *discharge* of weapons, *see* Act of July 1, 1882, 22 Stat. 126, § 5. Instead, it bans every single possible kind of weapon, even including knives—and in this way it is even broader than the ban in *Heller I* itself, which prohibited only pistols.

The Gun Ban makes no distinctions based on whether the weapons could be easily stolen, or if they are kept out of plain view.  That is, the Gun Ban does not apply just to concealed weapons, nor just to openly-carried weapons.  It effectively imposes a mandatory physical distance between people and their firearms, thereby ensuring that no one could possibly possess a firearm for self-defense on the Capitol Grounds—in direct violation of *Heller I* itself.  *Heller I*, 554 U.S. at 628–29 (striking down law requiring that guns be kept in a state that rendered them "impossible for citizens to use … for the core lawful purpose of self-defense"); *see also State v. Reid*, 1 Ala. 612, 616–17 (1840) (noting that a law "which requires arms to be so borne as to render them wholly useless for the purpose of defence[] would be clearly unconstitutional").

In sum, it is hard to imagine what government interest is being served by forbidding someone from keeping a pistol in a bag in his locked car.  The Gun Ban is not narrowly tailored with respect to the weapons it prohibits.

### b.     Who: The Gun Ban Disarms All Law-Abiding Citizens—Even Citizens With A Concealed Carry Permit.

"[T]he characteristics of the individual bringing the as-applied challenge—the 'who'—carry great weight, both in defining the relevant category and in determining whether the government may apply the regulation in these circumstances."  *Bonidy*, 790 F.3d at 1135 (Tymkovich, J., dissenting).

*Heller I* made clear that the core of the Second Amendment was to protect the right of responsible, law-abiding citizens to defend themselves. Yet the Gun Ban treats Mr. Class the same as it would treat a convicted felon or a certified psychopath. In other words, the Gun Ban makes no distinction between those individuals who pose a heightened security risk and those who do not. As applied here, it burdens the Second Amendment rights of Mr. Class and other citizens who are not just "law-abiding" and "responsible," *Heller I*, 554 U.S. at 635, but who have also passed a more stringent background check and are authorized under state law to carry a concealed weapon, *see Bonidy*, 790 F.3d at 1133 (Tymkovich, J., dissenting). Mr. Class's North Carolina permit required that he complete an approved gun safety course, release his mental health records, submit fingerprints, and complete an application under oath. *See* N.C. Gen. Stat. § 14-415.13. A permit must be denied to anyone who is ineligible to possess a firearm under federal law; is an unlawful user or addicted to marijuana, alcohol, depressants, stimulants, narcotics, or other controlled substances; is mentally ill; was dishonorably discharged from the armed forces; has a recent conviction for impaired driving; has been convicted of a felony or is under indictment for a felony; or has been convicted of a crime of violence. N.C. Gen. Stat. § 14-415.12(b)(1)–(11).

However, the Gun Ban "assum[es] that the mere act of carrying a permitted firearm increases the likelihood that one will engage in criminal activities." *Bonidy*, 790 F.3d at 1138 (Tymkovich, J., dissenting). There is no support for that assumption. Indeed, quite the opposite. Studies have shown that owners of concealed carry permits are very rarely charged with crimes or misuse of firearms. *See Drake*, 724 F.3d at 455 (Hardiman, J., dissenting) (citing numerous studies showing that states revoke much less than half of one percent of concealed carry licenses for misuse).

Further, the Gun Ban does not make any distinction based on the citizen's intent. It prohibits use of a weapon for self-defense, just as much as it prohibits use of a weapon for armed robbery. *See Bonidy*, 790 F.3d at 1135 (Tymkovich, J., dissenting). "By completely ignoring the right of self-defense, the [Gun Ban] cannot be saved by the line of cases … that upheld gun restrictions accommodating the right of self-defense." *Morris*, 990 F. Supp. 2d at 1087. Further, the Gun Ban does not even require a *mens rea* for being on the Capitol Grounds. J.A.125–J.A.139. Thus, it prohibits carrying a weapon regardless of whether the person even had a reason to suspect he was in a prohibited area. *See also* Part III, *infra* (discussing lack of *mens rea* in greater detail).

For these reasons, the Gun Ban is overbroad in terms of who it disarms and why it disarms them.

36

### c.     Where: The Gun Ban Disarms All Citizens In A Parking Lot That Is Not A "Sensitive Place."

The Gun Ban is also overbroad in terms of its geographic parameters, as the text of *Heller I* and *McDonald* themselves show.  There are strong logical reasons to distinguish gun bans inside government buildings (which are presumptively constitutional) from gun bans outside of government buildings (which enjoy no such presumption).  The Maryland Avenue parking lot is not a sensitive place, and, therefore, as applied to Mr. Class, the Gun Ban enjoys no presumptive constitutionality.[10]

### i.     *Heller I* And *McDonald* Speak Only To Gun Bans "*In* Sensitive Places."

*Heller I* and *McDonald* both stated that bans of weapons "*in* sensitive places such as schools and government buildings" are presumptively lawful. *Heller I*, 554 U.S. at 626 (emphasis added); *McDonald*, 561 U.S. at 786.  At the district court, the government suggested that this means it presumptively can ban all weapons on "government property," including publicly-accessible parking lots.  J.A.112.

---

[10] Because gun bans in "sensitive places" are only *presumptively* lawful—and not categorically so—the question of whether a particular location is a sensitive place fits more appropriately in the second step of the *Heller II* frame work (*i.e.*, whether the law is overbroad), rather than the first step (*i.e.*, whether the law burdens protected conduct at all).  *See United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010) (noting that even "longstanding" regulations "could be unconstitutional in the face of an as-applied challenge"); *Heller II*, 670 F.3d at 1253 (even longstanding presumptions are subjected to heightened scrutiny review if they impinge more than a "*de minimis*" amount on a Second Amendment right).

However, the government cannot stretch the phrase "*in* sensitive places" to include public, wide-open areas that happen to be somewhat *near* sensitive places, or to include *all* government property.  The Supreme Court did not say that bans "near" government buildings will be presumptively constitutional; nor did the Supreme Court say that bans of guns on all "government *property*" will be constitutional.    Rather, the Supreme Court said that bans "*in* government buildings" would be presumptively constitutional.  Commentators have noted that it is not a coincidence that the "decisions in *Heller* and *McDonald* used the preposition 'in' when referring to [sensitive places], as opposed to using 'around' or 'near.'"  Amy Hetzner, *Where Angels Tread: Gun-Free School Zone Laws and an Individual Right to Bear Arms*, 95 Marq. L. Rev. 359, 392 (2011).

This word choice was likely because there is "no longstanding tradition of treating several blocks *around* a [sensitive place] as [also being] a 'sensitive place[]' in which people are stripped of their right to keep and bear arms in self-defense."  Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1529 (2009) (third brackets in original).  To be sure, the Supreme Court noted that its list of presumptively lawful regulations was not exhaustive, but it would have been quite odd for the Court to employ the example of "*in* government *buildings*" if the Justices actually meant "*on* all government *property*."

38

Accordingly, no "thumb on the scale exists for those locations on which *Heller* expressed no view." *Bonidy*, 790 F.3d at 1136–37 (Tymkovich, J., dissenting). Bans in such location will have to "stand or fall on their own" because "restrictions on free carry in [such] locations [are] granted no such presumption" of constitutionality. *Id.* at 1130.

Parsing the Supreme Court's use of the phrase "*in* government buildings" is not a meaningless semantics exercise, especially in the District of Columbia, where the government could effectively prohibit guns throughout the city by imposing gun bans on all government property and in radii *around* that government property, claiming that such areas are *near* "sensitive places" and thus enjoy *Heller I*'s and *McDonald*'s presumptive blessing.[11]

### ii.     The Maryland Avenue Parking Lot Is Not In A Sensitive Place.

It is undisputed that the Gun Ban does not apply just "*in* government buildings." It applies to the much broader area of the Capitol Grounds, which "comprise a large area" ranging from Union Station (in the north) to the coal yard on I Street SE (in the south). *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 577 n.1 (D.D.C.) (three-judge panel), *aff'd*, 409 U.S. 972 (1972);

---

[11] *See* Br. of the District of Columbia at 50, *Wrenn v. District of Columbia*, No. 15-7057 (D.C. Cir. Aug. 27, 2015) (noting that bans on weapons *inside* government buildings already "effectively make[] public carrying impossible for many people who live and work in the District").

*see also* J.A.140.  The Capitol Grounds include twelve parking lots, as well as parts of the following thirty Avenues and Streets: Constitution NW and NE, Independence SW and SE, Delaware NE, Louisiana NW, Maryland NE and SW, Massachusetts NE, New Jersey NW, Pennsylvania NW, Virginia SW, Washington SW; 1st NW, NE, SW, and SE; 2nd NE, SE, and SW; C NE, SW, and SE; D NW, NE, SW, and SE; and East, North, and South Capitol.  *See* J.A.140.  "[T]he Capitol Grounds defined in this statute are so extensive that [activity] which may take place upon them might not be 'near' or 'in the immediate vicinity of' the Capitol itself."  *Jeannette Rankin Brigade*, 342 F. Supp. at 584.  It goes without saying that the Maryland Avenue outdoor parking lot, like most of the Capitol Grounds, is certainly not "in a government building."   The Gun Ban—as applied to Mr. Class—is thus outside of  any presumption of constitutionality applying only to "sensitive places."  *See Bonidy*, 790 F.3d at 1136–37 (Tymkovich, J., dissenting).

At the district court, the government resisted this conclusion by pushing for a broader interpretation of "in government buildings"—one that labels all government property as "sensitive."   But conflating government buildings with parking lots near them is merely at attempt to broaden the list of "sensitive places" by defining such locations "at too high a level of generality."  *Drake*, 724 F.3d at 451 (Hardiman, J., dissenting); *Heller II*, 670 F.3d at 1294 (Kavanaugh, J., dissenting).   Under heightened scrutiny, the Court must inquire as to what a

"sensitive place" really is, without just accepting the government's theory that all government-owned property must be sensitive.

There is scant caselaw defining what precisely makes a place "sensitive." As one court put it, a "place, such as a school, might be considered sensitive because of the people found there.  Other places, such as government buildings, might be considered sensitive because of the activities that take place there." *GeorgiaCarry.Org, Inc. v. Georgia*, 764 F. Supp. 2d 1306, 1319 (M.D. Ga. 2011). But regardless of the precise boundaries of the term "sensitive place,"  there can be little doubt that an unsecured, publicly-accessible parking lot is well outside of that scope.   For example, a Ninth Circuit decision (later vacated) upheld an exceptionally broad list of "sensitive places," but it still noted that "*[t]he only one of these that seems odd as a 'sensitive place' is parking lots.*"  *Nordyke v. King*, 563 F.3d 439, 460 (9th Cir. 2009), *vacated,* 611 F.3d 1015 (9th Cir. 2010).  Thus, even an extremely deferential view of "sensitive places" still found it difficult to label parking lots as "sensitive."   In an unpublished decision, the Fifth Circuit noted that a parking lot may be a sensitive place *only* when the parking lot itself is used "as a place of regular government business," such as loading and unloading mail or other valuables.  *United States v. Dorosan*, 350 F. App'x 874, 875 (5th Cir. 2009).  And in *Bonidy*, the Tenth Circuit's majority opinion concluded that a postal service parking lot was sensitive because, like in *Dorosan*, there were some "postal

transactions [that] take place in the parking lot," and thus "the parking lot should be considered as a single unit with the postal building itself to which it is attached and which it exclusively serves." *Bonidy*, 790 F.3d at 1125.

Judge Tymkovich's dissent in *Bonidy* provides the most comprehensive analysis of whether and when a parking lot can be considered a sensitive place. Judge Tymkovich noted that while guns can presumptively be banned inside government buildings (such as post offices or Capitol buildings), the "presumption of lawfulness associated with sensitivity [in the government building] does not necessarily hold in the adjacent parking lot." *Bonidy*, 790 F.3d at 1129 (Tymkovich, J., dissenting). This is because, even if a "building's security is related … to the parking lot's security, that, without more, does not mean they must be treated identically. It certainly does not mean that if banning [Mr. Class] from carrying his firearm into the [Capitol] building is constitutional, banning him from storing his firearm in his truck in the parking lot must also be." *Id.* at 1139.

As a matter of logic and common sense, when it comes to narrow tailoring, "there is a material difference between carrying a firearm on one's person into the area of heightened concern and storing it in a less accessible location outside that key area." *Id.* at 1140. Simply put, "the government interests are not equally weighty when it comes to physically carrying a firearm into the building versus storing it in the car outside." *Id.* at 1139. For example, buildings are "enclosed

42

space," and thus "even a lawful use of the firearm for self defense … poses greater risks to innocent bystanders than it would in the parking lot." *Id.* at 1139–40. Also, important and controversial business occurs within government buildings, and key government figures may congregate in large numbers there; these are all "reasonable target[s] for criminals." *Id.* at 1140. Further, security is often tight to enter government buildings such as the Capitol and courthouses, and thus there is less of a chance that anyone inside such buildings would actually need to exercise a right to self defense once inside (*i.e.*, because everyone, including any criminals, is disarmed). Thus, as one commentator put it, the "burden of being disarmed … is [n]il, when the government controls all public access … with metal detectors which are manned by armed law enforcement officers. This creates a genuine 'gun free zone.'" David Kopel, *Bonidy v. United States: The Second Amendment at the Post Office*, Wash. Post, Oct. 2, 2014, http://tinyurl.com/nnxm5yf; *accord* Volokh, 56 UCLA L. Rev. at 1526 ("[I]nside airport security cordons, and inside courthouses that screen for weapons, … a ban on civilian weapons seems likely to be a modest burden on lawful self-defense" because these areas "may indeed be nearly gun-free zones … and largely crime-free zones").

But *outside* the buildings, the analysis is very different. The Maryland Avenue parking lot is no safer or more "sensitive" than any other open areas or streets in Washington, where the importance of self-defense is obvious. *See* Part

II.A, *supra*. There is no evidence or reason to believe that there are clusters of particularly vulnerable people (*i.e.*, children) in the Maryland Avenue parking lot, like there would be in a school or playground. Nor is there any evidence that the parking lot is a frequent meeting place for conducting government business—especially given that Congress was not in session the entire week when Mr. Class was arrested. And unlike inside the Capitol buildings, the parking lot is not enclosed, thus reducing the probability of collateral damage if a private citizen lawfully uses a firearm for self-defense.

Critically, unlike inside Capitol buildings, which have extensive security barriers and armed guards at the entrances, there is no security screening to get inside the Maryland Avenue parking lot, as shown by the very fact that Mr. Class has repeatedly parked in that same lot. J.A.125 n.1; J.A.128. The "Capitol Grounds (excluding such places as the Senate and House floors, committee rooms, etc.) have traditionally been open to the public; indeed, thousands of people visit them each year." *Jeannette Rankin Brigade*, 342 F. Supp. at 584. Thus, there is nothing stopping criminals from carrying weapons in the parking lot and attempting to rob or otherwise injure law-abiding citizens. This is why one expert noted that "open spaces such as parking lots" are the prototypical location where one would most likely need to exercise a right to self-defense. Volokh, 56 UCLA L. Rev. at 1527.

44

Given all of these factors, the government is incorrect to suggest that its interests in banning all weapons in the Maryland Avenue parking lot are just as strong as banning all weapons inside the Capitol itself. Banning weapons in the lot is completely unnecessary to protect the government's interests.[12]

Thus, while the government will surely argue that the Court's adoption of *Amicus*'s argument would lead to firearms in the White House, in the Capitol, in schools, on playgrounds, and in courtrooms, such claims would be seriously overblown. In *McDonald*, the Supreme Court refused to accept such "doomsday proclamations" as justification for prohibiting law-abiding citizens from exercising a right to self-defense. 561 U.S. at 786. This case is about a law-abiding, responsible adult citizen storing legally-owned firearms in a locked vehicle in a public parking lot that happens to be in the same general area as the Capitol. It is

---

[12] To be clear, *Amicus* is not suggesting that guns must be permitted at *every* public location that is not "in" a government building. For example, using the factors above, Mr. Class's case is still easily distinguishable from someone carrying a gun on "[t]the White House lawn." *Bonidy*, 790 F.3d at 1137 & 1140 n.10 (Tymkovich, J., dissenting). There is no Second Amendment right to carry a weapon in a location where you are not allowed to be in the first place. Also, forcibly disarming all people entering the White House property imposes no burden on the right to self-defense, as it is particularly unlikely that armed hoodlums would be waiting around the corner of the White House lawn. The White House lawn also directly abuts the White House's front door, while the Maryland Avenue parking lot is about 1,000 feet from the entrance to the Capitol.

certainly not a case involving someone with a gun inside the Capitol or on the White House lawn.[13]

### iii.    It Does Not Matter That The Government Owns The Maryland Avenue Parking Lot.

Likewise meritless would be any argument that the government can simply ban weapons from all "government property." *See* J.A.81. If that were true, there would have been no need in *Heller I* and *McDonald* to single out schools and government buildings as locations where guns can presumptively be banned. It would have been much easier to simply state that the government can ban firearms on *all of its property*. But *Heller I* and *McDonald* did not say that. If the government were correct that it can ban weapons on its property, then it could ban the possession or storage of all firearms on all public streets and highways, effectively preventing anyone from ever acquiring or transporting any weapon. Again, that cannot be correct.

Thus, the mere fact that the government owns the property does not mean that heightened scrutiny "is somehow looser or more forgiving." *Bonidy*, 790 F.3d at 1137 n.8 (Tymkovich, J., dissenting). The government does not have "free rein

---

[13] Given that gun bans "in sensitive places" are only *presumptively* (not categorically) lawful, even if the Court concludes that the Maryland Avenue parking lot is a sensitive place, the Court should still hold that the Gun Ban is unconstitutional as applied to Mr. Class, given the extremely tenuous connection between any strong government interest and the prohibition on keeping firearms in a vehicle in a parking lot.

to restrict Second Amendment rights based on little more than a showing that it owns the property at issue." *Id.* at 1141. It is true that the government, as property holder, can ban citizens from even setting foot on certain property (which has the *de facto* effect of banning guns on that property, *see supra* at 50 n.11). However, the government *cannot* allow general public access to certain property but then categorically forbid citizens from defending themselves once there.

As this Court's First Amendment jurisprudence demonstrates, constitutional freedoms do not end at the government property line, and the government's authority to regulate speech in "traditional public forums" (*e.g.*, parks, streets, sidewalks) is narrowly circumscribed, even though the government owns those forums. *See Initiative and Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1310–12 (D.C. Cir. 2005) (striking down regulation forbidding solicitation of signatures while on postal property, despite fact that government owned the property and that signatures could still be solicited on nearby non-postal property). A publicly-accessible parking lot or street is the Second Amendment equivalent of a traditional public forum: an area where the government's interests in regulating protected behavior are quite weak, while the individual's interests in engaging in that behavior are particularly strong.

It is therefore unsurprising that one district court struck down a ban on firearms on Army Corps property (which includes many public parks), rejecting

the Corps' argument that it "is entitled to be more restrictive because it is a governmental entity acting as a proprietor managing its own property." *Morris v. U.S. Army Corps of Engineers*, 60 F. Supp. 3d 1120, 1124 (D. Idaho 2014). In *Morris*, the court held that "[w]hile the Corps retains the right to regulate the possession and carrying of handguns on Corps property," that power did not permit the Corps to "impose[] an outright ban" which was "unconstitutional under any level of scrutiny." *Id.* at 1125. The Corps also argued that it should be given more deference because it is not "required to open its sites to the public." *Morris*, 990 F. Supp. 2d at 1088. But "the Corps cites no case exempting the Government from constitutional requirements whenever it acts voluntarily. The Court can find no reason to adopt such a rule." *Id.*

The government has made the Maryland Avenue parking lot accessible by the general public, which unfortunately includes armed criminals. Having done so, the government cannot proceed to completely eliminate law-abiding citizens' right to defend themselves there. For all of these reasons, the Gun Ban is overbroad in terms of where it applies.

> ### d.    When: The Gun Ban Applies All Day, Every Day—Even When Congress Is Not In Session.

Finally, the overbreadth of the Gun Ban is made even worse by the fact that it applies 24 hours a day, 365 days a year. This is problematic because the parking lots and streets in the Capitol Grounds are generally open to traffic and the public

48

24 hours a day—including late at night when criminals would be more likely to strike at someone returning to his car all alone. *See* Volokh, 56 UCLA L. Rev. at 1529 ("I know of no longstanding tradition of treating several blocks around a school as a 'sensitive place[]' in which people are stripped of their right to keep and bear arms in self-defense, *including at night when self-defense is most necessary and school is not even in session*.").  The Gun Ban fails to allow self-defense even at the times when it would be most needed.

Further, the Gun Ban applies when Congress is not even in session.  At the time Mr. Class was arrested, Congress was on its Memorial Day recess: it had not been in session for six days and would not be in session again for another four days. *See supra* at 10 n.3.  The government cannot explain why it is necessary to ban all weapons at a time when no government business is occurring and when no government officials are even present.

* * *

It is "incumbent upon the [government] to show sufficient support for its absolute ban on firearms without any consideration of the possible accommodations that may lessen the burden on Mr. [Class's] individual interest in self-protection." *Bonidy v. U.S. Postal Serv.*, No. 10-CV-02408-RPM, 2013 WL 3448130, at *4 (D. Colo. July 9, 2013); *accord Heller II*, 670 F.3d at 1258.  This, the government cannot do—because there simply is no good reason why the

49

government, in a heavy-handed attempt to ban weapons from the Capitol, can sacrifice a law-abiding citizen's right to keep a lawfully-owned weapon in his car.

Further, although the government may be able to pass constitutional muster with respect to a ban on firearms *inside* government buildings (a question this Court need not answer), that does not mean the government can proceed to ban *all* weapons from *all* law-abiding citizens on *all* government property.

The Gun Ban's broad application means that the government cannot establish the "tight fit" required to survive even intermediate scrutiny. *Heller II*, 670 F.3d at 1258. Accordingly, as applied to Mr. Class, the Gun Ban violates the Second Amendment.[14]

---

[14] At the district court, Judge Kessler ordered the government to respond to Mr. Class's additional arguments that his "prosecution in the District of Columbia for conduct allegedly permitted by his North Carolina [concealed carry] permit violates the Privileges and Immunities Clause of Article IV of the Constitution, the Full Faith and Credit Clause, and the Equal Protection Clause of the Fourteenth Amendment." J.A.94. *Amicus* believes that the validity of these arguments turns on the discussion above. This is because, even assuming that the District of Columbia fully recognized Mr. Class's North Carolina license, the Gun Ban—as an Act of Congress—would still serve to prohibit Mr. Class (and all other citizens) from possessing any weapons *on Capitol Grounds*. *See, e.g., United States v. Mahdi*, 598 F.3d 883, 896 (D.C. Cir. 2010) ("Congress has plenary authority in the District of Columbia."); *see also Palmer*, 59 F. Supp. 3d at 184 ("[A]ll … who are not residents of the District … are treated exactly the same as residents of the District insofar as the [law in question serves as] a complete ban on the carrying of handguns in public for self-defense.").

## III.   THE GUN BAN IS VOID FOR VAGUENESS.

The Gun Ban fails to meet constitutional muster for another reason.  The Fifth Amendment states that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  As the Supreme Court recently held in *Johnson v. United States*, "[o]ur cases establish that the Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement."  135 S. Ct. 2551, 2556 (2015).[15]

The vagueness inquiry must be especially searching where the statute involves "protected conduct," *United States v. Adkins*, 743 F.3d 176, 194 (7th Cir. 2014), including rights protected by the Second Amendment, *see N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 265 (2d Cir. 2015) (applying "'more stringent' vagueness standard" to Second Amendment claim).

As the government's own briefing at the district court revealed, it is exceedingly difficult for someone to determine that the Maryland Avenue parking lot is part of the Capitol Grounds.  The government's own jury-instruction brief outlined the following steps an individual must take in order to discover that the Maryland Avenue parking lot is part of the Capitol Grounds:

---

[15] Thus, as this Court has noted, "[v]agueness may take two forms."  *Washington Mobilization Comm. v. Cullinane*, 566 F.2d 107, 117 (D.C. Cir. 1977).

(1) Obtain a "map entitled 'Map showing areas comprising United States Capitol Grounds', dated June 25, 1946, approved by the Architect of the Capitol and recorded in the Office of the Surveyor of the District of Columbia in book 127, page 8." J.A.137.

(2) Overlook the fact that this 1946 map "shows the relevant portion of Maryland Avenue, Southwest [where Mr. Class parked] as *not* part of the Capitol Grounds." J.A.137 (emphasis added); *see also* Addendum at S.A.8 (copy of 1946 map).

(3) Note that Public Law 96-432, passed in 1980 but not expressly listed in the Gun Ban, states that the Capitol Grounds are expanded to include "that portion of Maryland Avenue Southwest from the west curb of First Street Southwest to the east curb of Third Street, Southwest." J.A.137.

(4) Note that Public Law 97-379, passed in 1982 but not expressly listed in the Gun Ban, further expands the Capitol Grounds to include "[a]ll sidewalks and contiguous areas presently under the jurisdiction of the District of Columbia located on the north side of Maryland Avenue, Southwest, between the west curb of First Street, Southwest and the East curb of Third Street, Southwest." J.A.137.

Between these steps, one is to conclude that the 200-block of Maryland Avenue SW and its curbs and sidewalks are part of the Capitol Grounds.

52

Determining whether other locations are part of the Capitol Grounds would be equally difficult. It certainly is beyond the ken of someone of ordinary intelligence and diligence.

The difficulty in understanding the boundaries of the Capitol Grounds is only made worse by the fact that the Maryland Avenue parking lot is publicly accessible, and there were no signs indicating that the area is considered the Capitol Grounds, or that firearms are prohibited. J.A.125 n.1. This situation is analogous to *United States v. Grace*, 461 U.S. 171 (1983), which struck down a ban on displaying flags and banners on the Supreme Court's "grounds," including sidewalks. *Grace* noted that the Supreme Court's *private* sidewalks were not "separated from the streets and sidewalks of the city itself." *Id.* at 179. "There is no separation, no fence, and no indication whatever to persons stepping from the street to the curb and sidewalks that serve as the perimeter of the Court grounds that they have entered some special type of enclave." *Id.* at 180. This just as well describes the Maryland Avenue parking lot, which is within the Capitol Grounds but is open to the public and heavily trafficked by cars, tour buses, motorcycles, bicycles, and pedestrians on foot. There is no security gate or checkpoint required to enter the lot. If Mr. Class had parked just one block to the west, he would no longer have been on the Capitol Grounds at all. In other words, it is

indistinguishable in use and appearance from many other parking lots in Washington.

By failing to give meaningful advanced warning or on-site notice of what constitutes the "Capitol Grounds," the Gun Ban is inconsistent with this Court's holding in *Washington Mobilization Comm. v. Cullinane*, 566 F.2d 107, 118 (D.C. Cir. 1977), where the Court considered a regulation that made it a crime to "cross a police line without authority." This Court agreed to uphold the regulation against a vagueness challenge—*but only* "[i]f the location of the line is clearly indicated and if adequate notice is given." *Id.* This Court found that if the line is clearly marked and notice is given, then the regulation would "not trap innocent persons" and thus would not be void for vagueness. *Id.* Here, by contrast, the parking lot was not "clearly indicated" as Capitol Grounds or an area where firearms were prohibited, nor was there any "fair notice," given how convoluted the definition of Capitol Grounds is.

The Gun Ban stands in stark contrast to 18 U.S.C. § 922(q), which prohibits firearms within 1,000 feet of schools but explicitly requires the government to prove that the defendant knew or had reasonable cause to believe that he was within 1,000 feet of a school. 18 U.S.C. § 922(q)(2)(A). The First Circuit rejected a vagueness challenge to § 922(q) by noting that, under "the clear terms of the statute, [the defendant] could only have been convicted if she knew or reasonably

should have known that her possession of the firearm was within a school zone, *and this scienter requirement ameliorates any vagueness concerns*." *United States v. Nieves-Castano*, 480 F.3d 597, 603 (1st Cir. 2007) (emphasis added).[16]

But no such scienter requirement is found in the Gun Ban. In fact, at the district court, the government *highlighted* that there was no *mens rea* requirement in the statute, and thus the prosecution would never have to show that Mr. Class knew or even should have known he was on the Capitol Grounds. J.A.130–J.A.135. It is undisputed that Mr. Class did *not* know he was on the Capitol Grounds. J.A.130. Accordingly, not only is there a lack of notice as to what constitutes the Capitol Grounds, but any violation is practically a strict liability felony punished by up to five years in prison. *See Klein v. San Diego Cnty.*, 463 F.3d 1029, 1039 (9th Cir. 2006) (statute prohibiting conduct on certain property could be unconstitutionally vague if it is "impossible for the [defendant] to determine the ... boundary with any precision and if the lack of a scienter element left [the defendant] strictly liable for any violation").

Anyone parking on the 200-block of Maryland Avenue SW or driving down Constitution Avenue with a lawfully-owned rifle in his car has committed a

---

[16] Section 5104(e) also differs markedly from 18 U.S.C. § 930, which bans firearms in government buildings but requires that warning signs be conspicuously posted at the entrances of all such buildings and forbids prosecution unless such signs were posted or the defendant actually knew that firearms were forbidden. *See* 18 U.S.C. § 930(h).

felony—and could be imprisoned for five years and forever stripped of all civic rights—without the government ever having to prove that he knew or even *should have known* he was on Capitol Grounds or that weapons were forbidden in that area. Due process does not countenance such heavy-handed treatment of citizens engaging in such unsuspicious and protected activity.[17]

## CONCLUSION

The government cannot proffer a sufficient interest in flatly banning all citizens from possessing any weapon for any reason at any time in an unsecured parking lot when Congress is not even in session and where the risk of armed confrontation is the same as any other public place in Washington. The Gun Ban is also unconstitutionally vague because it fails to give fair warning to persons of average intelligence about where weapons are actually forbidden. For these reasons, this Court should vacate Mr. Class's conviction.

---

[17] It is no answer for the government to claim that the definition of the Capitol Grounds would not be vague in every instance. *Johnson* rejected the argument that a statute can be void only when it is "vague in all its applications." 135 S. Ct. at 2561. Thus, a statute can be void for vagueness even when "there will be straightforward cases." *Id.* at 2560.

56

November 20, 2015                    Respectfully submitted,

                                     /s/ David W. DeBruin

                                     DAVID W. DEBRUIN
                                     JESSICA RING AMUNSON
                                     R. TRENT MCCOTTER
                                     JENNER & BLOCK LLP
                                     1099 New York Ave., NW
                                     Suite 900
                                     Washington, DC 20001
                                     (202) 639-6000
                                     ddebruin@jenner.com
                                     jamunson@jenner.com
                                     tmccotter@jenner.com

## CERTIFICATE OF COMPLIANCE

I, R. Trent McCotter, in reliance on the word count of the word processing system used to prepare this brief, certify that the foregoing brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and Circuit Rule 32(a)(1). The brief contains 13,955 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman 14 point font.

November 20, 2015                                    /s/ R. Trent McCotter

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 20th day of November 2015, in accordance with Circuit Rule 25(c), I caused the foregoing brief together with statutory addendum and the joint appendix to be filed with this Court's ECF system. I have also caused a copy of this brief, statutory addendum, and joint appendix to be sent via certified mail to the address listed on the court docket for Mr. Class:

P.O. Box 435
High Shoals, NC 28077

/s/ R. Trent McCotter

# ADDENDUM

INDEX

40 U.S.C. § 5101 *et seq.*..........................................................................S.A.1

Map Showing Areas Comprising United States Capitol Grounds (June

    25, 1946) ................................................................................S.A.8

<u>40 U.S.C. § 5101 (formerly cited as 40 U.S.C. § 193m)</u>

In this chapter, the term "Capitol Buildings" means the United States Capitol, the Senate and House Office Buildings and garages, the Capitol Power Plant, all buildings on the real property described under section 5102(c) (including the Administrative Building of the United States Botanic Garden) all buildings on the real property described under section 5102(d), all subways and enclosed passages connecting two or more of those structures, and the real property underlying and enclosed by any of those structures.

<u>40 U.S.C. § 5102 (formerly cited as 40 U.S.C. § 193a)</u>

*Legal description and jurisdiction of United States Capitol Grounds*
(a) Legal description.—The United States Capitol Grounds comprises all squares, reservations, streets, roadways, walks, and other areas as defined on a map entitled "Map showing areas comprising United States Capitol Grounds", dated June 25, 1946, approved by the Architect of the Capitol, and recorded in the Office of the Surveyor of the District of Columbia in book 127, page 8, including all additions added by law after June 25, 1946.
(b) Jurisdiction.—
    (1) Architect of the Capitol.—The jurisdiction and control over the Grounds, vested prior to July 31, 1946, by law in the Architect, is extended to the entire area of the Grounds. Except as provided in paragraph (2), the Architect is responsible for the maintenance and improvement of the Grounds, including those streets and roadways in the Grounds as shown on the map referred to in subsection (a) as being under the jurisdiction and control of the Commissioners of the District of Columbia.
    (2) Mayor of the District of Columbia.—
        (A) In general.—The Mayor of the District of Columbia is responsible for the maintenance and improvement of those portions of the following streets which are situated between the curblines of those streets: Constitution Avenue from Second Street Northeast to Third Street Northwest, First Street from D Street Northeast to D Street Southeast, D Street from First Street Southeast to Washington Avenue Southwest, and First Street from the north side of Louisiana Avenue to the intersection of C Street and Washington Avenue Southwest, Pennsylvania Avenue Northwest from First Street Northwest to Third Street Northwest, Maryland Avenue Southwest from First Street Southwest to Third Street Southwest, Second Street Northeast from F

S.A.1

Street Northeast to C Street Southeast; C Street Southeast from Second Street Southeast to First Street Southeast; that portion of Maryland Avenue Northeast from Second Street Northeast to First Street Northeast; that portion of New Jersey Avenue Northwest from D Street Northwest to Louisiana Avenue; that portion of Second Street Southwest from the north curb of D Street to the south curb of Virginia Avenue Southwest; that portion of Virginia Avenue Southwest from the east curb of Second Street Southwest to the west curb of Third Street Southwest; that portion of Third Street Southwest from the south curb of Virginia Avenue Southwest to the north curb of D Street Southwest; that portion of D Street Southwest from the west curb of Third Street Southwest to the east curb of Second Street Southwest; that portion of Washington Avenue Southwest, including sidewalks and traffic islands, from the south curb of Independence Avenue Southwest to the west curb of South Capitol Street.

(B) Repair and maintenance of utility services.—The Mayor may enter any part of the Grounds to repair or maintain or, subject to the approval of the Architect, construct or alter, any utility service of the District of Columbia Government.

(c) National Garden of the United States Botanic Garden.—

(1) In general.—Except as provided under paragraph (2), the United States Capitol Grounds shall include—

(A) the National Garden of the United States Botanic Garden;

(B) all grounds contiguous to the Administrative Building of the United States Botanic Garden, including Bartholdi Park; and

(C) all grounds bounded by the curblines of First Street, Southwest on the east; Washington Avenue, Southwest to its intersection with Independence Avenue, and Independence Avenue from such intersection to its intersection with Third Street, Southwest on the south; Third Street, Southwest on the west; and Maryland Avenue, Southwest on the north.

(2) Maintenance and improvements.—Notwithstanding subsections (a) and (b), jurisdiction and control over the buildings on the grounds described in paragraph (1) shall be retained by the Joint Committee on the Library, and the Joint Committee on the Library shall continue to be solely responsible for the maintenance and improvement of the grounds described in such paragraph.

(3) Authority not limited.—Nothing in this subsection shall limit the authority of the Architect of the Capitol under section 307E of the Legislative Branch Appropriations Act, 1989 (40 U.S.C. 216c).

S.A.2

(d) Library of Congress buildings and grounds.—

    (1) In general.—Except as provided under paragraph (2), the United States Capitol Grounds shall include the Library of Congress grounds described under section 11 of the Act entitled "An Act relating to the policing of the buildings of the Library of Congress", approved August 4, 1950 (2 U.S.C. 167j).

    (2) Authority of Librarian of Congress.—Notwithstanding subsections (a) and (b), the Librarian of Congress shall retain authority over the Library of Congress buildings and grounds in accordance with section 1 of the Act of June 29, 1922 (2 U.S.C. 141; 42 Stat. 715).

40 U.S.C. § 5103 (formerly cited as 40 U.S.C. § 193b)

*Restrictions on public use of United States Capitol Grounds*
Public travel in, and occupancy of, the United States Capitol Grounds is restricted to the roads, walks, and places prepared for that purpose.

40 U.S.C.A. § 5104 (formerly cited as 40 U.S.C. § 193c; 40 U.S.C. § 193d; 40 U.S.C. § 193e; 40 U.S.C. § 193f; 40 U.S.C. § 193g; 40 U.S.C. § 193m)

*Unlawful activities*
(a) Definitions.—In this section—

    (1) Act of physical violence.—The term "act of physical violence" means any act involving—

        (A) an assault or other infliction or threat of infliction of death or bodily harm on an individual; or

        (B) damage to, or destruction of, real or personal property.

    (2) Dangerous weapon.—The term "dangerous weapon" includes—

        (A) all articles enumerated in section 14(a) of the Act of July 8, 1932 (ch. 465, 47 Stat. 654); and

        (B) a device designed to expel or hurl a projectile capable of causing injury to individuals or property, a dagger, a dirk, a stiletto, and a knife having a blade over three inches in length.

    (3) Explosives.—the The term "explosives" has the meaning given that term in section 841(d) of title 18.

    (4) Firearm.—The term "firearm" has the meaning given that term in section 921(3) of title 18.

(b) Obstruction of roads.—A person may not occupy the roads in the United States

Capitol Grounds in a manner that obstructs or hinders their proper use, or use the roads in the area of the Grounds, south of Constitution Avenue and B Street and north of Independence Avenue and B Street, to convey goods or merchandise, except to or from the United States Capitol on Federal Government service.

(c) Sale of articles, display of signs, and solicitations.—A person may not carry out any of the following activities in the Grounds:

    (1) offer or expose any article for sale.

    (2) display a sign, placard, or other form of advertisement.

    (3) solicit fares, alms, subscriptions, or contributions.

(d) Injuries to property.—A person may not step or climb on, remove, or in any way injure any statue, seat, wall, fountain, or other erection or architectural feature, or any tree, shrub, plant, or turf, in the Grounds.

(e) Capitol Grounds and Buildings security.—

    (1) Firearms, dangerous weapons, explosives, or incendiary devices.—An individual or group of individuals—

        (A) except as authorized by regulations prescribed by the Capitol Police Board—

            (i) may not carry on or have readily accessible to any individual on the Grounds or in any of the Capitol Buildings a firearm, a dangerous weapon, explosives, or an incendiary device;

            (ii) may not discharge a firearm or explosives, use a dangerous weapon, or ignite an incendiary device, on the Grounds or in any of the Capitol Buildings; or

            (iii) may not transport on the Grounds or in any of the Capitol Buildings explosives or an incendiary device; or

        (B) may not knowingly, with force and violence, enter or remain on the floor of either House of Congress.

    (2) Violent entry and disorderly conduct.—An individual or group of individuals may not willfully and knowingly—

        (A) enter or remain on the floor of either House of Congress or in any cloakroom or lobby adjacent to that floor, in the Rayburn Room of the House of Representatives, or in the Marble Room of the Senate, unless authorized to do so pursuant to rules adopted, or an authorization given, by that House;

        (B) enter or remain in the gallery of either House of Congress in violation of rules governing admission to the gallery adopted by that House or pursuant to an authorization given by that House;

        (C) with the intent to disrupt the orderly conduct of official business, enter or remain in a room in any of the Capitol Buildings set aside or designated for the use of—

S.A.4

   (i) either House of Congress or a Member, committee, officer, or employee of Congress, or either House of Congress; or
   (ii) the Library of Congress;
  (D) utter loud, threatening, or abusive language, or engage in disorderly or disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress;
  (E) obstruct, or impede passage through or within, the Grounds or any of the Capitol Buildings;
  (F) engage in an act of physical violence in the Grounds or any of the Capitol Buildings; or
  (G) parade, demonstrate, or picket in any of the Capitol Buildings.
 (3) Exemption of government officials.—This subsection does not prohibit any act performed in the lawful discharge of
official duties by—
  (A) a Member of Congress;
  (B) an employee of a Member of Congress;
  (C) an officer or employee of Congress or a committee of Congress; or
  (D) an officer or employee of either House of Congress or a committee of that House.
(f) Parades, assemblages, and display of flags.—Except as provided in section 5106 of this title, a person may not—
  (1) parade, stand, or move in processions or assemblages in the Grounds; or
  (2) display in the Grounds a flag, banner, or device designed or adapted to bring into public notice a party, organization,
or movement.


40 U.S.C. § 5105 (formerly cited as 40 U.S.C. § 193i)


*Assistance to authorities by Capitol employees*
Each individual employed in the service of the Federal Government in the United States Capitol or within the United States Capitol Grounds shall prevent, as far as may be in the individual's power, a violation of a provision of this chapter or section 9, 9A, 9B, 9C, or 14 of the Act of July 31, 1946 (ch. 707, 60 Stat. 719, 720), and shall aid the police in securing the arrest and conviction of the individual

violating the provision.


40 U.S.C. § 5106 (formerly cited as 40 U.S.C. § 193j; 40 U.S.C. § 193k)

*Suspension of prohibitions*
(a) Authority to suspend.—To allow the observance in the United States Capitol Grounds of occasions of national interest becoming the cognizance and entertainment of Congress, the President of the Senate and the Speaker of the House of Representatives concurrently may suspend any of the prohibitions contained in sections 5103 and 5104 of this title that would prevent the use of the roads and walks within the Grounds by processions or assemblages, and the use in the Grounds of suitable decorations, music, addresses, and ceremonies, if responsible officers have been appointed and the President and the Speaker determine that adequate arrangements have been made to maintain suitable order and decorum in the proceedings and to guard the United States Capitol and its grounds from injury.
(b) Power to suspend prohibitions in absence of President or Speaker.—If either the President or Speaker is absent from the District of Columbia, the authority to suspend devolves on the other officer. If both officers are absent, the authority devolves on the Capitol Police Board.
(c) Authority of Mayor to permit use of Louisiana Avenue.—Notwithstanding subsection (a) and section 5104(f) of this title, the Capitol Police Board may grant the Mayor of the District of Columbia authority to permit the use of Louisiana Avenue for any of the purposes prohibited by section 5104(f).


40 U.S.C.A. § 5107 (formerly cited as 40 U.S.C. § 193*l*)

*Concerts on grounds*
Sections 5102, 5103, 5104(b)–(f), 5105, 5106, and 5109 of this title and sections 9, 9A, 9B, and 9C of the Act of July 31, 1946 (ch. 707, 60 Stat. 719, 720), do not prohibit a band in the service of the Federal Government from giving concerts in the United States Capitol Grounds at times which will not interfere with Congress and as authorized by the Architect of the Capitol.


40 U.S.C. § 5108 (formerly cited as 40 U.S.C. § 193m-1)
*Audit of private organizations*
A private organization (except a political party or committee constituted for the

election of federal officials), whether or not organized for profit and whether or not any of its income inures to the benefit of any person, that performs services or conducts activities in the United States Capitol Buildings or Grounds is subject to a special audit of its accounts for each year in which it performs those services or conducts those activities. The Comptroller General shall conduct the audit and report the results of the audit to the Senate and the House of Representatives.

40 U.S.C. § 5109 (formerly cited as 40 U.S.C. § 193h)

*Penalties*

(a) Firearms, dangerous weapons, explosives, or incendiary device offenses.—An individual or group violating section 5104(e)(1) of this title, or attempting to commit a violation, shall be fined under title 18, imprisoned for not more than five years, or both.

(b) Other offenses.—A person violating section 5103 or 5104(b), (c), (d), (e)(2), or (f) of this title, or attempting to commit a violation, shall be fined under title 18, imprisoned for not more than six months, or both.

(c) Procedure.—

(1) In general.—An action for a violation of this chapter or section 9, 9A, 9B, 9C or 14 of the Act of July 31, 1946 (ch. 707, 60 Stat. 719, 720), including an attempt or a conspiracy to commit a violation, shall be brought by the Attorney General in the name of the United States. This chapter and sections 9, 9A, 9B, 9C and 14 do not supersede any provision of federal law or the laws of the District of Columbia. Where the conduct violating this chapter or section 9, 9A, 9B, 9C or 14 also violates federal law or the laws of the District of Columbia, both violations may be joined in a single action.

(2) Venue.—An action under this section for a violation of—

(A) section 5104(e)(1) of this title or for conduct that constitutes a felony under federal law or the laws of the District of Columbia shall be brought in the United States District Court for the District of Columbia; and

(B) any other section referred to in subsection (a) may be brought in the Superior Court of the District of Columbia.

(3) Amount of penalty.—The penalty which may be imposed on a person convicted in an action under this subsection is the highest penalty authorized by any of the laws the defendant is convicted of violating.

S.A.7



LEGEND:—

1. THE UNITED STATES CAPITOL GROUNDS COMPRISE ALL SQUARES, RESERVATIONS, STREETS, ROADWAYS, WALKS, AND OTHER AREAS SHOWN WITHIN THE HEAVY LINES, EXCEPT THE UNSHADED PORTIONS OF THE SENATE AND HOUSE BORDER AREAS.

2. THE HEAVY BORDER LINES INDICATE THE BOUNDARIES OF THE UNITED STATES CAPITOL GROUNDS AND ARE INCLUSIVE OF FACE OF CURBS OF ROADWAYS, (EXCEPT LOUISIANA AVENUE, WHICH IS INCLUSIVE OF THE WEST PROPERTY LINE OF SECTIONS OF CONSTITUTION AVENUE BORDERING SQUARE 574 AND D STREET BORDERING SQUARE 630 WHICH ARE INCLUSIVE OF THE NORTH PROPERTY LINE.)

3. THE SHADED AREAS INDICATE PROPERTIES COMPRISING THE UNITED STATES CAPITOL GROUNDS UNDER THE JURISDICTION AND CONTROL OF THE ARCHITECT OF THE CAPITOL.

4. THE HATCHED AREAS INDICATE STREETS AND ROADWAYS, BETWEEN FACES OF CURBS, COMPRISING THE UNITED STATES CAPITOL GROUNDS UNDER THE JURISDICTION AND CONTROL OF THE COMMISSIONERS OF THE DISTRICT OF COLUMBIA.

APPROVED—

*David Lynn*
ARCHITECT OF THE CAPITOL.

MAP SHOWING AREAS
COMPRISING
UNITED STATES
CAPITOL GROUNDS.

DAVID LYNN, ARCHITECT OF THE CAPITOL.
SCALE = 1 inch = 200 feet.
JUNE 25, 1946.

POST OFFICE BUILDING

UNION STATION

UNION STATION PLAZA

SENATE OFFICE BUILDING

UNITED STATES CAPITOL

SUPREME COURT

LIBRARY OF CONGRESS

PENNSYLVANIA AVENUE.

UNION SQUARE

U. S. BOTANIC GARDEN

HOUSE OFFICE BUILDING PARKING AREA

SOUTH HOUSE OFFICE BUILDING

ANNEX HOUSE OFFICE BUILDING

HOUSE OFFICE BUILDING

CONSTITUTION AVENUE N.W.

INDEPENDENCE AVE. S.W.

MARYLAND AVENUE

MASSACHUSETTS AVE.

DELAWARE AVENUE

NEW JERSEY AVENUE

FIRST STREET

SECOND STREET

THIRD STREET

EAST CAPITOL ST.

MARYLAND AVE. N.E.

SURVEYOR'S OFFICE, DISTRICT OF COLUMBIA
S.A.8