ORAL ARGUMENT SCHEDULED FOR MAY 5, 2016

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————————

### No. 15-3015

————————————

### UNITED STATES OF AMERICA,

*Appellee*,

v.

### RODNEY CLASS,

*Appellant.*

————————————

Appeal from the United States District Court
for the District of Columbia

————————————

## REPLY BRIEF OF COURT-APPOINTED AMICUS CURIAE
## IN SUPPORT OF APPELLANT

DAVID W. DEBRUIN
JESSICA RING AMUNSON
R. TRENT MCCOTTER
JENNER & BLOCK LLP
1099 New York Ave., NW
Suite 900
Washington, DC 20001
(202) 639-6000
ddebruin@jenner.com
jamunson@jenner.com
tmccotter@jenner.com

March 17, 2016

# TABLE OF CONTENTS

TABLE OF AUTHORITIES. ...................................................................... ii

SUMMARY OF ARGUMENT. ..............................................................1

ARGUMENT. .........................................................................................2

I.   MR. CLASS CAN APPEAL HIS UNDERLYING CONVICTION. .................2

     A.  The Plea Agreement Contains An Integration Clause And Does Not
         Expressly Waive Mr. Class's Right To Appeal His Conviction. ..................2

         1.  The Parties' Integration Clause Forbids The Government's Implied
             Waiver Argument. ..................................................................3

         2.  The Parties' Subsequent Actions Confirm They Did Not Believe
             Mr. Class Waived His Right To Directly Appeal His Conviction. .........6

     B.  Amicus's Claims Are Preserved Under *Blackledge/Menna*. ........................8

     C.  Any Waiver Of Mr. Class's Right To Directly Appeal His Conviction
         Was Void. ............................................................................13

II.  THE GUN BAN VIOLATES THE SECOND AMENDMENT. ......................15

     A.  The Gun Ban Implicates The Second Amendment. ...................................15

     B.  The Gun Ban Fails Heightened Scrutiny. .................................................16

         1.  The Government Fails To Put Forward A Compelling Or
             Substantial Government Interest. ...........................................16

         2.  The Gun Ban Is Overbroad. .................................................18

             a.  What: The Government's Concealed-Carry Argument Is A
                 Catch-22. ..................................................................19

             b.  Who: Citizens Do Not Forfeit Constitutional Rights Simply
                 Because They "Choose" To Go To A Particular Location. .......20

             c.  Where: The Capitol Grounds Are "Expansive," And The
                 Maryland Avenue Parking Lot Is Not A Sensitive Place. ........21

         3.  The Gun Ban Could Easily Be Narrowed. ............................................26

III. THE GUN BAN IS VAGUE. ...............................................................27

CONCLUSION .....................................................................................29

# TABLE OF AUTHORITIES*

## CASES

*Board of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972) ..........................21

*Blackledge v. Perry*, 417 U.S. 21 (1974) ...............................................................8, 9

*Bonidy v. United States Postal Service*, 790 F.3d 1121 (10th Cir. 2015) ...............................................................................15, 20, 24, 27

*Coleman v. Burnett*, 477 F.2d 1187 (D.C. Cir. 1973)............................................11

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .............................................20

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) ..........................................................19

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)...............16, 18, 23

*Jeannette Rankin Brigade v. Chief of the Capitol Police*, 421 F.2d 1090 (D.C. Cir. 1969) ...........................................................................22

*Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C. 1972) ...............................................................................................22

*Johnson v. United States*, 135 S. Ct. 2551 (2015) ..................................................29

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012)...........................15

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) .........................................................26

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ...............................................20

*Menna v. New York*, 423 U.S. 61 (1975) ...............................................................8, 9

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ......................................15, 16, 17

*People v. Aguilar*, 2 N.E.3d 321 (Ill. 2013).......................................................15, 16

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014)...............15, 16, 19

*Schrader v. Holder*, 704 F.3d 980 (D.C. Cir. 2013) .........................................21, 26

---

* Authorities upon which we chiefly rely are marked with an asterisk.

*In re Sealed Case*, 702 F.3d 59 (D.C. Cir. 2012) ...........................................2, 3, 7

*United States v. Ahn*, 231 F.3d 26 (D.C. Cir. 2000) .................................................5

*United States v. Alegria*, 192 F.3d 179 (1st Cir. 1999) ..............................................3

*United States v. Andis*, 333 F.3d 886 (8th Cir. 2003) ..........................................2, 14

*United States v. Baucum*, 80 F.3d 539 (D.C. Cir. 1996) ........................................11

*United States v. Benchimol*, 471 U.S. 453 (1985) ....................................................5

*United States v. Broce*, 488 U.S. 563 (1989) .......................................10, 11, 12, 13

*United States v. Curcio*, 712 F.2d 1532 (2d Cir. 1983) .........................................8, 9

*United States v. Delgado-Garcia*, 374 F.3d 1337 (D.C. Cir. 2004) ...................7, 12

*United States v. Dorosan*, 350 F. App'x 874 (5th Cir. 2009)................................24

*United States v. Drew*, 200 F.3d 871 (D.C. Cir. 2000)...........................................11

*United States v. Hahn*, 359 F.3d 1315 (10th Cir. 2004) ...........................................7

*United States v. Hamilton*, 81 F.3d 173 (10th Cir. 1996)........................................5

*United States v. Knowles*, 29 F.3d 947 (5th Cir. 1994) ..........................................10

*United States v. Miranda*, 780 F.3d 1185 (D.C. Cir. 2015)...............................11, 12

*United States v. Old Dominion Boat Club*, 630 F.3d 1039 (D.C. Cir. 2011) ...............................................................................................13

*United States v. Ortega-Hernandez*, 804 F.3d 447 (D.C. Cir. 2015) .....................13

*United States v. Palacios-Casquete*, 55 F.3d 557 (11th Cir. 1995)........................11

*United States v. Rahman*, 642 F.3d 1257 (9th Cir. 2011)........................................2

*United States v. Saac*, 632 F.3d 1203 (11th Cir. 2011) ..........................................11

*United States v. Sandsness*, 988 F.2d 970 (9th Cir. 1993)................................. 10-11

*United States v. Shmuckler*, 792 F.3d 158 (D.C. Cir. 2015)...................................13

*United States v. Spear*, 753 F.3d 964 (9th Cir. 2014)........................................ 4, 7-8

*United States v. West*, 392 F.3d 450 (D.C. Cir. 2004)................................................5

*United States v. Whited*, 311 F.3d 259 (3d Cir. 2002)............................................10

## STATUTES

40 U.S.C. § 5102(c)(1)(C) ...................................................................28

## OTHER AUTHORITIES

*2011 Annual Report on Crime and Crime Control*,
    http://tinyurl.com/gov5eul ...................................................................25

*2012 Annual Report on Crime and Crime Control*,
    http://tinyurl.com/z9muzeu..................................................................25

Appendix for Appellants, *United States v. Miranda*, 780 F.3d 1185
    (D.C. Cir. 2015) (No. 13-3032) ..........................................................12

Brief of the District of Columbia, *Wrenn v. District of Columbia*, No.
    15-7057 (D.C. Cir. Aug. 27, 2015)......................................................24

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for
    Self-Defense*, 56 UCLA L. Rev. 1443 (2009)....................................17

U.S. Attorneys' Manual, Criminal Resource Manual...............................................3

iv

## SUMMARY OF ARGUMENT

The government argues that Mr. Class waived his right to directly appeal his conviction, but his plea agreement contains no such waiver.  To the contrary, it contains an integration clause stating that the parties did not make *any* promises or agreements *except those listed in writing in the plea agreement itself.*  The government easily could have obtained such a waiver, which are common in other plea deals, but it did not.  The plea agreement is a contract and the government's omission is decisive given the integration clause.  Even if not, the constitutional claims at issue here fall under the *Blackledge/Menna* exception and can be raised even after an unconditional guilty plea.

This Court can and should entertain the constitutional claims.  Mr. Class's conviction under 40 U.S.C. § 5104(e) (the "Gun Ban") should be vacated because the government fails to offer a substantial or persuasive reason for banning all weapons by all people at all times in a publicly-accessible parking lot.  The Gun Ban could easily be narrowed to focus on the same harms while minimizing its impact on Second Amendment rights.

**ARGUMENT**

I.     **MR. CLASS CAN APPEAL HIS UNDERLYING CONVICTION.**

    A.     **The Plea Agreement Contains An Integration Clause And Does Not Expressly Waive Mr. Class's Right To Appeal His Conviction.**

"[T]he burden of proof is on the Government to demonstrate that a plea agreement clearly and unambiguously waives a defendant's right to appeal." *United States v. Andis*, 333 F.3d 886, 890 (8th Cir. 2003) (*en banc*).  Because plea agreements are contracts, the question of whether a defendant waived a certain right depends on the unique circumstances of his own plea agreement—and a waiver of appellate rights is enforceable only when "'the language of the waiver encompasses his right to appeal on the grounds raised.'"  *United States v. Rahman,* 642 F.3d 1257, 1259 (9th Cir. 2011); *accord In re Sealed Case*, 702 F.3d 59, 63 n.2 (D.C. Cir. 2012).

Here, looking to the terms of the plea agreement—especially the integration clause—the Court should conclude that "the language of the waiver" does not "encompass[ Mr. Class's] right to appeal on the grounds raised."  *Rahman*, 642 F.3d at 1259.  At the very least, there is a doubt about whether the parties agreed that Mr. Class would give up his right to directly appeal his conviction—and any such doubt must be construed against the government.

2

### 1.    The Parties' Integration Clause Forbids The Government's Implied Waiver Argument.

It is well recognized that "[i]nterpretation of a plea agreement relies on contract law." *Sealed Case*, 702 F.3d at 63 n.2. "That means, of course, that an inquiring court should construe the written document within its four corners, 'unfestooned with covenants the parties did not see fit to mention.'" *United States v. Alegria,* 192 F.3d 179, 185 (1st Cir. 1999); *accord* U.S. Attorneys' Manual, Criminal Resource Manual § 626 ("A plea bargain is a contract between the prosecutor and the defendant" that "will depend upon the precise language used").

Looking to the "four corners" of Mr. Class's plea agreement, "the parties did not see fit to mention" any waiver of the right to directly appeal Mr. Class's conviction. *Alegria*, 192 F.3d at 185. The absence is conspicuous given that Mr. Class agreed to waive numerous *other* statutory and constitutional rights, including his right to directly appeal his sentence and his right to collaterally attack his conviction or sentence. *See Sealed Case*, 702 F.3d at 64 ("The fact that the plea agreement expressly eliminates an appeal right for forfeiture but not for restitution suggests that appeal of restitution has not been waived."); J.A.157–58. The absence of any mention of a waiver of the right to appeal the conviction is especially noticeable given that such clauses are commonplace in guilty pleas. As the Ninth Circuit recently noted, "there are numerous examples of appellate waivers that clearly encompass both the defendant's right to appeal his sentence

3

*and* his right to appeal his conviction." *United States v. Spear*, 753 F.3d 964, 968 (9th Cir. 2014) (emphasis in original). Given the commonality of such clauses and the absence of one here, the Court should conclude that Mr. Class never waived this right.

The government responds by insisting that "no explicit waiver is required" because the guilty plea *implicitly* waived Mr. Class's ability to directly appeal his conviction. Gov.Br.22.[1] But the government overlooks a critical part of Mr. Class's plea agreement: the integration clause, which states that the express terms of the guilty plea contain the *entirety* of the parties' agreement. The integration clause states: "No agreements, promises, understandings, or representations have been made by the parties or their counsel other than those contained in writing herein, nor will any such agreements, promises, understandings, or representations be made unless committed to writing and signed by you, defense counsel, and an Assistant United States Attorney for the District of Columbia." J.A.159. Given this language, the government cannot now seek the benefit of some implicit understanding that was never expressed in writing by all parties.

The government relies on several cases for the proposition that a guilty plea inherently waives all non-preserved claims—but none of those cases discusses the

---

[1] "Gov.Br.__" refers to the Government's response brief; "Am.Br.__" refers to Amicus's opening brief.

effect of an integration clause. *See* Gov.Br.20–23. This Court has repeatedly recognized that an integration clause is "*strong evidence that no implied promises existed—after all, integration clauses 'establish that the written plea bargain was adopted by the parties as a complete and exclusive statement of the terms of the agreement*.'" *United States v. Ahn*, 231 F.3d 26, 36 (D.C. Cir. 2000) (emphasis added). Thus, in *United States v. West*, 392 F.3d 450 (D.C. Cir. 2004), this Court quoted a similar integration clause and held that "[b]y itself, this language argues strongly against the existence of any unwritten promises by *either party to the agreement*." *Id.* at 455–56 (emphasis added).

The integration clause forecloses the government's argument that Mr. Class implicitly or inherently agreed to waive his very important right to appeal his underlying conviction. "The problem with the government's contention is that nothing in the agreement reflected this alleged understanding. … In effect, the government is attempting to add a term to the plea agreement, yet it fails to explain how it can do so in the face of the agreement's integration clause barring such unwritten understandings." *United States v. Hamilton*, 81 F.3d 173, 1996 WL 153891, at *4 (10th Cir. 1996).

It would be "error for the Court of Appeals to imply as a matter of law a term which the parties themselves did not agree upon." *United States v. Benchimol*, 471 U.S. 453, 456 (1985). Because the parties agreed to an integration

5

clause and did not expressly agree in writing that Mr. Class was waiving his right to appeal his underlying conviction, the government cannot now seek to imply such a waiver.

### 2.     The Parties' Subsequent Actions Confirm They Did Not Believe Mr. Class Waived His Right To Directly Appeal His Conviction.

The government insists that Mr. Class's Rule 11 colloquy shows that he intended to waive his right to directly appeal his conviction.  Gov.Br.14–15. However, the plea agreement's integration clause prohibits the government from trying to use the oral Rule 11 colloquy to alter the written terms of the agreement, which stated that the parties would not agree to any additional promises except those made in writing.  J.A.159.

Even if the Court were to consider evidence beyond the four corners of the plea agreement, that evidence demonstrates that the parties did *not* believe Mr. Class had waived his right to directly appeal his conviction.  For his part, Mr. Class almost immediately appealed his conviction—in fact he appealed before the district court even entered the judgment.  Am.Br.1.  For its part, the government did not raise the waiver argument until almost a *year* after Mr. Class filed his opening *pro se* brief with this Court.  If the government believed the waiver was so clear, the government presumably would have quickly moved to dismiss the appeal and thereby saved itself from the effort of responding to the merits.  "'[O]nly

through the efficient dismissal of an appeal will the government receive the benefit of its appellate waiver bargain.'  Invariably, in cases such as this one [with an appeal waiver], the government files a motion to dismiss the appeal after the defendant files his notice of appeal." *United States v. Hahn*, 359 F.3d 1315, 1328 (10th Cir. 2004) (*en banc*) (alterations omitted).  Here, the government filed no such motion.  In fact, this Court could conclude that the government has waived any alleged waiver by waiting so long to raise the issue and by doing so in the context of full merits briefing, which is the burden that an appellate waiver is specifically designed to avoid.  *Cf. United States v. Delgado-Garcia*, 374 F.3d 1337, 1340 (D.C. Cir. 2004) (concluding government waived reliance on appellate waiver).  At the very least, the parties' conduct shows they did not believe Mr. Class had waived his right to directly appeal.

At a minimum, there is an ambiguity as to the parties' intentions regarding the appeal waiver.  "In determining a waiver's scope, we will 'strictly construe appeal waivers and any ambiguities in these agreements will be read against the Government and in favor of a defendant's appellate rights.'"  *Hahn*, 359 F.3d at 1325 (alterations omitted); *accord In re Sealed Case*, 702 F.3d at 63 n.2.    In a case like this, it is especially appropriate for "the government to bear responsibility for the lack of clarity" in the plea, given that waivers of the right to appeal convictions are commonplace in "numerous" other guilty pleas, *Spear*, 753 F.3d at

968—yet the government chose not to secure one here.  Thus, if the Court has any doubts on this issue, it must resolve them against waiver.

### B.     Amicus's Claims Are Preserved Under *Blackledge/Menna*.

Even if this Court concludes that Mr. Class's plea agreement *sub silentio* waived his right to directly appeal his conviction, such a waiver still would not bar claims that the Gun Ban is unconstitutional.

The government concedes that Rule 11 does not serve as an *automatic* bar on appellate consideration of all pre-plea arguments.  Gov.Br.24–29.  Indeed, the Supreme Court has made clear that even unconditional guilty pleas do *not* "inevitably 'waive' all antecedent constitutional violations."  *Menna v. New York*, 423 U.S. 61, 62 n.2 (1975).  In *Blackledge v. Perry*, 417 U.S. 21 (1974), and *Menna v. New York*, 423 U.S. 61 (1975), the Supreme Court outlined when a defendant could appeal pre-plea constitutional claims following an unconditional guilty plea.  The rule that emerged from these cases is that a "'defendant who has been convicted on a plea of guilty may challenge his conviction on any constitutional ground that, if asserted before trial, would *forever preclude the state from obtaining a valid conviction against him*, regardless of how much the state might endeavor to correct the defect.  In other words, a plea of guilty may operate as a forfeiture of all defenses *except those that, once raised, cannot be cured.*'"  *United States v. Curcio*, 712 F.2d 1532, 1539 (2d Cir. 1983) (emphases added).

Thus, a plea does *not* waive claims that "the State may not convict [the defendant] no matter how validly his factual guilt is established," *Menna*, 423 U.S. at 63 n.2, and where the "'practical result is to prevent a trial from taking place at all,'" *Blackledge*, 417 U.S. at 31.

Amicus's arguments fall squarely under this exception. Amicus does not present evidentiary or procedural errors that could have been cured. Rather, the Second Amendment and vagueness claims go directly to whether the government could ever "'obtain[] a valid conviction against'" Mr. Class. *Curcio*, 712 F.2d at 1539. An unconstitutional statute cannot be "cured" no matter what procedures or evidence the government used, and no matter how overwhelmingly the government established that Mr. Class violated each element of the Gun Ban. Under *Blackledge/Menna*, such claims survive a guilty plea.

The government responds by arguing that the *Blackledge/Menna* exception can be used only for facial, not as-applied, constitutional challenges. Gov.Br.28–29. That position is belied by *Blackledge* and *Menna* themselves, neither of which involved a facial challenge; both involved as-applied claims of prosecutorial vindictiveness and double jeopardy. 417 U.S. at 30; 423 U.S. at 61–62. In any event, regardless of whether it is framed as facial or as-applied, an argument that a statute is unconstitutional means that, for this particular defendant, the "'practical result is to prevent a trial from taking place at all,'" *Blackledge*, 417 U.S. at 31, and

9

it is irrelevant whether the government could perhaps convict a *different person under different facts*.

To the extent the government uses the word "facial" to mean that the claims must be apparent based only on the face of the *indictment*, the Supreme Court has rejected that argument and made clear that *Blackledge/Menna* claims can be made based on the entire "existing record" from "the time the plea was entered"—not just the indictment itself. *United States v. Broce*, 488 U.S. 563, 575 (1989). Amicus's arguments in this appeal are based solely on the undisputed facts from the "existing record" created at the trial court.

Under these standards, many circuit courts have entertained challenges that a statute is unconstitutional as applied to a defendant who unconditionally pled guilty. In *United States v. Whited*, 311 F.3d 259 (3d Cir. 2002), the defendant "did not preserve her right to appeal the pretrial motion by entering a conditional guilty plea," but the Third Circuit held that her challenge—that the statute was "unconstitutional as applied to the facts of her case"—was "properly … within the narrow scope of review not barred by a guilty plea." *Id.* at 260, 262. The Fifth Circuit has likewise made clear that "a guilty plea does not waive the right of the defendant to challenge the constitutionality of the statute under which he is convicted." *United States v. Knowles*, 29 F.3d 947, 952 (5th Cir. 1994). Decisions from other circuits are in accord. *See United States v. Sandsness*, 988 F.2d 970,

10

971 (9th Cir. 1993); *United States v. Palacios-Casquete*, 55 F.3d 557, 561 (11th Cir. 1995).[2]

In a case decided just prior to *Blackledge* and *Menna*, this Court held that "[g]uilty pleas are survived, however, by claims that … the statute under which a defendant is charged is unconstitutional." *Coleman v. Burnett*, 477 F.2d 1187, 1194 n.20 (D.C. Cir. 1973).[3]  That position fully accords with *Blackledge/Menna* and controls here.

This Court has addressed *Blackledge/Menna* in a few subsequent cases, but none is on point because the success of the constitutional claims in those cases was not apparent from the "existing [trial] record" at "the time the plea was entered," as *Blackledge/Menna* requires.  *Broce*, 488 U.S. at 575.  For example, in *United States v. Baucum*, 80 F.3d 539, 540 (D.C. Cir. 1996), and *United States v. Drew*, 200 F.3d 871, 876 (D.C. Cir. 2000), the constitutional claims had not even been

---

[2] Some circuits label their review of constitutional challenges to a statute as implicating the court's "jurisdiction."  *See, e.g., United States v. Saac*, 632 F.3d 1203, 1208 (11th Cir. 2011) ("The constitutionality of … the statute under which defendants were convicted … is a jurisdictional issue that defendants did not waive upon pleading guilty." ).  But this use of "jurisdiction" is merely shorthand for the authority to constitutionally impose a punishment—the same inquiry under *Blackledge/Menna*.  The *Blackledge/Menna* exceptions do not implicate "subject matter jurisdiction," which is a completely separate inquiry. *United States v. Miranda*, 780 F.3d 1185, 1190 (D.C. Cir. 2015).

[3] *See also United States v. Drew*, 200 F.3d 871, 882–83 (D.C. Cir. 2000) (Edwards, J., concurring) ("'[A] guilty plea does not waive the right of the defendant to challenge the constitutionality of the statute under which he is convicted." (quoting *Knowles*, 29 F.3d at 952)).

raised at the trial court, and therefore they were certainly not apparent from the "existing record" at "the time the plea was entered." *Broce*, 488 U.S. at 575. Similarly, both *United States v. Delgado-Garcia*, 374 F.3d 1337 (D.C. Cir. 2004), and *United States v. Miranda*, 780 F.3d 1185 (D.C. Cir. 2015), are distinguishable because the constitutional claims in those cases all depended on an alleged lack of a factual "nexus" between the defendants and the United States. But as part of their guilty pleas, the defendants in both of those cases had conceded that there *was* a factual nexus,[4] and, accordingly, the success of the constitutional claims in those cases was actually *foreclosed* by the record at the time of the guilty plea. *Broce*, 488 U.S. at 575.[5]

Here, by contrast, the constitutional claims do not depend on challenging any factual issue actually conceded in the district court. Rather, the constitutional claims proceed under the assumption that the government's facts are entirely true and uncontested. Therefore, unlike in the cases above, the success of the

---

[4] *See Delgado-Garcia*, 374 F.3d at 1343; *Miranda*, 780 F.3d at 1190; *see also* Appendix for Appellants at App.124, App.137, *Miranda* (D.C. Cir.) (No. 13-3032) (waiving any right to contest jurisdiction of the United States over defendants and their crimes).

[5] In *Delgado-Garcia*, only one judge (Judge Sentelle) joined the dictum stating that a guilty plea waives *any* claim that the offense is not actually a crime. *See* 374 F.3d at 1351 (Randolph, J., concurring); *id.* at 1362 (Rogers, J., dissenting).

constitutional claims is evident from the "existing record" at "the time the plea was entered." *Id*.[6]

In sum, even if this Court concludes that Mr. Class's guilty plea waived his right to challenge his conviction, the Court should still entertain Amicus's arguments under the *Blackledge/Menna* exception.

## C.     Any Waiver Of Mr. Class's Right To Directly Appeal His Conviction Was Void.

If the Court concludes that Mr. Class's plea waived his right to directly challenge his conviction and that there is no *Blackledge/Menna* exception, the Court should conclude that the appellate waiver was invalid.  A valid waiver occurs only when there is an "'intentional relinquishment or abandonment of a known right.'"  *United States v. Shmuckler*, 792 F.3d 158, 165 n.7 (D.C. Cir. 2015).  "'The requirement that a plea agreement and waiver be entered into knowingly and voluntarily applies to each term of an agreement.'"  *United States v. Ortega-Hernandez*, 804 F.3d 447, 452 (D.C. Cir. 2015) (emphasis added).

Accordingly, the inquiry here is whether Mr. Class knowingly and intelligently waived his right to directly appeal his conviction.  Although he consulted "off and on" with stand-by counsel, S.A.92, Mr. Class was still *pro se*

---

[6] To the extent the Court concludes that any of these recent decisions conflicts with *Coleman*, this Court should follow *Coleman*.  "[W]hen a  conflict exists within our own precedent, we are bound by the earlier decision."  *United States v. Old Dominion Boat Club*, 630 F.3d 1039, 1045 (D.C. Cir. 2011).

when he pled guilty, S.A.89.  Given this, and given the plea agreement's integration clause and the express listing of other waived rights, a reasonable *pro se* person like Mr. Class could not have intentionally relinquished a right that was not even listed in his plea.  An implied waiver is antithetical to an intentional relinquishment.

This is especially true given that the Rule 11 colloquy here was unclear.  The district court told Mr. Class: "You can appeal a conviction after a guilty plea if you believe that your guilty plea was somehow unlawful."  S.A.102.  A *pro se* individual would "believe" that his guilty plea was "somehow unlawful" if it is based on a statute that is unconstitutional (in fact, that is the motivation behind *Blackledge/Menna*).  Thus, Mr. Class believed he retained his right to directly appeal his conviction—which he quickly did.  This understanding is reinforced by the fact that the government itself did not think to raise this argument until almost a year after Mr. Class filed his original *pro se* appellate brief.  In these circumstances, any waiver of Mr. Class's right to directly appeal his conviction was not knowing and voluntary.[7]

* * *

For these reasons, this Court should address the merits of this case.

---

[7] The government suggests that Amicus may have waived these arguments against waiver.  Gov.Br.24.  However, the government has the burden of showing an appellate waiver, and Amicus cannot respond until the government makes its arguments.  *See Andis*, 333 F.3d at 890.

## II.    THE GUN BAN VIOLATES THE SECOND AMENDMENT.

As Amicus argued in its Opening Brief, the Gun Ban violates the Second Amendment as applied to Mr. Class because the Ban prohibits any citizen from ever carrying or storing any weapon in a publicly-accessible place that the government deems is somehow "sensitive."   AmBr.16–50.   The Court should reject the government's arguments to the contrary.

### A.    The Gun Ban Implicates The Second Amendment.

As a threshold matter, the government does not seriously challenge the argument that the Gun Ban implicates the Second Amendment.  The government never argues that the Second Amendment is inapplicable outside of the home, claiming only that there is "significant debate among the courts on this question" and that the issue "was not addressed by the Supreme Court in *Heller*." Gov.Br.35.   Even on these counts, the government is incorrect.   Courts have repeatedly held or assumed that the Second Amendment *does* apply outside of the home.  *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125-26 (10th Cir. 2015); *Peruta v. Cnty. of San Diego*, 742 F.3d 1144, 1152–53 (9th Cir. 2014), *vacated pending en banc*, 781 F.3d 1106 (9th Cir. 2015); *Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 89 (2d Cir. 2012); *People v. Aguilar*, 2 N.E.3d 321, 327 (Ill. 2013).  Further, *Heller I* and *McDonald* both "contain language strongly suggesting if not outright confirming

15

that the second amendment right to keep and bear arms extends beyond the home." *Aguilar*, 2 N.E.3d at 327; *Moore*, 702 F.3d at 937.  This Court should reach the issue and join the circuits above in finding that the Second Amendment applies outside the home.   Am.Br.18-25.[8]

Because the Gun Ban "govern[s] conduct within the scope of the [Second] Amendment," the Court must proceed to the next step of "whether the provision passes muster under the appropriate level of constitutional scrutiny."  *Heller v. District of Columbia* (*"Heller II"*), 670 F.3d 1244, 1252 (D.C. Cir. 2011).[9]

### B.     The Gun Ban Fails Heightened Scrutiny.

#### 1.     The Government Fails To Put Forward A Compelling Or Substantial Government Interest.

As to the government interest involved, the government offers several unpersuasive arguments in support of its claim that there is "an obvious need to limit the availability of firearms" in the Maryland Avenue parking lot.  Gov.Br.53.

*First*, the government claims that it has a compelling interest in forbidding all weapons because the "Capitol Grounds provide an important forum for the

---

[8] By "declin[ing] to undertake a complete historical analysis of the scope and nature of the Second Amendment right outside the home," the government ultimately "misapprehend[s] both the nature of the Second Amendment right and the implications of … laws that prevent the vast majority of responsible, law-abiding citizens from carrying in public for lawful self-defense purposes."  *Peruta*, 742 F.3d at 1173–74.

[9] Strict scrutiny is appropriate here because the Second Amendment is a fundamental right.  Am.Br.25–29.  But regardless of whether strict or intermediate scrutiny applies, the Gun Ban still fails.

exercise of First Amendment rights." Gov.Br.52–53. But that argument proves too much. The fact that a location has First Amendment protections does not somehow strip it of Second Amendment protections. Sidewalks, streets, and parking lots are the paradigmatic locations for First Amendment activity—and yet they are the very same places where individuals would have the strongest Second Amendment rights while in public. *See Moore*, 702 F.3d at 937 (discussing right to carry arms in public because of the risk of "be[ing] attacked on a sidewalk in a rough neighborhood"); Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev. 1443, 1527 (2009) ("[O]pen spaces such as parking lots" are prototypical locations for Second Amendment rights).

*Second*, the government argues there is a "compelling interest" in "ensuring safety on its own property for the public and its own employees," as well as visitors. Gov.Br.53. Amicus agrees that there is a strong interest in safety *generally*. But the government never responds to the arguments specifically about legislative areas—*i.e.*, that there are at least sixteen States that allow citizens to carry firearms *into* their State Capitol buildings. Am.Br.31. The government fails to explain why it has such a strong interest in prohibiting firearms stored in cars in a parking lot somewhat near the Capitol, while so many States expressly permit citizens to bring firearms directly inside the State Capitol buildings themselves, which similarly contain government workers, legislators, and visitors. Also, if the

17

government were genuinely interested in protecting its employees, it would allow those same employees to leave their own firearms in their vehicles on Capitol Grounds while they are at work, rather than disarming them. Finally, the government fails to explain why—if it had such a strong interest in forbidding weapons—it did not place signs at the Maryland Avenue parking lot informing individuals that weapons are forbidden, as the government already does at the entrance to all government buildings. Am.Br.32.

The government cannot merely present "assertions"—it must provide "meaningful evidence" in support of the interests it asserts. *Heller II*, 670 F.3d at 1259. The Court should conclude from the government's silence that it lacks such evidence.

### 2.     The Gun Ban Is Overbroad.

In its Opening Brief, Amicus showed that the Gun Ban is overbroad in every sense: *what* it bans (all weapons), *who* is affected (all people), *where* it applies (a nearly 300 acre area including many publicly accessible streets and parking lots), and *when* it applies (at all times, even when Congress is not in session). Am.Br.32–49. The government offers a scattershot of arguments in response, but none is meritorious.[10]

---

[10] The government does not dispute that the Gun Ban is overbroad in terms of time limitations.

### a.  What:  The  Government's  Concealed-Carry Argument Is A Catch-22.

Amicus demonstrated that the Gun Ban prohibits carrying or having readily accessible *any* weapon of *any* type—whether carried openly, carried concealed, or stored in a vehicle.  Am.Br.33–34.  In response, the government attempts to sidestep this flat ban by claiming that Mr. Class's weapons were concealed, and therefore he "cannot complain" that the statute also prohibits "the open carrying of firearms."  Gov.Br.37 n.20.

It is undisputed, however, that the Gun Ban prohibits *all weapons of all types*—whether concealed, open, or stored in a vehicle.  *See* Gov.Br.37 n.20; Am.Br.34.  "[T]o ban *both* the open and concealed carriage of pistols 'would be to prohibit the bearing of those arms' altogether."  *Peruta*, 742 F.3d at 1159; *accord Drake v. Filko*, 724 F.3d 426, 449 (3d Cir. 2013) (Hardiman, J., dissenting) ("[A] State may prohibit the open *or* concealed carry of firearms, [but] it may not ban *both*.").  This shows why the government's argument here is effectively a shell game.  Mr. Class stored his weapons in his vehicle, and the government claims that this was improper "concealment," suggesting that he could challenge the Gun Ban only if he had carried the weapons openly.  *See* Gov.Br.37 n.20; *id.* at 46.  But if Mr. Class had carried them openly, the government would argue that he had no right to do so, and he instead should have stored the weapons in his vehicle.  Under the government's theory, no one can challenge the Gun Ban, because no matter

where the defendant possessed or stored weapons, the government will claim he should have done it differently and therefore he lacks standing to complain about overbreadth.

In any event, Mr. Class's storage of his weapons in his vehicle was not "concealed carry" in the historically-forbidden sense—*i.e.*, carrying weapons concealed *on his person*. *See, e.g., McDonald v. City of Chicago*, 561 U.S. 742, 933 (2010) (Breyer, J., dissenting) (noting historical prohibitions on individuals "carry[ing] about his person, hidden from common observation, any pistol, dirk, bowie knife, or weapon"); *Bonidy*, 790 F.3d at 1140 (Tymkovich, J., dissenting) ("[T]here is a material difference between carrying a firearm on one's person into the area of heightened concern and storing it in a less accessible location outside that key area."). Further, *Heller I* suggested that there was no historical dispute that an individual, when "on a journey, or as traveller"—as Mr. Class was—could transport weapons for defense, and such weapons would inherently be out of sight in the traveler's carriage or vehicle. *District of Columbia v. Heller ("Heller I")*, 554 U.S. 570, 618 (2008).

### b. Who: Citizens Do Not Forfeit Constitutional Rights Simply Because They "Choose" To Go To A Particular Location.

The government does not challenge Amicus's claim that the Gun Ban prohibits all citizens—regardless of their age and law-abiding nature—from

possessing weapons on the Capitol Grounds.   Am.Br.34–36.   Rather, the government claims that the Gun Ban is narrow because it "affects only people who choose to go" to the Capitol Grounds.   Gov.Br.53.   That rationale would have upheld the unconstitutional laws in *Heller I*, because they applied only to people who "choose" to live in the District of Columbia.   The government improperly views the Second Amendment as "a privilege" that the government "can grant … or withhold … on conditions," such as voluntary presence on public property.   *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 583 (1972).   The "privilege" theory of constitutional law was rejected long ago.   *Id.*[11]

### c.     Where: The Capitol Grounds Are "Expansive," And The Maryland Avenue Parking Lot Is Not A Sensitive Place.

The government claims the Gun Ban causes only a "*de minimis*" impact on Second Amendment rights because the Capitol Grounds is of "limited geographical scope."   Gov.Br.45.   In support, the government relies exclusively on an opinion that was later supplemented—and the later panel held that the Capitol Grounds is actually "a large area" that is "so extensive that [activity] which may take place

---

[11] The government suggests that Mr. Class is not a law-abiding citizen because he had been arrested in 2002 in Ohio for storing weapons in his vehicle and was also arrested in 2014 in North Carolina during a traffic stop.   Gov.Br.48–49.   However, only felonies and violent crimes are sufficient to suspend Second Amendment rights.   *See Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013).   The government concedes that Mr. Class "does not have a record of violent criminal activity," Gov.Br.48, and it is likewise undisputed that he has no felony convictions (aside from the conviction at issue here).

upon [it] might not be 'near' or 'in the immediate vicinity' of the Capitol itself." *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 577 n.1, 584 (D.D.C.) (three-judge panel), *aff'd* 409 U.S. 972 (1972).[12]  The government does not dispute that the Capitol Grounds covers almost 300 acres, including twelve parking lots and parts of thirty different streets.  Am.Br.40.  That is hardly a "*de minimis*" area.

Perhaps realizing that the Gun Ban affects an expansive geographic scope, the government next claims that the Maryland Avenue parking lot itself is a "sensitive place" where gun bans are *presumptively* (although not categorically) lawful.  In support, the government claims that the wide-open, publicly-accessible parking lot is actually a "non-public," "sensitive government complex" that is a "restricted access" area with "a guard station and street barriers."  Gov.Br.2, 5, 32, 33, 50.

Each of the government's characterizations of the Maryland Avenue parking lot is flatly contradicted by the record.  The government admitted below that the only "guard stations" and "street barriers" were located on *other* parts of the Capitol Grounds—not the Maryland Avenue parking lot.  J.A.125 n.1.  The government also conceded that there "is no sign that states this is the Capitol

---

[12] The government relies on the earlier opinion *Jeannette Rankin Brigade v. Chief of the Capitol Police*, 421 F.2d 1090 (D.C. Cir. 1969). Gov.Br.45.

Grounds." *Id.* It was therefore undisputed that Maryland Avenue is open to any member of the public at any time without any kind of screening—in fact, tourists frequently park there by mistake, and Mr. Class himself had parked there previously on several occasions without any incident, showing just how publicly-accessible and unsecured the lot is. J.A.128. The Court should take the government's newfound mischaracterizations as a signal that the government simply cannot offer credible evidence of why the Maryland Avenue parking lot is "sensitive" or "secure."[13]

The unfettered public access to the parking lot is critical to the Second Amendment analysis, because "self-defense is the 'core lawful purpose' protected" by the Second Amendment. *Heller II*, 670 F.3d at 1260. Any criminal with a weapon faces no barriers whatsoever to entering the parking lot and inflicting harm on anyone present—and citizens have a fundamental right to deter and defend such attacks by possessing their own weapons for self-defense. *Id.*

The government also ignores the important distinction between buildings and parking lots for Second Amendment purposes. The "presumption of

---

[13] The fact that Mr. Class "could have easily avoided" the parking lot by parking "one block to the west," Gov.Br.46, confirms the overbreadth of labeling the Maryland Avenue parking lot as "sensitive." Under a constitutional analysis, one government-owned, publicly-accessible parking lot cannot be extremely sensitive, while another government-owned, publicly-accessible parking lot across the street is completely different.

lawfulness associated with sensitivity [in the government building] does not necessarily hold in the adjacent parking lot." *Bonidy*, 790 F.3d at 1129 (Tymkovich, J., dissenting). After all, *Heller I* stated that weapons can presumptively be banned "*in* government buildings"—it did not use language like "near government buildings" or "on government property." This suggests that the Supreme Court did not intend for the "sensitive places" analysis to become an expansive exception to the Second Amendment, where the government can ban weapons in bubbles surrounding all sensitive places. That would convert *Heller I*'s limited exception into an exceedingly broad approval of bans across the entire city, especially when combined with the government's assertion in another case that bans on weapons *inside* government buildings already "effectively make[] public carrying impossible for many people who live and work in the District." Br. of the District of Columbia at 50, *Wrenn v. District of Columbia*, No. 15-7057 (D.C. Cir. Aug. 27, 2015).[14]

The government next contends that it can ban weapons because it owns the Capitol Grounds. Gov.Br.49–50. But the mere fact that the government owns the

---

[14] The government's repeated reliance on *United States v. Dorosan*, 350 F. App'x 874, 875 (5th Cir. 2009), is misplaced because in that case, the parking lot was a sensitive place *only* because it was used "as a place of regular government business," such as loading and unloading mail or other valuables. The government here never contends that government business is regularly conducted in the Maryland Avenue parking lot itself.

24

property does not mean that heightened scrutiny "'is somehow looser or more forgiving.'"  Am.Br.46–48 (quoting *Bonidy*, 790 F.3d at 1137 n.8 (Tymkovich, J., dissenting)).  The need for self-defense still applies on government property that is publicly accessible, because there is no security screening or barriers to keep out armed criminals.  The government cannot make its property fully accessible to the most dangerous people in society, then prohibit citizens like Mr. Class from even attempting to defend themselves.  Citizens do not shed their constitutional rights at the government property line.[15]

Finally, the government seems to claim that because Mr. Class accidentally parked in someone else's reserved parking spot, he forfeited his right to self-defense.  Gov.Br.46–47.  As discussed above, it is undisputed that there is unfettered public access to the lot itself, and it is undisputed that Mr. Class could drive his vehicle through the lot; in fact, hundreds of vehicles and buses drive through the very same lot every day.  Mr. Class was therefore *not* "in a location where [he was] not allowed to be in the first place."  Gov.Br.47.  Further, the

---

[15] The government provides no support for its claim that crime is so low on the Capitol Grounds that self-defense is unnecessary.  Gov.Br.45-46.  In fact, in 2011 to 2012 (the two years preceding Mr. Class's arrest), the Capitol Police reported 65 robberies, 18 aggravated assaults, 22 burglaries, and 71 cars stolen.  *See* Metropolitan Washington Council of Governments, *2011 Annual Report on Crime and Crime Control*, http://tinyurl.com/gov5eul; Metropolitan Washington Council of Governments, *2012 Annual Report on Crime and Crime Control*, http://tinyurl.com/z9muzeu.

25

Capitol Police did not even give Mr. Class a parking ticket—they issued "a warning"—which illustrates the trivial nature of mistakenly parking in this lot. J.A.103 n.2. The government offers no caselaw for its assertion that someone forfeits a constitutional right because he is given a warning for a parking violation; usually a violent crime or felony conviction is required to strip someone of a Second Amendment right. *See Schrader v. Holder*, 704 F.3d 980, 990 (D.C. Cir. 2013). In any event, the key inquiry under the Second Amendment is whether the Maryland Avenue parking lot is a sensitive place—and the fact that some parking spots are reserved at certain times does not suddenly convert the parking lot into a sensitive place, anymore than labeling a spot as handicapped-parking would have.

### 3.     The Gun Ban Could Easily Be Narrowed.

In a last ditch effort, the government claims that this Court should disregard the Gun Ban's significant overbreadth because it would be "simply unrealistic" to narrow the Gun Ban. Gov.Br.54. *First*, the government cannot claim a strong interest in a broad law simply because it is "easier" to write and enforce than a narrowly-tailored law would be. *McCullen v. Coakley*, 134 S. Ct. 2518, 2540 (2014).

*Second*, it would be easy for the government to narrow the Gun Ban while still addressing the relevant harms. For example, the government could:

(1)        return to a version of the Gun Ban that was in place from 1882 to 1967, which forbade the *discharge*—rather than the mere possession—of weapons on Capitol Grounds, *see* Am.Br.24;

(2)        prohibit weapons only inside the Capitol and the other government buildings;

(3)        recognize carry permits from the States, or establish a new permit system for carrying weapons on government property; or

(4)        prohibit weapons only during special events like inaugurations or when Congress is in active session.

Each of these simple alternatives shows that the Gun Ban is unconstitutionally overbroad, because the government could significantly narrow the law while still addressing the behavior Congress wanted to prevent: the criminal use of firearms.  The current Gun Ban, however, "assum[es] that the mere act of carrying a permitted firearm increases the likelihood that one will engage in criminal activities."  *Bonidy*, 790 F.3d at 1138 (Tymkovich, J., dissenting).  That theory is prohibited by the Second Amendment, which presumes that adults are responsible enough to "bear arms" for their own self-defense.

* * *

The government has failed to provide sufficient support for its decision to ban all weapons by all people at all times in a publicly-accessible parking lot.

## III.    THE GUN BAN IS VAGUE.

Amicus showed in its Opening Brief that the Gun Ban is also unconstitutionally vague.  Am.Br.51–56.   In response, the government claims that

27

this issue was not raised below.  Gov.Br.29-32.  However, Mr. Class argued to the district court that "at no time did the District of Columbia post signs that warned people of it[s] Firearm laws."  J.A.39.  He later made the same arguments in court. J.A.65.  Giving his *pro se* arguments the liberal construction required, Mr. Class sufficiently raised the issue of whether the Gun Ban provided warning that firearms were prohibited in the Maryland Avenue parking lot, and "warning" is the *lingua franca* of a vagueness challenge.  Accordingly, the issue was preserved.[16]

On the merits, the government claims that there is no difficulty in determining the relevant boundaries of the Capitol Grounds because the Botanic Garden—which is included in the Capitol Grounds—is described as bounded by "Maryland Avenue, Southwest" between First and Third Streets.   40 U.S.C. § 5102(c)(1)(C).  The government claims this is a "clear reference" to where Mr. Class parked.  Gov.Br.58.  But that provision states only that the Botanic Garden is bounded "on the north" by *"the curbline[]"* of "Maryland Avenue"—in other words, the Botanic Garden ends as soon as it hits Maryland Avenue's curbline and accordingly does not include Maryland Avenue *itself*.

Even if the boundaries could eventually be determined by an ordinary person, the government fails to respond to Amicus's argument that the confusion

---

[16] Judge Kessler herself noted, "I find it hard to imagine that there can be a new argument that [Mr. Class] ha[s]n't already made."  J.A.55.

about the Capitol Grounds boundaries is exacerbated by the fact that the Gun Ban contains no *mens rea*—which is especially troubling given the expansive scope of the Capitol Grounds.  Am.Br.54–55.  The government's silence is telling, given that its district court briefing touted the lack of any *mens rea* requirement for a conviction.  J.A.130–35.

Finally, the government claims that Mr. Class should have been on notice of the Gun Ban in the *parking lot* because he knew there were metal detectors in the *buildings* 1,000 feet away.  Gov.Br.61.  The presence of such security and barriers in the buildings—but not in the parking lot—actually provides the opposite inference: that the parking lot is different and that weapons can be stored there.

In sum, the due process clause does not permit a law that operates without any *mens rea* on an expansive and confusing set of geographic boundaries that includes many areas where an ordinary citizen would have no idea that his otherwise-protected Second Amendment actions actually constitute a felony subject to five years' imprisonment.  *See Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015).

## CONCLUSION

The Court should vacate Mr. Class's conviction and remand with instructions to dismiss the indictment.

March 17, 2016                          Respectfully submitted,

                                        /s/ David W. DeBruin

                                        DAVID W. DEBRUIN
                                        JESSICA RING AMUNSON
                                        R. TRENT MCCOTTER
                                        JENNER & BLOCK LLP
                                        1099 New York Ave., NW
                                        Suite 900
                                        Washington, DC 20001
                                        (202) 639-6000
                                        ddebruin@jenner.com
                                        jamunson@jenner.com
                                        tmccotter@jenner.com

## CERTIFICATE OF COMPLIANCE

I, R. Trent McCotter, in reliance on the word count of the word processing system used to prepare this brief, certify that the foregoing brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(ii) and Circuit Rule 32(a)(1).  The brief contains 6,998 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Circuit Rule 32(a)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in Times New Roman 14 point font.

March 17, 2016                                         /s/ R. Trent McCotter

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 17th day of March 2016, in accordance with Circuit Rule 25(c), I caused the foregoing brief to be filed with this Court's ECF system.  I have also caused a copy of this brief to be sent via certified mail to the address listed on the court docket for Mr. Class:

P.O. Box 435
High Shoals, NC 28077

/s/ R. Trent McCotter