1099 NEW YORK AVENUE NW, WASHINGTON, DC 20001

**JENNER&BLOCK** LLP

April 25, 2016

David W. DeBruin
Tel +1 202 639-6015
ddebruin@jenner.com

## VIA ELECTRONIC FILING AND HARD COPY

Mark Langer, Clerk of Court
United States Court of Appeals for the District of
Columbia Circuit
333 Constitution Avenue, N.W.
Washington, D.C. 20001

> Re:     **United States v. Rodney Class,**
> **Case No.: 15-3015**

Dear Mr. Langer:

Pursuant to F.R.A.P. 28(j), counsel for Court-appointed Amicus wishes to bring to the Court's attention the Supreme Court's recent order in *Caetano v. Massachusetts*, ___ S. Ct. ___, 2016 WL 1078932 (Mar. 21, 2016) (Exhibit A).  In *Caetano*, the Supreme Court vacated and remanded the decision of the Massachusetts Supreme Judicial Court, which had upheld a defendant's conviction for the "mere possession" of a stun gun in a vehicle in a supermarket "parking lot."  *Id.* at **3 (Alito, J., concurring).

Mr. Class, like the defendant in *Caetano*, was convicted for the "mere possession" of weapons stored in his vehicle in a publicly-accessible "parking lot."  Am.Br.4-7.  By applying the Second Amendment to such facts, *Caetano* supports Amicus's arguments that the Second Amendment applies outside of the home and prohibits the government from banning all weapons at all times from the Maryland Avenue parking lot.  Am.Rep.Br. 15-16.  *Caetano* also implicitly rejects the government's argument that storing weapons "out of plain view" in a vehicle is "not protected by the Second Amendment."  Gov.Br. 37 & n.20.

Further, counsel wishes to bring to the Court's attention the Supreme Court's decision in *Halbert v. Michigan*, 545 U.S. 605 (2005) (Exhibit B).  Although *Halbert* is not cited in Amicus's briefs, counsel may wish to rely on the case at oral argument.  In *Halbert*, the Supreme Court noted: "One who pleads guilty or *nolo contendere* may still raise on appeal '*constitutional defects that are irrelevant to his factual guilt*, double jeopardy claims requiring no further factual record, jurisdictional defects, challenges to the sufficiency of the evidence at the preliminary examination, preserved entrapment claims, mental competency claims, factual basis claims, claims that the state had no right to proceed in the first place, including claims that a defendant

was charged under an inapplicable statute, and claims of ineffective assistance of counsel.'"  *Id.* at 621-22 (emphasis added).  Counsel may rely on *Halbert* to argue that Mr. Class's guilty plea did not waive his ability to raise on appeal that the Gun Ban is constitutionally defective regardless of his "factual guilt."  Am.Rep.Br.8-10; Gov.Br.27-28.

Respectfully submitted,

/s/ David W. DeBruin

David W. DeBruin

cc:     Valinda Jones
        Jessica Ring Amunson
        R. Trent McCotter
        Rodney Class

# EXHIBIT A

Caetano v. Massachusetts, 136 S.Ct. 1027 (2016)
2016 WL 1078932, 16 Cal. Daily Op. Serv. 2934, 26 Fla. L. Weekly Fed. S 27

USCA Case #15-3015      Document #1610269      Filed: 04/25/2016      Page 4 of 35

136 S.Ct. 1027
Supreme Court of the United States

Jaime CAETANO

v.

MASSACHUSETTS.

No. 14–10078.
|
March 21, 2016.

**Synopsis**

**Background:** Defendant was convicted after a bench trial in the Massachusetts District Court Department, Framingham Division, Middlesex County, Robert V. Greco and Martine G. Carroll, JJ., of possession of a stun gun. Defendant's application for direct appellate review was granted. The Massachusetts Supreme Judicial Court, 470 Mass. 774, 26 N.E.3d 688, affirmed.

**[Holding:]** Upon granting certiorari, the Supreme Court held that lack of common use of stun guns at time of Second Amendment's enactment, unusual nature of stun guns as a modern invention, and lack of ready adaptability of stun guns for use in the military did not preclude stun guns from being protected by Second Amendment right to bear arms.

Certiorari granted; vacated and remanded.

Justice Alito filed an opinion concurring in the judgment, in which Justice Thomas joined.

West Headnotes (4)

**[1]** **Weapons**
 👉 What guns are allowed

The Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. U.S.C.A. Const.Amend. 2.

Cases that cite this headnote

**[2]** **Weapons**

👉 Constitutional, Statutory, and Regulatory Provisions

The Second Amendment right to bear arms is fully applicable to the States. U.S.C.A. Const.Amend. 2.

1 Cases that cite this headnote

**[3]** **Weapons**
 👉 What guns are allowed

Lack of common use of stun guns at time of Second Amendment's enactment, unusual nature of stun guns as a modern invention, and lack of ready adaptability of stun guns for use in the military, did not preclude stun guns from being protected by the Second Amendment right to bear arms. U.S.C.A. Const.Amend. 2.

1 Cases that cite this headnote

**[4]** **Weapons**
 👉 What guns are allowed

Second Amendment protection of the right to bear arms is not limited to weapons useful in warfare. U.S.C.A. Const.Amend. 2.

1 Cases that cite this headnote

**West Codenotes**

**Validity Called into Doubt**

M.G.L.A. c. 140, § 131J

**Opinion**

**\*1027** PER CURIAM.

**\*\*1** **[1]** **[2]** The Court has held that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," *District of Columbia v. Heller,* 554 U.S. 570, 582, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), and that this "Second Amendment right is fully applicable to the States," *McDonald v. Chicago,* 561 U.S. 742, 750, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). In this case, the Supreme Judicial Court of Massachusetts upheld a Massachusetts law prohibiting the possession of stun guns after examining

Caetano v. Massachusetts, 136 S.Ct. 1027 (2016)
2016 WL 1078932, 16 Cal. Daily Op. Serv. 2934, 26 Fla. L. Weekly Fed. S 27

USCA Case #15-3015          Document #1610269          Filed: 04/25/2016          Page 5 of 35

"whether a stun gun is the type of weapon contemplated by Congress in 1789 as being protected by the Second Amendment." 470 Mass. 774, 777, 26 N.E.3d 688, 691 (2015).

[3]    The court offered three explanations to support its holding that the Second Amendment does not extend to stun guns. First, the court explained that stun guns are not protected because they "were not in common use at the time of the Second Amendment's enactment." **1028 *Id.,* at 781, 26 N.E.3d, at 693. This is inconsistent with *Heller* 's clear statement that the Second Amendment "extends ... to ... arms ... that were not in existence at the time of the founding." 554 U.S., at 582, 128 S.Ct. 2783.

The court next asked whether stun guns are "dangerous per se at common law and unusual," 470 Mass., at 781, 26 N.E.3d, at 694, in an attempt to apply one "important limitation on the right to keep and carry arms," *Heller,* 554 U.S., at 627, 128 S.Ct. 2783; see *ibid.* (referring to "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons' "). In so doing, the court concluded that stun guns are "unusual" because they are "a thoroughly modern invention." 470 Mass., at 781, 26 N.E.3d, at 693–694. By equating "unusual" with "in common use at the time of the Second Amendment's enactment," the court's second explanation is the same as the first; it is inconsistent with *Heller* for the same reason.

[4]    Finally, the court used "a contemporary lens" and found "nothing in the record to suggest that [stun guns] are readily adaptable to use in the military." 470 Mass., at 781, 26 N.E.3d, at 694. But *Heller* rejected the proposition "that only those weapons useful in warfare are protected." 554 U.S., at 624–625, 128 S.Ct. 2783.

For these three reasons, the explanation the Massachusetts court offered for upholding the law contradicts this Court's precedent. Consequently, the petition for a writ of certiorari and the motion for leave to proceed *in forma pauperis* are granted. The judgment of the Supreme Judicial Court of Massachusetts is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

Justice ALITO, with whom Justice THOMAS joins, concurring in the judgment.

**2    After a "bad altercation" with an abusive boyfriend put her in the hospital, Jaime Caetano found herself homeless and "in fear for [her] life." Tr. 31, 38 (July 10, 2013). She obtained multiple restraining orders against her abuser, but they proved futile. So when a friend offered her a stun gun "for self-defense against [her] former boy friend," 470 Mass. 774, 776, 26 N.E.3d 688, 690 (2015), Caetano accepted the weapon.

It is a good thing she did. One night after leaving work, Caetano found her ex-boyfriend "waiting for [her] outside." Tr. 35. He "started screaming" that she was "not gonna [expletive deleted] work at this place" any more because she "should be home with the kids" they had together. *Ibid.* Caetano's abuser towered over her by nearly a foot and outweighed her by close to 100 pounds. But she didn't need physical strength to protect herself. She stood her ground, displayed the stun gun, and announced: "I'm not gonna take this anymore.... I don't wanna have to [use the stun gun on] you, but if you don't leave me alone, I'm gonna have to." *Id.,* at 35–36. The gambit worked. The ex-boyfriend "got scared and he left [her] alone." *Id.,* at 36.

It is settled that the Second Amendment protects an individual right to keep and bear arms that applies against both the Federal Government and the States. *District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008); *McDonald v. Chicago,* 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). That right vindicates the "basic right" of "individual self-defense." *Id.,* at 767, 130 S.Ct. 3020; see *Heller, supra,* at 599, 628, 128 S.Ct. 2783. Caetano's encounter with her violent ex-boyfriend illustrates the connection  *1029  between those fundamental rights: By arming herself, Caetano was able to protect against a physical threat that restraining orders had proved useless to prevent. And, commendably, she did so by using a weapon that posed little, if any, danger of permanently harming either herself or the father of her children.

Under Massachusetts law, however, Caetano's mere possession of the stun gun that may have saved her life made her a criminal. See Mass. Gen. Laws, ch. 140, § 131J (2014). When police later discovered the weapon, she was arrested, tried, and convicted. The Massachusetts Supreme Judicial Court affirmed the conviction, holding that a stun gun "is not the type of weapon that is eligible for Second Amendment protection" because it was "not in common use at the time of [the Second Amendment's] enactment." 470 Mass., at 781, 26 N.E.3d, at 693.

Caetano v. Massachusetts, 136 S.Ct. 1027 (2016)
2016 WL 1078932, 16 Cal. Daily Op. Serv. 2934, 26 Fla. L. Weekly Fed. S 27

USCA Case #15-3015    Document #1610269    Filed: 04/25/2016    Page 6 of 35

This reasoning defies our decision in *Heller,* which rejected as "bordering on the frivolous" the argument "that only those arms in existence in the 18th century are protected by the Second Amendment." 554 U.S., at 582, 128 S.Ct. 2783. The decision below also does a grave disservice to vulnerable individuals like Caetano who must defend themselves because the State will not.

## I

**\*\*3** The events leading to Caetano's prosecution occurred sometime after the confrontation between her and her ex-boyfriend. In September 2011, police officers responded to a reported shoplifting at an Ashland, Massachusetts, supermarket. The store's manager had detained a suspect, but he identified Caetano and another person in the parking lot as potential accomplices. Police approached the two and obtained Caetano's consent to search her purse. They found no evidence of shoplifting, but saw Caetano's stun gun. Caetano explained to the officers that she had acquired the weapon to defend herself against a violent ex-boyfriend.

The officers believed Caetano, but they arrested her for violating Mass. Gen. Laws, ch. 140, § 131J, "which bans entirely the possession of an electrical weapon," 470 Mass., at 775, 26 N.E.3d, at 689.[1] When Caetano moved to dismiss the charge on Second Amendment grounds, the trial court denied the motion.

A subsequent bench trial established the following undisputed facts. The parties stipulated that Caetano possessed the stun gun and that the weapon fell within the statute's prohibition.[2] The Commonwealth also did not challenge Caetano's testimony **\*1030** that she possessed the weapon to defend herself against the violent ex-boyfriend. Indeed, the prosecutor urged the court "to believe the defendant." Tr. 40. The trial court nonetheless found Caetano guilty, and she appealed to the Massachusetts Supreme Judicial Court.

The Supreme Judicial Court rejected Caetano's Second Amendment claim, holding that "a stun gun is not the type of weapon that is eligible for Second Amendment protection." 470 Mass., at 775, 26 N.E.3d, at 689. The court reasoned that stun guns are unprotected because they were "not 'in common use at the time' of enactment of the Second Amendment," *id.,* at 781, 26 N.E.3d, at 693 (quoting *Heller, supra,* at 627, 128 S.Ct. 2783), and because they fall within

the "traditional prohibition against carrying dangerous and unusual weapons," 470 Mass., at 779, 26 N.E.3d, at 692 (citing *Heller, supra,* at 627, 128 S.Ct. 2783).

## II

Although the Supreme Judicial Court professed to apply *Heller,* each step of its analysis defied *Heller* 's reasoning.

## A

The state court repeatedly framed the question before it as whether a particular weapon was " 'in common use at the time' of enactment of the Second Amendment." 470 Mass., at 781, 26 N.E.3d, at 693; see also *id.,* at 779, 780, 781, 26 N.E.3d, at 692, 693, 694. In *Heller,* we emphatically rejected such a formulation. We found the argument "that only those arms in existence in the 18th century are protected by the Second Amendment" not merely wrong, but "bordering on the frivolous." 554 U.S., at 582, 128 S.Ct. 2783. Instead, we held that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, *even those that were not in existence at the time of the founding.*" *Ibid.* (emphasis added).[3] It is hard to imagine language speaking more directly to the point. Yet the Supreme Judicial Court did not so much as mention it.

Instead, the court seized on language, originating in *United States v. Miller,* 307 U.S. 174, 59 S.Ct. 816, 83 L.Ed. 1206 (1939), that " 'the sorts of weapons protected were those "in common use at the time." ' " 470 Mass., at 778, 26 N.E.3d, at 692 (quoting *Heller, supra,* at 627, 128 S.Ct. 2783 in turn quoting *Miller, supra,* at 179, 59 S.Ct. 816). That quotation does not mean, as the court below thought, that only weapons popular in 1789 are covered by the Second Amendment. It simply reflects the reality that the founding-era militia consisted of citizens "who would bring the sorts of lawful weapons that they possessed at home to militia duty," *Heller,* 554 U.S., at 627, 128 S.Ct. 2783 and that the Second Amendment accordingly guarantees the right to carry weapons "typically possessed by law-abiding citizens for lawful purposes," *id.,* at 625, 128 S.Ct. 2783. While stun guns were not in existence at the end of the 18th century, the same is true for the weapons most commonly used today for self-defense, namely, revolvers and semiautomatic pistols. Revolvers were virtually unknown until well into the

Caetano v. Massachusetts, 136 S.Ct. 1027 (2016)
2016 WL 1078932, 16 Cal. Daily Op. Serv. 2934, 26 Fla. L. Weekly Fed. S 27

USCA Case #15-3015    Document #1610269    Filed: 04/25/2016    Page 7 of 35

19th century, [4] and semiautomatic pistols **\*1031** were not invented until near the end of that century. [5] Electronic stun guns are no more exempt from the Second Amendment's protections, simply because they were unknown to the First Congress, than electronic communications are exempt from the First Amendment, or electronic imaging devices are exempt from the Fourth Amendment. *Id.,* at 582 (citing *Reno v. American Civil Liberties Union,* 521 U.S. 844, 849, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997), and *Kyllo v. United States,* 533 U.S. 27, 35–36, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001)). As *Heller* aptly put it: "We do not interpret constitutional rights that way." 554 U.S., at 582, 128 S.Ct. 2783.

B

**\*\*4** The Supreme Judicial Court's holding that stun guns may be banned as "dangerous and unusual weapons" fares no better. As the *per curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual. Because the Court rejects the lower court's conclusion that stun guns are "unusual," it does not need to consider the lower court's conclusion that they are also "dangerous." See *ante,* at 1027 – 1028. But make no mistake—the decision below gravely erred on both grounds.

1

As to "dangerous," the court below held that a weapon is "dangerous per se" if it is " 'designed and constructed to produce death or great bodily harm' and 'for the purpose of bodily assault or defense.' " 470 Mass., at 779, 26 N.E.3d, at 692 (quoting *Commonwealth v. Appleby,* 380 Mass. 296, 303, 402 N.E.2d 1051, 1056 (1980)). That test may be appropriate for applying statutes criminalizing assault with a dangerous weapon. See *ibid.,* 402 N.E.2d, at 1056. But it cannot be used to identify arms that fall outside the Second Amendment. First, the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes. See *Heller, supra,* at 627, 128 S.Ct. 2783 (contrasting " 'dangerous and unusual weapons' " that may be banned with protected "weapons ... 'in common use at the time' "). Second, even in cases where dangerousness might be relevant, the Supreme Judicial Court's test sweeps far too broadly. *Heller* defined the "Arms" *covered by* the Second Amendment to include " 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.' " 554 U.S., at 581, 128 S.Ct. 2783. Under the decision below, however, virtually every covered arm would qualify as "dangerous."

Were there any doubt on this point, one need only look at the court's first example of "dangerous per se" weapons: "firearms." 470 Mass., at 779, 26 N.E.3d, at 692. If *Heller* tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous. 554 U.S., at 636, 128 S.Ct. 2783. *A fortiori,* stun guns that the Commonwealth's own witness described as "non-lethal force," Tr. 27, cannot be banned on that basis.

2

**\*\*5** The Supreme Judicial Court's conclusion that stun guns are "unusual" rested largely on its premise that one must ask whether a weapon was commonly used in 1789. See **\*1032** 470 Mass., at 780–781, 26 N.E.3d, at 693–694. As already discussed, that is simply wrong. See *supra,* at 1030 – 1031.

The court also opined that a weapon's unusualness depends on whether "it is a weapon of warfare to be used by the militia." 470 Mass., at 780, 26 N.E.3d, at 693. It asserted that we followed such an approach in *Miller* and "approved its use in *Heller.*" 470 Mass., at 780, 26 N.E.3d, at 693. But *Heller* actually said that it would be a "startling reading" of *Miller* to conclude that "only those weapons useful in warfare are protected." 554 U.S., at 624, 128 S.Ct. 2783. Instead, *Miller* and *Heller* recognized that militia members traditionally reported for duty carrying "the sorts of lawful weapons that they possessed at home," and that the Second Amendment therefore protects such weapons as a class, regardless of any particular weapon's suitability for military use. 554 U.S., at 627, 128 S.Ct. 2783; see *id.,* at 624–625, 128 S.Ct. 2783. Indeed, *Heller* acknowledged that advancements in military technology might render many commonly owned weapons ineffective in warfare. *Id.,* at 627–628, 128 S.Ct. 2783. But such "modern developments ... cannot change our interpretation of the right." *Ibid.*

In any event, the Supreme Judicial Court's assumption that stun guns are unsuited for militia or military use is untenable. Section 131J allows law enforcement and correctional officers to carry stun guns and Tasers, presumably for such purposes as nonlethal crowd control. Subduing members of a mob is little different from

"suppress[ing] Insurrections," a traditional role of the militia. U.S. Const., Art. I, § 8, cl. 15; see also *ibid.*(militia may be called forth "to execute the Laws of the Union"). Additionally, several branches of the U.S. armed services equip troops with electrical stun weapons to "incapacitate a target without permanent injury or known side effects." U.S. Army, Project Manager Close Combat Systems, PD Combat Munitions: Launched Electrode Stun Device (LESD), http://www.pica.army.mil/pmccs/combatmunitions/nonlethalsys/taserx26e.html (all Internet materials as last visited Mar. 18, 2016); see U.S. Marine Corps Administrative Message 560/08 (Oct. 2, 2008) (Marine Corps guidance for use of Tasers), http://www.marines.mil/News/Messages/MessagesDisplay/tabid/13286/Article/113024/marine-corps-training-and-use-of-human-electro-muscular-incapacitation-hemi-dev.aspx; Joint Non–Lethal Weapons Directorate, Non–Lethal Weapons (NLW) Reference Book 3 (2012) (Department of Defense report stating that "[m]ultiple Services employ" Tasers), http://dtic.mil/dtic/tr/fulltext/u2/a565971.pdf.

### C

**\*\*6** As the foregoing makes clear, the pertinent Second Amendment inquiry is whether stun guns are commonly possessed by law-abiding citizens for lawful purposes *today*. The Supreme Judicial Court offered only a cursory discussion of that question, noting that the " 'number of Tasers and stun guns is dwarfed by the number of firearms.' " 470 Mass., at 781, 26 N.E.3d, at 693. This observation may be true, but it is beside the point. Otherwise, a State would be free to ban *all* weapons *except* handguns, because "handguns are the most popular weapon chosen by Americans for self-defense in the home." *Heller, supra,* at 629, 128 S.Ct. 2783.

The more relevant statistic is that "[h]undreds of thousands of Tasers and stun guns have been sold to private citizens," who it appears may lawfully possess them in 45 States. *People v. Yanna,* 297 Mich.App. 137, 144, 824 N.W.2d 241, 245 (2012) (holding Michigan stun gun ban unconstitutional); see Volokh, **\*1033** Nonlethal Self–Defense, (Almost Entirely) Nonlethal Weapons, and the Rights To Keep and Bear Arms and Defend Life, 62 Stan. L. Rev. 199, 244 (2009) (citing stun gun bans in seven States); Wis. Stat. § 941.295 (Supp. 2015) (amended Wisconsin law permitting stun gun possession); see also Brief in Opposition 11 (acknowledging that "approximately 200,000 civilians owned stun guns" as of 2009). While less popular than handguns, stun guns are

widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment.

### III

The lower court's ill treatment of *Heller* cannot stand. The reasoning of the Massachusetts court poses a grave threat to the fundamental right of self-defense. The Supreme Judicial Court suggested that Caetano could have simply gotten a firearm to defend herself. 470 Mass., at 783, 26 N.E.3d, at 695. But the right to bear other weapons is "no answer" to a ban on the possession of protected arms. *Heller,* 554 U.S., at 629, 128 S.Ct. 2783. Moreover, a weapon is an effective means of self-defense only if one is prepared to use it, and it is presumptuous to tell Caetano she should have been ready to shoot the father of her two young children if she wanted to protect herself. Courts should not be in the business of demanding that citizens use *more* force for self-defense than they are comfortable wielding. [6]

Countless people may have reservations about using deadly force, whether for moral, religious, or emotional reasons —or simply out of fear of killing the wrong person. See Brief for Arming Women Against Rape & Endangerment as *Amicus Curiae* 4–5. "Self-defense," however, "is a basic right." *McDonald,* 561 U.S., at 767, 130 S.Ct. 3020. I am not prepared to say that a State may force an individual to choose between exercising that right and following her conscience, at least where both can be accommodated by a weapon already in widespread use across the Nation.

\* \* \*

**\*\*7** A State's most basic responsibility is to keep its people safe. The Commonwealth of Massachusetts was either unable or unwilling to do what was necessary to protect Jaime Caetano, so she was forced to protect herself. To make matters worse, the Commonwealth chose to deploy its prosecutorial resources to prosecute and convict her of a criminal offense for arming herself with a nonlethal weapon that may well have saved her life. The Supreme Judicial Court then affirmed her conviction on the flimsiest of grounds. This Court's grudging *per curiam* now sends the case back to that same court. And the consequences for Caetano may prove more tragic still, as her conviction likely bars her from ever bearing arms for self-defense. See Pet. for Cert. 14.

Caetano v. Massachusetts, 136 S.Ct. 1027 (2016)
2016 WL 1078932, 16 Cal. Daily Op. Serv. 2934, 26 Fla. L. Weekly Fed. S 27

USCA Case #15-3015    Document #1610269    Filed: 04/25/2016    Page 9 of 35

If the fundamental right of self-defense does not protect Caetano, then the safety of all Americans is left to the mercy of state authorities who may be more concerned about disarming the people than about keeping them safe.

**All Citations**

136 S.Ct. 1027, 2016 WL 1078932, 16 Cal. Daily Op. Serv. 2934, 26 Fla. L. Weekly Fed. S 27

Footnotes

1    Specifically, the statute prohibits the possession of any "portable device or weapon from which an electrical current, impulse, wave or beam may be directed, which current, impulse, wave or beam is designed to incapacitate temporarily, injure or kill." Mass. Gen. Laws, ch. 140, § 131J (2014). The statute includes exceptions for law-enforcement officers and weapon suppliers, who may possess electrical weapons "designed to incapacitate temporarily." *Ibid.* Violations are punishable by a fine of $500 to $1,000, imprisonment of 6 months to 2 ½ years, or both. *Ibid.*

2    Stun guns like Caetano's "are designed to stun a person with an electrical current" by running a current between two metal prongs on the device and placing the prongs in direct contact with the person. 470 Mass. 774, 775, n. 2, 26 N.E.3d 688, 689, n. 2 (2015). A similar device, popularly known by the brand name "Taser," shoots out wires tipped with electrodes that can deliver an electrical current from a distance. Tr. 25–26. Tasers can also be used like a stun gun without deploying the electrodes—a so-called "dry stun." *Id.,* at 26. As the Commonwealth's witness testified at trial, these sorts of electrical weapons are "non-lethal force" "designed to incapacitate"—"not kill"—a target. *Id.,* at 27.

3    Stun guns are plainly "bearable arms." As *Heller* explained, the term includes any "[w]eapo[n] of offence" or "thing that a man wears for his defence, or takes into his hands," that is "carr[ied] ... for the purpose of offensive or defensive action." 554 U.S., at 581, 584, 128 S.Ct. 2783 (internal quotation marks omitted).

4    See J. Bilby, A Revolution in Arms: A History of the First Repeating Rifles 23 (2006). Samuel Colt did not patent his famous revolver until 1836. *Ibid.*

5    See Firearms: An Illustrated History 166 (2014); see also W. Greener, The Gun and Its Development 524–529, 531–534 (9th ed. 1910) (discussing revolvers and self-loading semiautomatic pistols as "modern pistols").

6    The court below also noted that Massachusetts no longer requires a license to possess mace or pepper spray. 470 Mass., at 783, 26 N.E.3d, at 695. But the law was changed in 2014, after Caetano was convicted. A spray can also be foiled by a stiff breeze, while a stun gun cannot.

---

**End of Document**        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

see and plead facts showing a colorable basis for relief.[9]

The Court of Appeals got it right, and I respectfully dissent.



545 U.S. 605, 162 L.Ed.2d 552

**Antonio Dwayne HALBERT,
Petitioner,**

v.

**MICHIGAN.**

No. 03–10198.

Argued April 25, 2005.

Decided June 23, 2005.

**Background:** Indigent defendant pled nolo contendere in the Saginaw County Circuit Court to charges of second-degree criminal sexual conduct. After defendant's pro se motion to withdraw his plea was denied, the trial court and the Michigan Court of Appeals denied defendant's requests for appointed counsel to assist with application for leave to appeal. The Michigan Supreme Court declined review. Certiorari was granted.

**Holdings:** The United States Supreme Court, Justice Ginsburg, held that:

(1) Due Process and Equal Protection clauses require appointment of counsel for indigent defendants, convicted on their pleas, who seek access to first-tier review in Michigan Court of Appeals, abrogating *People v. Harris*, 470

Mich. 882, 681 N.W.2d 653, and *People v. Bulger*, 462 Mich. 495, 614 N.W.2d 103, and

(2) defendant could not, via his plea, have waived his due process and equal protection rights to appointed counsel.

Vacated and remanded.

Justice Thomas filed dissenting opinion joined by Justice Scalia and joined in part by the Chief Justice.

**1. Criminal Law ⟜1004, 1766**

Federal Constitution imposes on states no obligation to provide appellate review of criminal convictions; however, where state provides first appeals as of right, state must appoint counsel to represent indigent defendants.

**2. Criminal Law ⟜1766**

State need not appoint counsel to aid indigent defendant in discretionary appeal to state's high court, or in petitioning for review in United States Supreme Court.

**3. Constitutional Law ⟜3228, 4809
     Criminal Law ⟜1766**

Due Process and Equal Protection clauses require appointment of counsel for indigent defendants, convicted on pleas of guilty or nolo contendere, who seek access to first-tier review in Michigan Court of Appeals, even though such review is discretionary under state law; Court of Appeals sits as error-correcting instance and thus looks to merits of claims made in defendant's application for leave to appeal, and indigent defendants pursuing first-tier

---

**9.** It is not that I see the Court's rule as constitutionally troubling. But this case requires us to apply text that is ambiguous, and the Court's resolution of that ambiguity is based on the assumption that when Congress authorized the appointment of counsel in habeas cases, it would have intended the appointed lawyer to have one hand tied behind his back,

as compared with an attorney hired by a prisoner with money. That is not in my view a sound assumption. (The Court also observes that in this case counsel had plenty of time to file an amended petition, but that fact cannot drive this decision, for the rule the Court adopts today will of course apply in cases other than this one.)

**HALBERT v. MICHIGAN**
*Cite as 125 S.Ct. 2582 (2005)*

review in Court of Appeals are generally ill-equipped to represent themselves; abrogating *People v. Harris*, 470 Mich. 882, 681 N.W.2d 653, and *People v. Bulger*, 462 Mich. 495, 614 N.W.2d 103. U.S.C.A. Const.Amend. 14; M.C.L.A. Const. Art. 1, §20; M.C.L.A. § 770.3a.

**4. Criminal Law ⟷1766**

Indigent defendant who, following plea of nolo contendere, sought access to discretionary first-tier review in Michigan Court of Appeals, could not have waived, via his plea, his due process and equal protection guarantees of appointed counsel for application for leave to appeal; at time of plea, state law did not recognize right to appointed appellate counsel for defendants convicted on their pleas, and trial court did not inform defendant simply and directly that in his case there would be no access to appointed counsel. U.S.C.A. Const. Amend. 14; M.C.L.A. Const. Art. 1, §20; M.C.L.A. § 770.3a.

West Codenotes

**Unconstitutional as Applied**

M.C.L.A. § 770.3a.

┴₆₀₆*Syllabus* \*

In *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811, this Court held that, in criminal proceedings, a State must provide counsel for an indigent defendant in a first appeal as of right. Two considerations were key: (1) An appeal "of right" yields an adjudication on the "merits," *id.*, at 357, 83 S.Ct. 814, and (2) first-tier review differs from subsequent appellate stages "at which the claims have once been presented by a lawyer and passed upon by an appellate court," *id.*, at 356, 83

S.Ct. 814. Later, in *Ross v. Moffitt*, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341, the Court held that a State need not appoint counsel to aid a poor person seeking to pursue a second-tier discretionary appeal to the State's highest court, or, thereafter, certiorari review in this Court. *Id.*, at 610–612, 615–618, 94 S.Ct. 2437. The *Douglas* rationale does not extend to second-tier discretionary review, the Court explained, because, at that stage, error correction is not the reviewing court's prime function. 417 U.S., at 615, 94 S.Ct. 2437. Principal criteria for state high court review, *Ross* noted, include whether the issues presented are of significant public interest, whether the cause involves legal principles of major significance to the State's jurisprudence, and whether the decision below is in probable conflict with the high court's precedent. *Ibid.* Further, a defendant who has received counsel's aid in a first-tier appeal as of right would be armed with a transcript or other record of trial proceedings, a brief in the appeals court setting forth his claims, and, often, that court's opinion disposing of the case. *Ibid.*

Michigan has a two-tier appellate system. The State Supreme Court hears appeals by leave only. The intermediate Court of Appeals adjudicates appeals as of right from criminal convictions, except that a defendant convicted on a guilty or *nolo contendere* plea who seeks intermediate appellate court review must apply for leave to appeal. Under Michigan law, most indigent defendants convicted on a plea must proceed *pro se* in seeking leave to appeal to the intermediate court. In *People v. Bulger,* the Michigan Supreme Court held that the Fourteenth Amendment's Equal Protection and Due Process Clauses do not

---

\* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of

the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

secure a right to appointed counsel for plea-convicted defendants seeking review in the intermediate appellate court for these reasons: Such review is discretionary; plea proceedings are shorter, simpler, and more routine than trials; and a defendant entering a plea accedes to the State's fundamental interest in finality.

⎣606Petitioner Halbert pleaded *nolo contendere* to two counts of criminal sexual conduct. During Halbert's plea colloquy, the trial court advised him of instances in which it "must" or "may" appoint appellate counsel, but failed to tell him that it could not appoint counsel in any other circumstances, including Halbert's own case. The day after his sentence was imposed, Halbert moved to withdraw his plea. Denying the motion, the trial court stated that Halbert's proper remedy was to appeal to the State Court of Appeals. Twice thereafter, Halbert asked the trial court to appoint counsel to help him prepare an application for leave to appeal to the intermediate court, stating that his sentence had been misscored, that he needed counsel to preserve the issue before undertaking an appeal, that he had learning disabilities and was mentally impaired, and that he had been obliged to rely on fellow inmates in preparing his *pro se* filings. The court denied Halbert's motion, citing *Bulger*. Halbert then filed a *pro se* application for leave to appeal, asserting sentencing error and ineffective assistance of counsel and seeking, *inter alia*, remand for appointment of appellate counsel. The Court of Appeals denied leave "for lack of merit in the grounds presented." The Michigan Supreme Court declined review.

*Held:* The Due Process and Equal Protection Clauses require the appointment of counsel for defendants, convicted on their pleas, who seek access to first-tier review in the Michigan Court of Appeals. Pp. 2590–2595.

Two aspects of the Michigan Court of Appeals' process following plea-based convictions compel the conclusion that *Douglas,* not *Ross,* controls here. First, in ruling on an application for leave to appeal, that court looks to the merits of the appellant's claims. Second, indigent defendants pursuing first-tier review in the Court of Appeals are generally ill equipped to represent themselves. A defendant who pleads guilty or *nolo contendere* in a Michigan court, although he relinquishes access to an appeal as of right, is entitled to apply for leave to appeal, and that entitlement is officially conveyed to him. Of critical importance, the intermediate appellate court, unlike the Michigan Supreme Court, sits as an error-correction instance. A court Rule provides that the intermediate court may respond to a leave application in a number of ways: It may grant or deny the application, enter a final decision, grant other relief, request additional material from the record, or require a certified concise statement of proceedings and facts from the lower court. The court's response to the leave application by any of these alternatives—including denial of leave—necessarily entails some evaluation of the merits of the applicant's claims. Pp. 2590–2591.

This Court rejects Michigan's argument that *Ross* is dispositive here because review in the intermediate appellate court following a plea-based607 conviction is discretionary, given the necessity of filing an application for leave to appeal. The *Ross* Court recognized that leave-granting determinations by a State's highest court turn on considerations other than a lower court's commission of error, *e.g.,* the involvement of a matter of "significant public interest." 417 U.S., at 615, 94 S.Ct. 2437. Michigan's Supreme Court, like the highest courts of other States, sits not to correct errors in individual cases, but to decide matters of larger public import. By

contrast, the intermediate court, as an error-correction instance, is guided in responding to leave to appeal applications by the merits of the particular defendant's claims, not by the general importance of the questions presented. P. 2591.

Whether formally categorized as the decision of an appeal or the disposal of a leave application, the intermediate appellate court's ruling on a plea-convicted defendant's claims provides the first, and likely the only, direct review the defendant's conviction and sentence will receive. Parties like Halbert, however, are disarmed in their endeavor to gain first-tier review. *Ross* emphasized that a defendant seeking State Supreme Court review following a first-tier appeal as of right earlier had the assistance of appellate counsel, who will have reviewed the trial court record, researched the legal issues, and prepared a brief reflecting that review and research. 417 U.S., at 615, 94 S.Ct. 2437. Such a defendant may also be armed with an opinion of the intermediate appellate court addressing the issues counsel raised. Without such guides keyed to a court of review, a *pro se* applicant's entitlement to seek leave to appeal to Michigan's intermediate court may be more formal than real. Cf. *Swenson v. Bosler*, 386 U.S. 258, 87 S.Ct. 996, 18 L.Ed.2d 33 *(per curiam).* Persons in Halbert's situation, many of whom have little education, learning disabilities, and mental impairments, are particularly handicapped as self-representatives. See *Kowalski v. Tesmer*, 543 U.S. 125, 140, 125 S.Ct. 564, 160 L.Ed.2d 519 (GINSBURG, J., dissenting). Further, appeals by defendants convicted on their pleas may be "no less complex than other appeals." *Id.*, at 141, 125 S.Ct. at 574.

Michigan's complex procedures for seeking leave to appeal after sentencing on a plea, moreover, may intimidate the uncounseled. See *id.*, at 141–142, 125 S.Ct. at 574. The State does have a legitimate interest in reducing its judiciary's workload, but providing indigents with appellate counsel will yield applications easier to comprehend. Michigan's Court of Appeals would still have recourse to summary denials of leave applications in cases not warranting further review. And when a defendant's case presents no genuinely arguable issue, appointed counsel may so inform the court. Pp. 2591–2594.

The Court disagrees with Michigan's contention that, even if Halbert had a constitutionally guaranteed right to appointed counsel for first-level[608] appellate review, he waived that right by entering a *nolo contendere* plea. At the time he entered his plea, Halbert had no recognized right to appointed counsel he could elect to forgo. Moreover, the trial court did not tell Halbert, simply and directly, that in his case, there would be no access to appointed counsel. Cf. *Iowa v. Tovar*, 541 U.S. 77, 81, 124 S.Ct. 1379, 158 L.Ed.2d 209. Pp. 2594–2595.

Vacated and remanded.

GINSBURG, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, KENNEDY, SOUTER, and BREYER, JJ., joined. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined, and in which REHNQUIST, C. J., joined as to all but Part III–B–3, *post*, p. 2595.

———————

Gene E. Schaerr, for Louisiana, et al., as amici curiae, by special leave of the Court, supporting the respondent.

David A. Moran, Counsel of Record, Wayne State University Law School, Detroit, Michigan, Mark Granzotto, Royal Oak, Michigan, Michael J. Steinberg, Kary

L. Moss, American Civil Liberties Union Foundation of Michigan, Detroit, Michigan, Steven R. Shapiro, American Civil Liberties Union Foundation, New York, New York, Terence R. Flanagan, Hartland, Michigan, Counsel for Petitioner.

Michael A. Cox, Michigan Attorney General, Thomas L. Casey, Michigan Solicitor General, Counsel of Record, Bernard Eric Restuccia, Assistant Attorney General, Lansing, Michigan, Attorneys for Respondent.

For U.S. Supreme Court briefs, see:

    2005 WL 413044 (Pet.Brief)

    2005 WL 736818 (Resp.Brief)

    2005 WL 847513 (Reply.Brief)

Justice GINSBURG delivered the opinion of the Court.

_|₆₀₉_In 1994, Michigan voters approved a proposal amending the State Constitution to provide that "an appeal by an accused who pleads guilty or nolo contendere shall be by leave of the court." Mich. Const., Art. 1, § 20. Thereafter, "several Michigan state judges began to deny appointed appellate counsel to indigents" convicted by plea. *Kowalski v. Tesmer*, 543 U.S. 125, 127, 125 S.Ct. 564, 566, 160 L.Ed.2d 519 (2004). Rejecting challenges based on the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the Federal Constitution, the Michigan Supreme Court upheld this practice, and its codification in Mich. Comp. Laws Ann. § 770.3a (West 2000). *People v. Harris*, 470 Mich. 882, 681 N.W.2d 653 (2004); *People v. Bulger*, 462 Mich. 495, 511, 614 N.W.2d 103, 110 (2000).

Petitioner Antonio Dwayne Halbert, convicted on his plea of *nolo contendere*, sought the appointment of counsel to assist him in applying for leave to appeal to the Michigan Court of Appeals. The state trial court and the Court of Appeals denied Halbert's requests for appointed counsel, and the Michigan Supreme Court declined review.

Michigan Court of Appeals review of an application for leave to appeal, Halbert contends, ranks as a first-tier appellate proceeding requiring appointment of counsel under *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). Michigan urges that appeal to the State Court of Appeals is discretionary and, for an appeal of that order, *Ross v. Moffitt*, 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974), holds counsel need not be appointed. Earlier this Term, in *Kowalski v. Tesmer*, this Court, for prudential reasons, declined to reach the classification question posed by Michigan's system for appellate review following a plea of guilty, guilty but mentally ill, or *nolo contendere*. Today,_|₆₁₀_we reach the classification question and conclude that Halbert's case is properly ranked with *Douglas* rather than *Ross*. Accordingly, we hold that the Due Process and Equal Protection Clauses require the appointment of counsel for defendants, convicted on their pleas, who seek access to first-tier review in the Michigan Court of Appeals.

I

**[1, 2]** The Federal Constitution imposes on the States no obligation to provide appellate review of criminal convictions. *McKane v. Durston*, 153 U.S. 684, 687, 14 S.Ct. 913, 38 L.Ed. 867 (1894). Having provided such an avenue, however, a State may not "bolt the door to equal justice" to indigent defendants. *Griffin v. Illinois*, 351 U.S. 12, 24, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (Frankfurter, J., concurring in judgment); see *id.*, at 23, 76 S.Ct. 585 (same) ("[W]hen a State deems it wise and just that convictions be susceptible to review by an appellate court, it cannot by force of its exactions draw a line which precludes

convicted indigent persons . . . from securing such . . . review."). *Griffin* held that, when a State conditions an appeal from a conviction on the provision of a trial transcript, the State must furnish free transcripts to indigent defendants who seek to appeal. *Id.,* at 16–20, 76 S.Ct. 585 (plurality opinion). *Douglas* relied on *Griffin's* reasoning to hold that, in first appeals as of right, States must appoint counsel to represent indigent defendants. 372 U.S., at 357, 83 S.Ct. 814. *Ross* held, however, that a State need not appoint counsel to aid a poor person in discretionary appeals to the State's highest court, or in petitioning for review in this Court. 417 U.S., at 610–612, 615–618, 94 S.Ct. 2437.

Cases on appeal barriers encountered by persons unable to pay their own way, we have observed, "cannot be resolved by resort to easy slogans or pigeonhole analysis." *M.L.B. v. S.L. J.,* 519 U.S. 102, 120, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (internal quotation marks omitted). Our decisions in point reflect "both equal protection and due process concerns." *Ibid.* "The equal protection concern relates to the legitimacy of fencing out would-be |₆₁₁appellants based solely on their inability to pay core costs," while "[t]he due process concern harbors homes in on the essential fairness of the state-ordered proceedings." *Ibid.;* see also *Evitts v. Lucey,* 469 U.S. 387, 405, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985).

Two considerations were key to our decision in *Douglas* that a State is required to appoint counsel for an indigent defendant's first-tier appeal as of right. First, such an appeal entails an adjudication on the "merits." 372 U.S., at 357, 83 S.Ct. 814. Second, first-tier review differs from subsequent appellate stages "at which the claims have once been presented by [appellate counsel] and passed upon by an appellate court." *Id.,* at 356, 83 S.Ct. 814. Under the California system at issue in *Douglas,* the first-tier appellate court independently examined the record to determine whether to appoint counsel. *Id.,* at 355, 83 S.Ct. 814. When a defendant able to retain counsel pursued an appeal, the *Douglas* Court observed, "the appellate court passe[d] on the merits of [the] case only after having the full benefit of written briefs and oral argument by counsel." *Id.,* at 356, 83 S.Ct. 814. In contrast, when a poor person appealed, "the appellate court [wa]s forced to prejudge the merits [of the case] before it c[ould] even determine whether counsel should be provided." *Ibid.*

In *Ross,* we explained why the rationale of *Douglas* did not extend to the appointment of counsel for an indigent seeking to pursue a second-tier discretionary appeal to the North Carolina Supreme Court or, thereafter, certiorari review in this Court. The North Carolina Supreme Court, in common with this Court we perceived, does not sit as an error-correction instance. 417 U.S., at 615, 94 S.Ct. 2437. Principal criteria for state high court review, we noted, included "whether the subject matter of the appeal has significant public interest, whether the cause involves legal principles of major significance to the jurisprudence of the State, [and] whether the decision below is in probable conflict" with the court's precedent. *Ibid.* (internal quotation marks omitted). Further, we pointed out, a defendant who had already benefited₆₁₂ from counsel's aid in a first-tier appeal as of right would have, "at the very least, a transcript or other record of trial proceedings, a brief on his behalf in the Court of Appeals setting forth his claims of error, and in many cases an opinion by the Court of Appeals disposing of his case." *Ibid.*

II

A

Michigan has a two-tier appellate system comprising the State Supreme Court

and the intermediate Court of Appeals. The Michigan Supreme Court hears appeals by leave only. Mich. Comp. Laws Ann. § 770.3(6) (West Supp.2004). Prior to 1994, the Court of Appeals adjudicated appeals as of right from all criminal convictions. *Bulger,* 462 Mich., at 503–504, 614 N.W.2d, at 106–107. To reduce the workload of the Court of Appeals, a 1994 amendment to the Michigan Constitution changed the process for appeals following plea-based convictions. *Id.,* at 504, 614 N.W.2d, at 106–107. As amended, the State Constitution provides: "In every criminal prosecution, the accused shall have the right ... to have an appeal as a matter of right, except as provided by law an appeal by an accused who pleads guilty or nolo contendere shall be by leave of the court." Mich. Const., Art. 1, § 20.

A defendant convicted by plea who seeks review in the Michigan Court of Appeals must now file an application for leave to appeal pursuant to Mich. Ct. Rule 7.205 (2005). In response, the Court of Appeals may, among other things, "grant or deny the application; enter a final decision; [or] grant other relief." Rule 7.205(D)(2). If the court grants leave, "the case proceeds as an appeal of right." Rule 7.205(D)(3). The parties agree that the Court of Appeals, in its orders denying properly filed applications for leave, uniformly cites "lack of merit in the grounds presented" as the basis for its decision. See Tr. of Oral Arg. 21–22, 24, 39.

Under Michigan law, most indigent defendants convicted by plea must proceed *pro se* in seeking leave to appeal. ₆₁₃Michigan Comp. Laws Ann. § 770.3a (West 2000) provides, in relevant part, that a "defendant who pleads guilty, guilty but mentally ill, or nolo contendere shall not have appellate counsel appointed for review of the defendant's conviction or sentence," except that:

"(2) The trial court shall appoint appellate counsel for an indigent defendant [if the] prosecuting attorney seeks leave to appeal[, the] defendant's sentence exceeds the upper limit of the minimum sentence range of the applicable sentencing guidelines[, the] court of appeals or the supreme court grants the defendant's application for leave to appeal[, or the] defendant seeks leave to appeal a conditional plea . . . .

"(3) The trial court may appoint appellate counsel [if the] defendant seeks leave to appeal a sentence based upon an alleged improper scoring of an offense variable or a prior record variable[, the] defendant objected to the scoring or otherwise preserved the matter for appeal[, and the] sentence imposed by the court constitutes an upward departure from the upper limit of the minimum sentence range that the defendant alleges should have been scored." § 770.3a(1)-(3).

In *People v. Bulger,* the Michigan Supreme Court considered whether the Federal Constitution secures a right to appointed counsel for plea-convicted defendants seeking review in the Court of Appeals. 462 Mich., at 511, 614 N.W.2d, at 110. Recognizing *Douglas* and *Ross* as the guiding decisions, 462 Mich., at 511–516, 614 N.W.2d, at 110–112, the State Supreme Court concluded that appointment of counsel is not required for several reasons: Court of Appeals review following plea-based convictions is by leave and is thus "discretionary," *id.,* at 506–508, 519, 614 N.W.2d, at 108, 113; "[p]lea proceedings are ... shorter, simpler, and more routine than trials," *id.,* at 517, 614 N.W.2d, at 112; and by entering a plea, a defendant "accede[s] to the state's fundamental interest₆₁₄ in finality," *ibid.* In *People v. Harris,* the Michigan Supreme Court, adhering to *Bulger,* upheld the

constitutionality of § 770.3a. 470 Mich. 882, 681 N.W.2d 653.

**B**

Petitioner Halbert pleaded *nolo contendere* to two counts of second-degree criminal sexual conduct. App. 23. During Halbert's plea colloquy, the trial court asked Halbert, "You understand if I accept your plea you are giving up or waiving any claim of an appeal as of right," and Halbert answered, "Yes, sir." *Id.*, at 22. The court then advised Halbert of certain instances in which, although the appeal would not be as of right, the court nevertheless "must" or "may" appoint appellate counsel. The court did not tell Halbert, however, that it could not appoint counsel in any other circumstances, including Halbert's own case:

> "THE COURT: You understand if I accept your plea and you are financially unable to retain a lawyer to represent you on appeal, the Court must appoint an attorney for you if the sentence I impose exceeds the sentencing guidelines or you seek leave to appeal a conditional plea or the prosecutor seeks leave to appeal or the Court of Appeals or Supreme Court grants you leave to appeal. Under those conditions I must appoint an attorney, do you understand that?
>
> "THE DEFENDANT: Yes, sir.
>
> "THE COURT: Further, if you are financially unable to retain a lawyer to represent you on appeal, the Court may

appoint an attorney for you if you allege an improper scoring of the sentencing guidelines, you object to the scoring at the time of the sentencing and the sentence I impose exceeds the sentencing guidelines as you allege it should be scored. Under those conditions I may appoint an attorney for you, do you understand that?

> |₆₁₅"THE DEFENDANT: Yes, sir."

*Id.*, at 22–23 (alteration omitted).[1]

At Halbert's sentencing hearing, defense counsel requested that the sentences for the two counts run concurrently, but urged no error in the determination of Halbert's exposure under the Michigan sentencing guidelines. *Id.*, at 33. The trial court set Halbert's sentences to run consecutively. *Id.*, at 35. Halbert submitted a handwritten motion to withdraw his plea the day after sentencing. Denying the motion, the trial court stated that Halbert's "proper remedy is to appeal to the Michigan Court of Appeals." *Id.*, at 43.

Twice thereafter and to no avail, Halbert asked the trial court to appoint counsel to help him prepare an application for leave to appeal to the intermediate appellate court. He submitted his initial request on a form provided by the State. *Id.*, at 46–50, 53–57. The trial court denied the request. *Id.*, at 44–45, 51–52. Halbert next sent the trial court a letter and accompanying motion, again seeking appointed counsel. *Id.*, at 58. Halbert stated that his sentence had been misscored and that he needed the aid of counsel to preserve

---

1. Michigan provided Halbert with a form titled "Notice of Rights After Sentencing (After Plea of Guilty/Nolo Contendere) and Request for Appointment of Attorney." App. 46–50, 53–57. Resembling the advice conveyed to Halbert by the trial judge, the form described the circumstances in which counsel must or may be appointed, but did not expressly state that, absent such circumstances, counsel would not be provided. As revised, Michi-

gan's notice form now states: "You are not entitled to have a lawyer appointed at public expense to assist you in filing an application for leave to appeal . . . ." Advice Concerning Right To Appeal After Plea of Guilty/Nolo Contendere (rev. June 2004), available at http://courts.michigan. gov/scao/courtforms/appeals/cc265b.pdf (all Internet materials as visited June 21, 2005, and available in Clerk of Court's case file).

the issue before undertaking an appeal. *Id.,* at 58, 61–62. Halbert also related that he had "required special education due to learning disabilities," *id.,* at 61, and was "mentally impaired," *id.,* at 62. To prepare his *pro se* filings, he noted, |₆₁₆he was obliged to rely on the assistance of fellow inmates. *Id.,* at 61. The trial court denied Halbert's motion; citing *Bulger,* the court stated that Halbert "does not have a constitutional ... right to appointment of appellate counsel to pursue a discretionary appeal." App. 64.

Again using a form supplied by the State and acting *pro se,* Halbert filed an application for leave to appeal. *Id.,* at 66– 71. He asserted claims of sentencing error and ineffective assistance of counsel, *id.,* at 68, and sought, *inter alia,* remand for appointment of appellate counsel and resentencing, *id.,* at 71. In a standard form order, the Court of Appeals denied Halbert's application "for lack of merit in the grounds presented." *Id.,* at 72.

The State Supreme Court, dividing 5 to 2, denied Halbert's application for leave to appeal to that court. The dissenting justices would have provided for the appointment of counsel, and would have allowed counsel to file a supplemental leave application prior to the Court of Appeals' reconsideration of Halbert's pleas. *Id.,* at 84.

We granted certiorari, 543 U.S. 1042, 125 S.Ct. 823, 160 L.Ed.2d 609 (2005), to consider whether the denial of appointed counsel to Halbert violated the Fourteenth Amendment. We now vacate the judgment of the Michigan Court of Appeals.

**III**

[3] Petitioner Halbert's case is framed by two prior decisions of this Court concerning state-funded appellate counsel, *Douglas* and *Ross.* The question before us is essentially one of classification: With which of those decisions should the instant case be aligned? [2] We hold that *Douglas* provides the |₆₁₇controlling instruction. Two aspects of the Michigan Court of Appeals' process following plea-based convictions lead us to that conclusion. First, in determining how to dispose of an application for leave to appeal, Michigan's intermediate appellate court looks to the merits of the claims made in the application. Second, indigent defendants pursuing first-tier review in the Court of Appeals are generally ill equipped to represent themselves.

A defendant who pleads guilty or *nolo contendere* in a Michigan court does not thereby forfeit all opportunity for appellate review. Although he relinquishes access to an appeal as of right, he is entitled to apply for leave to appeal, and that entitlement is officially conveyed to him. See *supra,* at 2587–2588; Mich. Ct. Rule 6.425(E)(2)(a) (2005) ("[T]he defendant is entitled to file an application for leave to appeal."); see also Advice Concerning Right To Appeal, ¶ 1 ("You are entitled to file an application for leave to appeal with the Court of Appeals."), see *supra,* at 2589, n. 1. Of critical importance, the tribunal to which he addresses his application, the Michigan Court of Appeals, unlike the Michigan Supreme Court, sits as an error-correction instance.[3]

**2.** The question at hand, all Members of the Court agree, is whether this case should be bracketed with *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963), because appointed counsel is sought for initial review before an intermediate appellate court, or with *Ross v. Moffitt,* 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974), because a plea-

convicted defendant must file an application for leave to appeal. See *post,* at 2597 (THOMAS, J., dissenting) ("Michigan's system bears some similarity to the state systems at issue in both *Douglas* and *Ross.*").

**3.** Both the majority and the dissent in *People v. Bulger,* 462 Mich. 495, 614 N.W.2d 103 (2000), described the State's intermediate ap-

The Court of Appeals may respond to a leave application in a number of ways. It "may grant or deny the application; enter a final decision; grant other relief; request additional material from the record; or require a certified concise statement of proceedings and facts from the court . . . whose order $\lfloor_{619}$is being appealed." Mich. Ct. Rule 7.205(D)(2) (2005). When the court denies leave using the stock phrase "for lack of merit in the grounds presented," its disposition may not be equivalent to a "final decision" on the merits, *i.e.*, the disposition may simply signal that the court found the matters asserted unworthy of the expenditure of further judicial resources. But the court's response to the leave application by any of the specified alternatives—including denial of leave—necessarily entails some evaluation of the merits of the applicant's claims.

Michigan urges that review in the Court of Appeals following a plea-based conviction is as "discretionary" as review in the Michigan Supreme Court because both require an application for leave to appeal. See *Bulger*, 462 Mich., at 506–508, 519, 614 N.W.2d, at 108, 113; Brief for Respondent 31–34.[4] Therefore, Michigan maintains, *Ross* is dispositive of this case. The Court in *Ross*, however, recognized that leave-granting determinations by North Carolina's Supreme Court turned on considerations other than the commission of error

by a lower court, *e.g.*, the involvement of a matter of "significant public interest." See *supra*, at 2587. Michigan's Supreme Court, too, sits not to correct errors in individual cases, but to decide matters of larger public import. See Mich. Ct. Rule 7.302(B)(2)-(3) (2005) (criteria for granting leave to appeal to the Michigan Supreme Court include whether a case presents an "issue [of] significant public interest" or "involves legal principles of major significance to the state's jurisprudence"); *Great Lakes Realty Corp. v. Peters*$_{,619}$ 336 Mich. 325, 328–329, 57 N.W.2d 901, 903 (1953) (equating denial of an application for leave to appeal to the Michigan Supreme Court with denial of a petition for writ of certiorari in this Court); see also this Court's Rule 10 (considerations guiding decision whether to grant certiorari). By contrast, the Michigan Court of Appeals, because it is an error-correction instance, is guided in responding to leave to appeal applications by the merits of the particular defendant's claims, not by the general importance of the questions presented.

Whether formally categorized as the decision of an appeal or the disposal of a leave application, the Court of Appeals' ruling on a plea-convicted defendant's claims provides the first, and likely the only, direct review the defendant's conviction and sentence will receive. Parties like Halbert, however, are disarmed in their

---

pellate court's function as error correction. Compare *id.*, at 516–518, 614 N.W.2d, at 112–113 (in the majority's view, the Court of Appeals could perform its review function, despite the defendant's lack of representation, because plea-convicted defendants have ample aid for preservation of their claims in the trial court and ineffective assistance of counsel should be readily apparent to the Court of Appeals from the record), with *id.*, at 543, 614 N.W.2d, at 125 (Cavanagh, J., dissenting) ("[T]he function of our Court of Appeals is reviewing the merits and correcting errors made by the lower courts.").

**4.** The *Bulger* opinions nowhere describe the discretion exercised by the Michigan Court of Appeals as so unconstrained that it may "deny leave [to appeal] for any reason, or for no reason at all." *Post*, at 2600 (THOMAS, J., dissenting). Compare *Bulger*, 462 Mich., at 511, 614 N.W.2d, at 110 (appeal to intermediate court is discretionary because a defendant must "obtai[n] leave"); *id.*, at 506–508, 519, 614 N.W.2d, at 108, 113, with *id.*, at 542–543, 614 N.W.2d, at 125 (Cavanagh, J., dissenting) (Court of Appeals may deny leave to appeal where error is not outcome determinative).

endeavor to gain first-tier review. As the Court in *Ross* emphasized, a defendant seeking State Supreme Court review following a first-tier appeal as of right earlier had the assistance of appellate counsel. The attorney appointed to serve at the intermediate appellate court level will have reviewed the trial court record, researched the legal issues, and prepared a brief reflecting that review and research. 417 U.S., at 615, 94 S.Ct. 2437. The defendant seeking second-tier review may also be armed with an opinion of the intermediate appellate court addressing the issues counsel raised. A first-tier review applicant, forced to act *pro se*, will face a record unreviewed by appellate counsel, and will be equipped with no attorney's brief prepared for, or reasoned opinion by, a court of review.

The *Bulger* court concluded that "a pro se defendant seeking discretionary review" in the Court of Appeals is adequately armed because he "will have the benefit of a transcript, trial counsel's framing of the issues in [a] motion to withdraw, and the trial court's ruling on the motion." 462 Mich., at 518, 614 N.W.2d, at 113; see also Mich. Ct. Rule 6.005(H)(4) (2005) (trial counsel must file "postconviction motions[620] the lawyer deems appropriate, including motions . . . to withdraw plea, or for resentencing"); *post*, at 2600–2601 (THOMAS, J., dissenting).[5] But we held in *Swenson v. Bosler*, 386 U.S. 258, 87 S.Ct. 996, 18 L.Ed.2d 33 (1967) *(per curiam)*, that comparable materials prepared by trial counsel are no substitute for an appellate lawyer's aid. There, the Missouri court reviewing an indigent's post-trial appeal had before it a transcript plus trial counsel's "notice of appeal and . . . motion for new trial which

specifically designated the issues which could be considered on direct appeal." *Id.*, at 259, 87 S.Ct. 996. The absence of counsel in these circumstances, *Bosler* held, "violated [the defendant's] Fourteenth Amendment rights, as defined in *Douglas.*" *Ibid.* Adhering to *Douglas*, we explained that "[t]he assistance of appellate counsel in preparing and submitting a brief to the appellate court which defines the legal principles upon which the claims of error are based and which designates and interprets the relevant portions of the [record] may well be of substantial benefit to the defendant [and] may not be denied . . . solely because of his indigency." 386 U.S., at 259, 87 S.Ct. 996. Although *Bosler* involved a post-trial rather than postplea appeal, the Court recognized that a transcript and motion by trial counsel are not adequate stand-ins for an appellate lawyer's review of the record and legal research. Without guides keyed to a court of review, a *pro se* applicant's entitlement to seek leave to appeal to Michigan's intermediate court may be more formal than real.

Persons in Halbert's situation are particularly handicapped as self-representatives. As recounted earlier this Term, "[a]pproximately 70% of indigent defendants represented by appointed counsel plead guilty, and 70% of those convicted [621]are incarcerated." *Kowalski*, 543 U.S., at 140, 125 S.Ct., at 574 (GINSBURG, J., dissenting). "[Sixty-eight percent] of the state prison populatio[n] did not complete high school, and many lack the most basic literacy skills." *Ibid.* (citation omitted). "[S]even out of ten inmates fall in the lowest two out of five levels of literacy—marked by an

---

**5.** This assumes that trial counsel will recognize, in a postconviction motion, any issues appropriate for preservation for appellate review. A lawyer may not, however, perceive his own errors or the need for such a motion.

Defense counsel here, for example, whose performance Halbert alleged to be ineffective, apparently did not assist Halbert in preparing and filing his motion to withdraw his plea. See *supra*, at 2589–2590.

inability to do such basic tasks as write a brief letter to explain an error on a credit card bill, use a bus schedule, or state in writing an argument made in a lengthy newspaper article." *Ibid.* Many, Halbert among them, have learning disabilities and mental impairments. See U.S. Dept. of Justice, Bureau of Justice Statistics, A. Beck & L. Maruschak, Mental Health Treatment in State Prisons, 2000, pp. 3–4 (July 2001), http://www.ojp.usdoj. gov/bjs/ pub/pdf/mhtsp00.pdf (identifying as mentally ill some 16% of state prisoners and noting that 10% receive psychotropic medication).

Navigating the appellate process without a lawyer's assistance is a perilous endeavor for a layperson, and well beyond the competence of individuals, like Halbert, who have little education, learning disabilities, and mental impairments. See *Evitts*, 469 U.S., at 393, 105 S.Ct. 830 ("[T]he services of a lawyer will for virtually every layman be necessary to present an appeal in a form suitable for appellate consideration on the merits."); *Gideon v. Wainwright*, 372 U.S. 335, 345, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) ("Even the intelligent and educated layman has small and sometimes no skill in the science of law." (quoting *Powell v. Alabama*, 287 U.S. 45, 69, 53 S.Ct. 55, 77 L.Ed. 158 (1932))). Appeals by defendants convicted on their pleas may involve "myriad and often complicated" substantive issues, *Kowalski*, 543 U.S., at 145, 125 S.Ct., at 576 (GINSBURG, J., dissenting), and may be "no less complex than other appeals," *id.*, at 141, 125 S.Ct., at 574 (same). One who pleads guilty or *nolo contendere* may still raise on appeal

"constitutional defects that are irrelevant to his factual guilt, double jeopardy claims requiring no further factual record, jurisdictional defects, challenges to the sufficiency of the evidence at the preliminary examination, |₆₂₂preserved

entrapment claims, mental competency claims, factual basis claims, claims that the state had no right to proceed in the first place, including claims that a defendant was charged under an inapplicable statute, and claims of ineffective assistance of counsel." *Ibid.* (quoting *Bulger*, 462 Mich., at 561, 614 N.W.2d, at 133–134 (Cavanagh, J., dissenting); citations omitted).

Michigan's very procedures for seeking leave to appeal after sentencing on a plea, moreover, may intimidate the uncounseled. See *Kowalski*, 543 U.S., at 141–142, 125 S.Ct., at 574 (GINSBURG, J., dissenting). Michigan Ct. Rule 7.205(A) (2005) requires the applicant to file for leave to appeal within 21 days after the trial court's entry of judgment. "The defendant must submit five copies of the application 'stating the date and nature of the judgment or order appealed from; concisely reciting the appellant's allegations of error and the relief sought; [and] setting forth a concise argument . . . in support of the appellant's position on each issue.'" *Kowalski*, 543 U.S., at 141, 125 S.Ct., at 574 (GINSBURG, J., dissenting) (quoting Rule 7.205(B)(1)). Michigan does provide "a three-page form application accompanied by two pages of instructions for defendants seeking leave to appeal after sentencing on a . . . plea. But th[e] form is unlikely to provide adequate aid to an indigent and poorly educated defendant." *Ibid.* It directs the defendant to provide information such as "charge code(s), MCL citation/PACC Code," state the issues and facts relevant to the appeal, and "'state the law that supports your position and explain how the law applies to the facts of your case.'" *Id.*, at 141–142 (quoting Application for Leave To Appeal After Sentencing on Plea of Guilty or Nolo Contendere (rev.Oct.2003), http://courts.michigan.

gov/scao/courtforms/appeals/cc405.pdf; some internal quotation marks omitted). "This last task would not be onerous for an applicant familiar with law school examinations, but it is a tall order for a defendant of marginal literacy." *Kowalski*, 543 U.S., at 142, 125 S.Ct., at 574 (GINSBURG, J., dissenting).

|₆₂₃While the State has a legitimate interest in reducing the workload of its judiciary, providing indigents with appellate counsel will yield applications easier to comprehend.[6] Michigan's Court of Appeals would still have recourse to summary denials of leave applications in cases not warranting further review. And when a defendant's case presents no genuinely arguable issue, appointed counsel may so inform the court. See *Anders v. California*, 386 U.S. 738, 744, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967) ("[I]f counsel finds [the] case to be wholly frivolous, after a conscientious examination of it, he should so advise the court and request permission to withdraw," filing "a brief referring to anything in the record that might arguably support the appeal."); Tr. of Oral Arg. 27 ("[I]n a significant percentage of the cases . . . [,] after reviewing the case, the appel-

late counsel then concludes that there is no merit . . ., at which point then either a motion to withdraw may be filed or . . . the Michigan equivalen[t] of an Anders brief.").

[4] Michigan contends that, even if Halbert had a constitutionally guaranteed right to appointed counsel for first-level appellate review, he waived that right by entering a plea of *nolo contendere*. We disagree. At the time he entered his plea, Halbert, in common with other defendants convicted on their pleas, had no recognized right to appointed appellate counsel he could elect to forgo.[7] Moreover, as earlier observed,₆₂₄ the trial court did not tell Halbert, simply and directly, that in his case, there would be no access to appointed counsel. See *supra*, at 2589; cf. *Iowa v. Tovar*, 541 U.S. 77, 81, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004) ("Waiver of the right to counsel, as of constitutional rights in the criminal process generally, must be a 'knowing, intelligent ac[t] done with sufficient awareness of the relevant circumstances.' " (quoting *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970))).[8]

---

6. "No one questions," the *Bulger* court stated, "that the appointment of appellate counsel at state expense would be more efficient and helpful not only to defendants, but also to the appellate courts." 462 Mich., at 520, 614 N.W.2d, at 114.

7. Assuming, as Justice THOMAS suggests, that whether Michigan law conferred on Halbert a postplea right to appointed appellate counsel is irrelevant to whether Halbert waived a federal constitutional right to such counsel, *post*, at 2603–2604, the remainder of the dissent's argument slips from our grasp, see *post*, at 2604. No conditional waiver— "on[e] in which a defendant agrees that, if he has . . . a right, he waives it," *ibid.*—is at issue here. Further, nothing in Halbert's plea colloquy indicates that he waived an "unsettled," but assumed, right to the assistance of appointed appellate counsel, postplea. *Ibid.*

8. We are unpersuaded by the suggestion that, because a defendant may be able to waive his right to appeal entirely, Michigan can consequently exact from him a waiver of the right to government-funded appellate counsel. See Tr. of Oral Arg. 14. Many legal rights are "presumptively waivable," *post*, at 2602 (THOMAS, J., dissenting), and if Michigan were to require defendants to waive all forms of appeal as a condition of entering a plea, that condition would operate against moneyed and impoverished defendants alike. A required waiver of the right to appointed counsel's assistance when applying for leave to appeal to the Michigan Court of Appeals, however, would accomplish the very result worked by Mich. Comp. Laws Ann. § 770.3a (West 2000): It would leave indigents without access to counsel in that narrow range of circumstances in which, our decisions hold, the State must affirmatively ensure that poor defendants receive the legal assistance neces-

\* \* \*

For the reasons stated, we vacate the judgment of the Michigan Court of Appeals and remand the case for further proceedings not inconsistent with this opinion.

*It is so ordered.*

Justice THOMAS, with whom Justice SCALIA joins, and with whom THE CHIEF JUSTICE joins as to all but Part III–B–3, dissenting.

Petitioner Antonio Halbert pleaded no contest to charges that he sexually assaulted his stepdaughter and another |₆₉₅young girl. Michigan law did not provide Halbert—as a defendant convicted by a plea of guilty or no contest—an appointed attorney to help him prepare an application for leave to appeal to the Michigan Court of Appeals. The Court holds Michigan's law unconstitutional as applied to Halbert. It fails, however, to ground its analysis in any particular provision of the Constitution or in this Court's precedents. It also ignores that, even if there is a right to counsel in the circumstances at issue, the right is waivable and was validly waived here. I respectfully dissent.

**I**

To understand why the Court's holding is an unwarranted extension of our precedents, it is necessary first to understand the limits that Michigan places on the provision of court-appointed counsel for defendants who plead guilty or no contest. Before 1994, Michigan afforded all criminal defendants the right to appeal their convictions to the Michigan Court of Appeals. By the early 1990's, however, the

Michigan Court of Appeals had a backlog of thousands of cases awaiting decision, nearly a third of which were appeals by defendants who had pleaded guilty or no contest. *People v. Bulger,* 462 Mich. 495, 504, 614 N.W.2d 103, 107 (2000). To reduce this backlog, Michigan voters amended the Michigan Constitution in 1994 to provide that "[i]n every criminal prosecution, the accused shall ... have an appeal as a matter of right, except [that] an appeal by an accused who pleads guilty or nolo contendere shall be by leave of the court." Mich. Const., Art. 1, § 20; *Bulger, supra,* at 504, 614 N.W.2d, at 107. This constitutional amendment created a two-track system for Michigan defendants: The Michigan Court of Appeals must hear the appeals of those who dispute their guilt, while it may elect to hear the appeals of those who concede or do not contest their guilt of the substantive crime.

In 1999, the Michigan Legislature enacted the statute at issue here. It provides that, in general, a "defendant who |₆₉₆pleads guilty, guilty but mentally ill, or nolo contendere shall not have appellate counsel appointed for review of the defendant's conviction or sentence." Mich. Comp. Laws Ann. § 770.3a(1) (West 2000). Defendants who plead guilty or no contest do not, however, invariably lose the right to counsel on appeal; the statute contains exceptions to the general rule. The trial court must appoint appellate counsel for plea-convicted defendants if the State seeks leave to appeal, the defendant's sentence exceeds the upper limit of the applicable minimum guidelines range, or the defendant seeks leave to appeal a conditional plea. § 770.3a(2). Further, the trial

sary to provide meaningful access to the judicial system. See *Douglas,* 372 U.S., at 357–358, 83 S.Ct. 814; *M.L.B. v. S.L.J.,* 519 U.S. 102, 110–113, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996); cf. *Griffin v. Illinois,* 351 U.S. 12, 23,

76 S.Ct. 585, 100 L.Ed. 891 (1956) (Frankfurter, J., concurring in judgment) (ordinarily, "a State need not equalize economic conditions" between criminal defendants of lesser and greater wealth).

court may appoint appellate counsel for plea-convicted defendants who seek leave to appeal certain sentencing errors. § 770.3a(3). Finally, if the Court of Appeals grants leave to appeal, "the case proceeds as an appeal of right," Mich. Ct. Rule 7.205(D)(3) (2005), and the plea-convicted defendant is entitled to appointed counsel, Mich. Comp. Laws Ann. § 770.3a(2)(c). Thus, plea-convicted defendants lack appellate counsel only in certain types of cases, and only then when they are seeking leave to appeal.

## II

The majority nevertheless holds that Michigan's system is constitutionally inadequate. It finds that all plea-convicted indigent defendants have the right to appellate counsel when seeking leave to appeal. The majority does not say where in the Constitution that right is located—the Due Process Clause, the Equal Protection Clause, or some purported confluence of the two. *Ante,* at 2586–2587. Nor does the majority attempt to anchor its holding in the history of those Clauses. *M.L.B. v. S.L. J.,* 519 U.S. 102, 131, 133, 138, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (THOMAS, J., dissenting). Nor does the majority even attempt to ground its holding in the entirety of this Court's jurisprudence, which does not require paid appellate assistance for indigent criminal defendants. *Id.,* at 131–138, 117 S.Ct. 555. The |₆₃₇majority ignores the bulk of that jurisprudence and leaves those arguments unanswered.

Instead, the majority pins its hopes on a single case: *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). *Douglas,* however, does not support extending the right to counsel to any form of discretionary review, as *Ross v. Moffitt,* 417 U.S. 600, 94 S.Ct. 2437, 41 L.Ed.2d 341 (1974), and later cases make

clear. Moreover, Michigan has not engaged in the sort of invidious discrimination against indigent defendants that *Douglas* condemns. Michigan has done no more than recognize the undeniable difference between defendants who plead guilty and those who maintain their innocence, in an attempt to divert resources from largely frivolous appeals to more meritorious ones. The majority substitutes its own policy preference for that of Michigan voters, and it does so based on an untenable reading of *Douglas.*

## A

In *Douglas,* California granted an initial appeal as of right to all convicted criminal defendants. 372 U.S., at 356, 83 S.Ct. 814. However, the California Court of Appeal appointed counsel for indigent defendants only after determining whether counsel would be useful to the defendant or the court. *Ibid.* Thus the California appellate court was "forced to prejudge the merits" of indigent defendants' appeals, while it judged the merits of other defendants' appeals only after briefing and oral argument. *Ibid.*

In previous cases, this Court had considered state-imposed conditions like transcript and filing fees that prevented indigent criminal defendants from obtaining any appellate review. *Ross, supra,* at 606–607, 94 S.Ct. 2437 (discussing *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956), and its progeny). By contrast, in *Douglas,* California provided appellate review to all criminal defendants, but it did not provide a state subsidy for indigent defendants whose claims appeared unlikely to benefit from counsel's assistance. This Court nevertheless held that when States provide a first appeal as of right, they must |₆₃₈supply indigent defendants with counsel. *Ross, supra,* at 607, 94 S.Ct. 2437. In *Ross,* however, this

Court declined to extend *Douglas*' right to counsel beyond initial appeals as of right. States need not appoint counsel for indigent defendants who seek discretionary review in a State's highest court or this Court. *Ross, supra*, at 616–618, 94 S.Ct. 2437.

Michigan's system bears some similarity to the state systems at issue in both *Douglas* and *Ross*. Like the defendant in *Douglas*, Halbert requests appointed counsel for an initial appeal before an intermediate appellate court. But like the defendant in *Ross*, Halbert requests appointed counsel for an appeal that is discretionary, not as of right. Crucially, however, *Douglas* noted that its decision extended only to initial appeals *as of right*—and later cases have repeatedly reaffirmed that understanding.[1] This Court has never required States to appoint counsel for discretionary review. *Ross, supra*, at 610, 94 S.Ct. 2437; *Murray v. Giarratano*, 492 U.S. 1, 10–11, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989); see also *Pennsylvania v. Finley*, 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987). And an appeal permitted only "by leave of the court," Mich. Const., Art. 1, § 20, is discretionary—as the Michigan Supreme Court has recognized, *Bulger*, 462 Mich., at 519, 614 N.W.2d, at 113; *id.*, at 542–543, 614 N.W.2d, at 125 (Cavanagh, J., dissenting). Neither *Douglas* nor any other decision of this Court warrants extending the right to counsel to discretionary review, even on a defendant's initial appeal.

*$L_{629}$* Just as important, the rationale of *Douglas* does not support extending the right to counsel to this particular form of discretionary review. Admittedly, the precise rationale for the *Griffin/Douglas* line of cases has never been made explicit. *Ross, supra*, at 608–609, 94 S.Ct. 2437. Those cases, however, have a common theme. States may not impose financial barriers that preclude indigent defendants from securing appellate review altogether. *Griffin*, 351 U.S., at 17–18, 76 S.Ct. 585 (plurality opinion); *id.*, at 22, 76 S.Ct. 585 (Frankfurter, J., concurring in judgment); *Burns v. Ohio*, 360 U.S. 252, 258, 79 S.Ct. 1164, 3 L.Ed.2d 1209 (1959); *Smith v. Bennett*, 365 U.S. 708, 713–714, 81 S.Ct. 895, 6 L.Ed.2d 39 (1961). Nor may States create "'unreasoned distinctions'" among defendants, *M.L.B.*, 519 U.S., at 111, 117 S.Ct. 555 (quoting *Rinaldi v. Yeager*, 384 U.S. 305, 310, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966)); *Douglas, supra*, at 356, 83 S.Ct. 814; *Griffin, supra*, at 22–23, 76 S.Ct. 585 (Frankfurter, J., concurring in judgment), that "arbitrarily cut off appeal rights for indigents while leaving open avenues of appeals for more affluent persons," *Ross, supra*, at 607, 94 S.Ct. 2437.

Far from being an "arbitrary" or "unreasoned" distinction, Michigan's differentiation between defendants convicted at trial and defendants convicted by plea is sensible. First and perhaps foremost, the danger of wrongful convictions is less significant than in *Douglas*. In *Douglas*, California preliminarily denied counsel to all

---

1. *Douglas*, 372 U.S., at 357, 83 S.Ct. 814; *Ross*, 417 U.S., at 608, 94 S.Ct. 2437 ("*[Douglas]* extended only to initial appeals as of right"); *Evitts v. Lucey*, 469 U.S. 387, 394, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) (*Douglas* "is limited to the first appeal as of right"); *Pennsylvania v. Finley*, 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987) ("[T]he right to appointed counsel extends to the first appeal of right, and no further"); *Coleman v. Thompson*, 501 U.S. 722, 755, 111 S.Ct. 2546,

115 L.Ed.2d 640 (1991) ("*[Douglas]* establish[es] that an indigent criminal defendant has a right to appointed counsel in his first appeal as of right in state court"); see also *Wainwright v. Torna*, 455 U.S. 586, 587, 102 S.Ct. 1300, 71 L.Ed.2d 475 (1982) *(per curiam)* ("*[Ross]* held that a criminal defendant does not have a constitutional right to counsel to pursue discretionary state appeals or applications for review in this Court").

indigent defendants, regardless of whether they maintained their innocence at trial or conceded their guilt by plea. Here, Michigan preliminarily denies paid counsel only to indigent defendants who admit or do not contest their guilt. And because a defendant who pleads guilty "may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea," *Tollett v. Henderson*, 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973), the potential issues that can be raised on appeal are more limited, *Bulger*, 462 Mich., at 517, and n. 7, 614 N.W.2d, at 112–113, and n. 7. Further, as the Michigan Supreme Court has explained:

"Plea proceedings are also shorter, simpler, and more routine than trials; the record most often consists of the ⌊₆₃₀'factual basis' for the plea that is provided to the trial court. In contrast with trials, less danger exists in plea cases that the record will be so unclear, or the errors so hidden, that the defendant's appeal will be reduced to a meaningless ritual." *Id.*, at 517, 614 N.W.2d, at 112.

When a defendant pleads in open court, there is less need for counsel to develop the record and refine claims to present to an appellate court. These are all " '[r]easoned distinctions' " between defendants convicted by trial and those convicted by their own plea. *M.L.B.*, *supra*, at 111, 117 S.Ct. 555 (quoting *Rinaldi*, *supra*, at 310, 86 S.Ct. 1497).

The brief history of Michigan's system confirms this. When Michigan voters amended the State Constitution to establish the current system, roughly 13,000 civil and criminal appeals per year clogged the Michigan Court of Appeals' docket. Of those, nearly a third were appeals by criminal defendants who had pleaded guilty or no contest. Even though at the time plea-convicted defendants were appointed paid

appellate counsel, few of these defendants were granted relief on appeal. Simply put, Michigan's bar and bench were devoting a substantial portion of their scarce resources to thousands of cases with little practical effect. Reallocating resources was not "invidious discrimination" against criminal defendants, indigent or otherwise. *Douglas*, 372 U.S., at 356, 83 S.Ct. 814 (internal quotation marks omitted). It was an attempt to ensure "that frivolous appeals [were] not subsidized and public moneys not needlessly spent." *Griffin*, *supra*, at 24, 76 S.Ct. 585 (Frankfurter, J., concurring in judgment).

Today's decision will therefore do no favors for indigent defendants in Michigan—at least, indigent defendants with nonfrivolous claims. While defendants who admit their guilt will receive more attention, defendants who maintain their innocence will receive less. Even some defendants who plead guilty will feel the pinch, because plea-convicted defendants are entitled to counsel in preparing their leave applications if, for example, they appeal from conditional ⌊₆₃₁pleas, Mich. Comp. Laws Ann. § 770.3a(2)(d) (West 2005), or their sentences exceed the applicable guidelines ranges, § 770.3a(2)(b). And any plea-convicted defendant granted leave to appeal is entitled to appointed counsel. § 770.3a(2)(c). Holding Michigan's resources constant (since we have no control over the State's bar or budget), the majority's policy choice to redistribute the State's limited resources only harms those most likely to have worthwhile claims—to say nothing of "the cost of enabling courts and prosecutors to respond to the 'over-lawyering' of minor cases." *Alabama v. Shelton*, 535 U.S. 654, 681, 122 S.Ct. 1764, 152 L.Ed.2d 888 (2002) (SCALIA, J., dissenting); cf. *Rompilla v. Beard*, *ante*, 545 U.S. 403, 125 S.Ct. 2456, 162 L.Ed.2d 360 (KENNEDY, J., dissenting). Then, too, Michigan is under no constitutional obli-

gation to provide appeals for plea-convicted defendants. *Ante,* at 2586–2587 (citing *McKane v. Durston,* 153 U.S. 684, 14 S.Ct. 913, 38 L.Ed. 867 (1894)). Michigan may decline to provide an appellate process altogether (since the Court's ruling increases the cost of having a system of appellate review). Surely plea-convicted defendants would prefer appeals with limited access to counsel than no appeals at all.

B

The majority does not attempt to demonstrate that Michigan's system is the sort of "unreasoned" discrimination against indigent defendants *Douglas* prohibits. Instead, the majority says that this case is earmarked by two considerations that were also key to this Court's decision in *Douglas:* First, when a plea-convicted defendant seeks leave to appeal, the Michigan Court of Appeals adjudicates the leave application with reference to the merits. *Ante,* at 2590. Second, the plea-convicted defendant who seeks leave to appeal is "generally ill equipped to represent [himself]." *Ibid.* Neither of these arguments is correct.

1

The majority reasons that in adjudicating an application for leave to appeal, the Michigan Court of Appeals "is |₆₃₉guided . . . by the merits of the particular defendant's claims." *Ante,* at 2591. The distinction that *Douglas* drew, however, was not between appellate systems that involve "some evaluation of the merits of the applicant's claims" and those that do not, *ante,* at 2591, but instead between discretionary and mandatory review. *Supra,* at 2596–2598. Of course the California intermediate courts in *Douglas* evaluated cases on their merits: These courts were hearing appeals as of right.

The Michigan Court of Appeals probably does consider "the merits of the applicant's claims" in exercising its discretion; so do other courts of discretionary review, including this Court. For instance, this Court would be unlikely to grant certiorari in a case to announce a rule that could not alter the case's disposition, or to correct an error that had not affected the proceedings below. This Court often considers whether errors are worth correcting in both plenary and summary dispositions. None of this converts discretionary, error-noticing review into mandatory, error-correcting review.

Likewise, the Michigan Court of Appeals is not required to hear particular cases or correct particular errors. It may elect to hear cases when it finds the trial court's disposition questionable or dubious. Or it may elect to hear cases when it finds the trial court's disposition important or interesting. For all we know, it may (and probably does) consider both. Regardless, the Court of Appeals' decision to grant review remains "discretionary," because it does not depend on "whether there has been 'a correct adjudication of guilt' in every individual case." *Ross,* 417 U.S., at 615, 94 S.Ct. 2437. Like other courts of discretionary review, the Court of Appeals may opt to correct errors, *ante,* at 2590–2591, and n. 3—but it is not compelled to do so.

The majority appears to dispute that review before the Michigan Court of Appeals is truly discretionary, *ante,* at 2591–2592, and n. 4, but it provides no support for its speculation. Unlike the California Court of Appeal in *Douglas* |₆₃₈the Michigan Court of Appeals has discretion in deciding whether to grant leave applications. See *Bulger,* 462 Mich., at 519, 614 N.W.2d, at 113 (describing the issue as "whether a defendant is entitled under the federal constitution to appointed counsel in

a first *discretionary* appeal from a plea-based conviction" (emphasis in original)); *id.*, at 542–543, 614 N.W.2d, at 125 (Cavanagh, J., dissenting) ("Nothing in our court rules or statute preclude the Court of Appeals from denying leave even though it may believe that the trial court's decision was incorrect"). So far as we can tell, the Michigan Court of Appeals' decision to grant or deny a leave application is not constrained by any state constitutional provision, statute, or court rule. The Michigan Court of Appeals may deny leave for any reason, or for no reason at all.

The majority's holding suggests that Michigan's system would pass constitutional muster if the Court of Appeals recited "lack of importance in the grounds presented" as its ground for denying leave, *ante*, at 2591–2592, or if its decisional criteria were set forth in a statute, judicial decision, or court rule, *ibid.* Yet the relevant inquiry under *Douglas* and *Ross* is whether the Court of Appeals is obliged to review the case—not whether the Court of Appeals must or does offer a particular ground for declining review.

### 2

The majority also asserts that, without counsel, plea-convicted defendants who seek leave to appeal are "generally ill equipped to represent themselves." *Ante*, at 2590. This overgeneralizes *Douglas'* rationale. The *Douglas* Court was concerned with the "barren record" that would follow a defendant on appeal. 372 U.S., at 356, 83 S.Ct. 814. For "where the record [was] unclear or the errors [were] hidden," the appellate court would have difficulty detecting errors without the assistance of counsel. *Id.*, at 358, 83 S.Ct. 814.

This is in part why this Court in *Ross* did not extend the right to counsel to discretionary review before the North

Carolina Supreme Court. Before that court, a defendant applying for leave had "a transcript or other record of trial proceedings, a brief on his behalf in the Court of Appeals setting forth his claims of error, and in many cases an opinion by the Court of Appeals disposing of his case." 417 U.S., at 615, 94 S.Ct. 2437. Coupled with whatever the defendant might submit on his own, these materials provided the State Supreme Court "with an adequate basis for its decision to grant or deny review." *Ibid.*

The majority does not argue that indigent plea-convicted defendants who file leave applications do so with a "barren record," *Douglas, supra*, at 356, 83 S.Ct. 814, or that the Michigan Court of Appeals lacks an "adequate basis" for reviewing their leave applications, *Ross, supra*, at 615, 94 S.Ct. 2437. The Michigan Supreme Court put it best:

"[Michigan's] court rules require trial counsel to assist the defendant in organizing and presenting to the trial court any potential appellate issues that warrant preservation. Accordingly, a pro se defendant seeking discretionary review will have the benefit of a transcript, trial counsel's framing of the issues in the motion to withdraw, and the trial court's ruling on the motion." *Bulger, supra*, at 518, 614 N.W.2d, at 113; see also Mich. Ct. Rule 6.005(H)(4) (2005).

As in *Ross*, these materials aid both the plea-convicted defendant and the Michigan Court of Appeals in identifying claims appropriate for plenary consideration. A plea-convicted defendant does not face a record unreviewed by counsel, and he does not lack any reasoned treatment of his claims. And, again, plea proceedings tend to be more transparent than trials, *supra*, at 2597–2598; "less danger exists in plea cases that the record will be so unclear, or the errors so hidden," *Bulger, supra*, at

517, 614 N.W.2d, at 112, that the Michigan Court of Appeals will be unable to identify issues that deserve further examination on appeal. After all, the ⌊635⌋Michigan Court of Appeals need know only enough to decide whether to grant further review. Should it elect to do so, Michigan law requires the appointment of counsel to aid in the appeal. Mich. Comp. Laws Ann. § 770.3a(2)(c) (2005).

The majority's unwillingness to confront the distinctions between Michigan's system and the California system at issue in *Douglas* is made clear by its reliance on *Swenson v. Bosler*, 386 U.S. 258, 87 S.Ct. 996, 18 L.Ed.2d 33 (1967) *(per curiam)*. *Swenson* considered whether indigent defendants convicted at trial have a right to appointed counsel during their initial appeal as of right, even if the State provides indigent defendants with a trial transcript and a motion for a new trial prepared by trial counsel. *Id.*, at 258–259, 87 S.Ct. 996. But *Douglas* had already answered that question, as this Court summarily declared: "[Appointed counsel] may not be denied to a criminal defendant, solely because of his indigency, on the only appeal which the State affords him *as a matter of right*." 386 U.S., at 259, 87 S.Ct. 996 (emphasis added). Of course, Michigan's entire argument is that there is a "[r]easoned distinctio[n]" between defendants convicted following trials and pleas, as there is between appeals as of right and discretionary review. *M.L.B.*, 519 U.S., at 111, 117 S.Ct. 555 (internal quotation marks omitted); Brief for Respondent 28. This Court's brief, *per curiam* opinion in *Swenson* did not consider, much less address, these arguments.

Lacking support in this Court's cases, the majority effects a not-so-subtle shift from whether the record is adequate to enable discretionary review to whether plea-convicted defendants are generally able to "[n]aviga[te] the appellate process

without a lawyer's assistance." *Ante*, at 2593. This rationale lacks any stopping point. *Pro se* defendants may have difficulty navigating discretionary direct appeals and collateral proceedings, but this Court has never extended the right to counsel beyond first appeals as of right. *Supra*, at 2589, and n. 1. The majority does not demonstrate that *pro se* defendants have any more difficulty filing leave applications⌊636⌋ before the Michigan courts than, say, filing petitions for certiorari before this Court.

In fact, this Court receives thousands of *pro se* petitions every year that list "the date and nature of the judgment or order appealed from," Mich. Ct. Rule 7.205(B)(1) (2005); "reci[te] the appellant's allegations of error and the relief sought," *ibid.;* and "se[t] forth a concise argument . . . in support of the appellant's position on each issue," *ibid.* See this Court's Rule 14 (setting forth analogous requirements for petitions for writs of certiorari). Michigan actually provides a three-page form application accompanied by two pages of instructions for defendants seeking leave to appeal after sentencing on a plea. It counsels defendants to "state the issues and facts relevant to the appeal," and "state the law that supports your position and explain how the law applies to the facts of your case." *Ante*, at 2593 (internal quotation marks omitted). The majority gives no clue as to how Michigan could make its procedures for seeking leave to appeal less intimidating to the uncounseled. *Ibid.* Regardless, Michigan's procedures are more than sufficient to enable discretionary review.

The majority then attempts to soften the blow by saying that it is doing the State a favor, because "providing indigents with appellate counsel will yield applications easier to comprehend." *Ante*, at 2594. Even assuming the majority's paternalism

is accurate, there is no evidence that the Michigan courts currently have difficulty adjudicating leave applications. At the least, the majority leaves unexplained why the Michigan courts have greater difficulty than do state and federal courts considering discretionary direct appeals and collateral proceedings. And even assuming the Michigan courts have special difficulty, it is unlikely any marginal gains will offset the harms wrought by the majority's preference for redistributing resources to a set of generally less meritorious claims. Whether or not one agrees with ⌊₆₃₇the policy choice made by Michigan voters, it is perfectly constitutional.

### III

Even assuming that there is a right to appointed appellate counsel in these circumstances, the right, like the vast majority of other procedural rights, is waivable, despite the majority's dictum to the contrary. Moreover, Michigan's statutory prohibition on appointed appellate counsel does not prevent defendants from waiving any constitutional right to such counsel. And, in this case, Halbert's waiver was knowing and intelligent.

### A

Legal rights, even constitutional ones, are presumptively waivable. *United States v. Mezzanatto,* 513 U.S. 196, 200–201, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995); see also *New York v. Hill,* 528 U.S. 110, 114, 120 S.Ct. 659, 145 L.Ed.2d 560 (2000); *Peretz v. United States,* 501 U.S. 923, 936, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991) ("The most basic rights of criminal defendants are . . . subject to waiver"). The presumption of waivability holds true for the right to counsel. This Court has held repeatedly that a defendant may waive that right, both at trial and at the entry of

a guilty plea, so long as the waiver is knowing and intelligent. *Iowa v. Tovar,* 541 U.S. 77, 88, 124 S.Ct. 1379, 158 L.Ed.2d 209 (2004); *Faretta v. California,* 422 U.S. 806, 835, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975); *Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 87 L.Ed. 268 (1942); *Johnson v. Zerbst,* 304 U.S. 458, 464–465, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). Michigan seeks a waiver no more extensive than those this Court has already sanctioned at other stages of a criminal proceeding: It asks defendants convicted by plea to waive the right to appointed counsel on appeal.

There may be some nonwaivable rights: ones "so fundamental to the reliability of the factfinding process that they may never be waived without irreparably discrediting the federal courts." *Mezzanatto, supra,* at 204, 115 S.Ct. 797 (internal quotation marks and brackets omitted). The right to appointed counsel on discretionary appeal from a guilty plea, however, ⌊₆₃₈is not one of them. Even assuming that the assistance of appellate counsel enhances the reliability of the factfinding process by correcting errors in that process, it cannot possibly be so fundamental to the process that its absence "irreparably discredit[s]" the federal courts, particularly since the Constitution guarantees no right to an appeal at all, *e.g., M.L.B.,* 519 U.S., at 110, 120, 117 S.Ct. 555. Furthermore, as I have explained, the record of a plea proceeding is fully adequate to enable discretionary review and, in turn, to permit the correction of errors in the factfinding process when necessary. *Supra,* at 2600 (explaining that a plea-convicted defendant does not face a record unreviewed by counsel, and does not lack any reasoned treatment of his claims). And, finally, even if the reliability of the appellate process rather than the trial process is the relevant consideration here, the assistance of appellate counsel is not

so fundamental to the appellate process that its absence deprives that process of meaning. *Supra,* at 2597–2598, 2600–2602. Cf. *Hill, supra,* at 116–117, 120 S.Ct. 659 (a constitutional protection may be waived even if it benefits society as well as criminal defendants).

Petitioner emphasizes the difficulty of the choice to which Michigan's statute puts criminal defendants: proceed to trial and guarantee the appointment of appellate counsel, or plead guilty and forgo that benefit. But this Court has repeatedly recognized that difficult choices are a necessary byproduct of the criminal justice system, and of plea bargaining in particular. See, *e.g., Mezzanatto, supra,* at 210, 115 S.Ct. 797; *Brady v. United States,* 397 U.S. 742, 750, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). Michigan's waiver requires a choice no more demanding than others criminal defendants regularly face.

### B

The majority maintains, first, that Halbert could not waive the right to appointed appellate counsel because Michigan law afforded him no such right to waive; second, in dictum, that the right cannot be waived; and, third, that even if the ⌊639⌋right can be waived, Halbert did not knowingly and intelligently waive it here. The Court is wrong in each respect.

### 1

The majority claims that "[a]t the time he entered his plea, Halbert, in common with other defendants convicted on their pleas, had no recognized right to appointed appellate counsel he could elect to forgo." *Ante,* at 2594. This assertion apparently refers to the Michigan statute, Mich. Comp. Laws Ann. § 770.3a (West 2000). At the time of Halbert's plea, the statute provided that, if a defendant was convicted

by plea, he generally could not receive appointed appellate counsel. The majority's reasoning is flawed for at least three reasons.

First, the statement that "Halbert, in common with other defendants convicted on their pleas, had no recognized right to appointed appellate counsel," *ante,* at 2594, is either incorrect or irrelevant. If we view (as we must) the waiver decision from the perspective of Halbert and other defendants *before entering a plea,* the statement is wrong as a matter of Michigan law. The Michigan Court Rules applicable at the time of Halbert's plea explicitly provided that he was entitled to appointed appellate counsel if convicted following a trial. Mich. Ct. Rule 6.425(F)(1)(b) (Lexis 2001) ("In a case involving a conviction following a trial, if the defendant is indigent, the court must enter an order appointing a lawyer if the request is filed within 42 days after sentencing or within the time for filing an appeal of right"). Michigan law thus gave Halbert, before entering a plea, the choice either to proceed to trial and guarantee himself appointed appellate counsel, or to plead guilty or no contest and forgo appointed appellate counsel in most circumstances.

Alternatively, by stating that "Halbert, in common with other defendants convicted on their pleas, had no recognized right to appointed appellate counsel," *ante,* at 2594, the majority might mean that Michigan law afforded Halbert no right to appointed appellate counsel following a plea-based conviction.⌊640⌋ If so, the statement is true but irrelevant. Of course Michigan law did not afford Halbert a right to appointed counsel once he pleaded no contest to the charged crimes. But the question is whether, by pleading no contest with knowledge of the condition (no paid counsel on appeal), Halbert accepted the condition and thereby waived his right to paid

counsel on appeal. In other words, the question is whether Halbert had no right to counsel following his plea, because he had elected to forgo the right *by pleading.*

Second, even if the majority were correct about Michigan law, that is beside the point. At issue here is whether Halbert waived any federal constitutional right to appointed appellate counsel he might have enjoyed. Whether Michigan law provides for such counsel says nothing about whether a defendant possesses (and hence can waive) a federal constitutional right to that effect. That Michigan, as a matter of state law, prohibited Halbert from receiving appointed appellate counsel if he pleaded guilty or no contest is irrelevant to whether Halbert had (and could waive) an independent federal constitutional right to such counsel.

Third, the majority implies that if the existence of a right to paid appellate counsel had been something more than "no[t] recognized" at the time of Halbert's plea, then the right would have been waivable, *ibid.* What this cryptic statement means is unclear. But it cannot possibly mean that only rights that have been explicitly and uniformly recognized by statute or case law may be waived. If that is what the statement means, then the majority has outlawed all conditional waivers (ones in which a defendant agrees that, if he has such a right, he waives it).

I take it instead that the reference to rights that are something more than "no[t] recognized," and hence waivable, *ibid.,* means not just rights that are uniformly

recognized, but also rights whose existence is unsettled. If this understanding of the majority's rule is correct, then the rule does not justify its claim that the constitutional right at issue was |₆₄₁wholly unrecognized. In fact, the existence of such a right was unsettled when Halbert entered his plea. By that date, November 7, 2001, the Michigan Supreme Court had issued *Bulger,* 462 Mich. 495, 614 N.W.2d 103, sustaining over a vigorous dissent the practice of denying the appointment of appellate counsel on application for leave to appeal a plea-based conviction; and a Federal District Court had enjoined Michigan state judges from denying the appointment of appellate counsel to indigents pursuant to the state statute, on the ground that the statute was unconstitutional, *Tesmer v. Kowalski,* 114 F.Supp.2d 622, 625–629 (E.D.Mich.2000). The majority appears to focus on the fact that Michigan law did not afford defendants this right, but, again, state law is irrelevant to whether they possessed a federal constitutional right. The existence of that right was unsettled at the time of Halbert's plea; hence, on what I take to be the majority's own terms, the right should have been waivable.[2]

The majority attempts to deflect this criticism by saying that "nothing in Halbert's plea colloquy indicates that he waived an 'unsettled' ... but assumed right to the assistance of appointed appellate counsel, postplea." *Ante,* at 2594, n. 7. But any arguable inadequacy in the plea colloquy is a separate issue from, and is

---

**2.** Moreover, the majority's failure to make clear which sources of law are to be considered in deciding whether a right is "no[t] recognized," *ante,* at 2594, and hence non-waivable, is bound to wreak havoc. For instance, suppose that a defendant waived the right to appeal his sentence after the regional Court of Appeals had held that the principle of *Blakely v. Washington,* 542 U.S. 296, 124

S.Ct. 2531, 159 L.Ed.2d 403 (2004), did not apply to the United States Sentencing Guidelines, but before this Court held the contrary in *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). The defendant could claim that, in his circuit, the Sixth Amendment right against the application of the Guidelines was "no[t] recognized," and hence that the right was nonwaivable.

irrelevant to, the question at hand: whether the right was recognized, and hence waivable, by Halbert (or any other defendant deciding how to plead), irrespective of the content of the plea colloquy.

### |₆₄₂2

The majority compounds its error by expressing doubt in dictum that the right to appointed appellate counsel can be waived. *Ante,* at 2594–2595, n. 8. This ignores the well-established presumption of waivability, *e.g., Mezzanatto,* 513 U.S., at 200–201, 115 S.Ct. 797; *Hill,* 528 U.S., at 114, 120 S.Ct. 659. By ignoring the presumption, the majority effectively reverses it, espousing an analysis that is "directly contrary to the approach we have taken in the context of a broad array of constitutional and statutory provisions." *Mezzanatto, supra,* at 200, 115 S.Ct. 797. For the proposition that Michigan's waiver requirement is unconstitutional, the majority cites *Douglas,* 372 U.S., at 357–358, 83 S.Ct. 814, and *M.L.B.,* 519 U.S., at 110–113, 117 S.Ct. 555, which explained that States cannot create unreasoned distinctions between indigent and moneyed defendants. *Ante,* at 2594–2595, n. 8. These cases have nothing to do with waiver; they determined only that certain rights existed, not that they both existed *and were nonwaivable.*

The majority seems to think that Michigan's waiver requirement arbitrarily distinguishes between indigents and more affluent persons. As I have explained, however, the statute does no such thing. Rather, it sensibly differentiates between defendants convicted at trial and defendants convicted by plea. *Supra,* at 2589. The majority's dictum fails to persuade.

### 3

In this case, the plea colloquy shows that Halbert's waiver was knowing and intelligent, and that any deficiency in the plea colloquy was harmless. See 28 U.S.C. § 2111; cf. Fed. Rule Crim. Proc. 11(h). First, Halbert understood he was waiving any appeal as of right: The trial court asked Halbert, "You understand if I accept your plea you are giving up or waiving any claim of an appeal as of right," and Halbert answered "Yes, sir." App. 22. Second, the court explained the statutory exceptions governing when counsel must or |₆₄₃might be appointed, and Halbert again indicated that he understood those conditions. *Ante,* at 2598 (quoting colloquy). In context, the court's enumeration of the limited conditions in which counsel might be appointed informed Halbert that counsel would not be appointed in other circumstances. Third, at the end of the colloquy, the court asked counsel, "Any other promises or considerations I should be made aware of?" App. 24, and "Do counsel believe I've complied with the court rule regarding no contest pleas?" *id.,* at 25, both of which questions the prosecutor and defense attorney answered in the affirmative. Cf. *Bradshaw v. Stumpf, ante,* 545 U.S., at 183, 125 S.Ct. 2398, 162 L.Ed.2d 143 ("Where a defendant is represented by competent counsel, the court usually may rely on that counsel's assurance that the defendant has been properly informed of the nature and elements of the charge to which he is pleading guilty"). Fourth, the court "f[ound] the plea understandingly made, voluntary and accurate." App. 25. There can be no serious claim that Halbert would have changed his plea had the court provided further information.

\* \* \*

Today the Court confers on defendants convicted by plea a right nowhere to be found in the Constitution or this Court's cases. It does so at the expense of defendants whose claims are, on average, likely

**2606**      125 SUPREME COURT REPORTER      545 U.S. 643

more meritorious. And it ignores that, even if such a right exists, it is fully waivable and was waived in this case. I respectfully dissent.



545 U.S. 596, 162 L.Ed.2d 544

**Francis A. ORFF, et al., Petitioners,**

**v.**

**UNITED STATES et al.**

**No. 03–1566.**

Argued Feb. 23, 2005.

Decided June 23, 2005.

**Background:** Farmers brought suit alleging that federal government breached its contract with irrigation district by reducing its allocation of water to district. The United States District Court for the Eastern District of California, Wanger, J., ruled for government. Farmers appealed. The United States Court of Appeals for the Ninth Circuit, 358 F.3d 1137, affirmed. Certiorari was granted.

**Holding:** The Supreme Court, Justice Thomas, held that Reclamation Reform Act did not waive government's sovereign immunity.

Affirmed.

**1. United States** ⟲125(6)

Waiver of sovereign immunity must be strictly construed in favor of the sovereign.

---

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of

**2. United States** ⟲125(22)

    **Waters and Water Courses** ⟲222

Reclamation Reform Act did not waive sovereign immunity with respect to farmers' claim that they were intended third-party beneficiaries of government's contract with irrigation district; provision giving consent "to join the United States as a necessary party defendant in any suit to adjudicate" certain rights under federal reclamation contract granted consent to join United States in action between other parties when action required construction of reclamation contract and joinder of United States was necessary, and did not permit a plaintiff to sue United States alone. Reclamation Reform Act of 1982, § 222, 43 U.S.C.A. § 390uu.

---

⌊596⌋*Syllabus* *

Petitioner California farmers and farming entities purchase water from respondent Westlands Water District, which receives its water from the United States Bureau of Reclamation under a 1963 contract between Westlands and the Bureau. In 1993, Westlands and other water districts sued the Bureau for reducing their water supply. Petitioners, though not parties to the 1963 contract, intervened as plaintiffs. After negotiations, all parties except petitioners stipulated to dismissal of the districts' complaint. Petitioners pressed forward with, as relevant here, the claim that the United States had breached the contract. They contended that they were third-party beneficiaries entitled to enforce the contract and that the United States had waived its sovereign immunity from breach of contract suits in a provision of the Reclamation Reform Act of 1982, 43 U.S.C. § 390uu. The District Court ultimately held that petitioners were neither

the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.